**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CURTIS WESTLEY, *et al.*,

        Plaintiffs,

    v.

OCLARO, INC., *et al.*,

        Defendants.

_____/

No. C-11-2448 EMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS SECOND
AMENDED COMPLAINT**

**(Docket No. 63)**

      Plaintiffs have filed a class action against Oclaro, Inc. and two of its officers, Alain Couder and Jerry Turin, for violations of the federal securities laws.  In essence, Plaintiffs charge Defendants with making false and misleading statements about Oclaro's customer demand and how Oclaro could be expected to fare for the first quarter of 2011 ("1Q11") and for the calendar year.  *See* SAC ¶ 1.  Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' second amended complaint ("SAC").  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion to dismiss.

## I.    FACTUAL & PROCEDURAL BACKGROUND

      In their SAC, Plaintiffs allege as follows.

      Oclaro is a company that manufactures and distributes core optical network components and subsystems to global telecom equipment manufacturers.  *See* SAC at 1 n.1; *see also* SAC ¶ 20. During the class period, Mr. Couder was Oclaro's CEO and a member of the board of directors.  *See* SAC ¶ 21.  During the class period, Mr. Turin was Oclaro's CFO.  *See* SAC ¶ 22.  The putative class

1   consists of persons who purchased or otherwise acquired Oclaro common stock between May 6 and

2   October 28, 2010.  *See* SAC ¶ 1.

3       According to Plaintiffs, from May to August 2010, Defendants made false statements that,

4   *e.g.*, (1) current customer demand for Oclaro's products was strong and that (2) revenues and

5   earnings for 1Q11 would increase.  *See* SAC ¶ 1.

6   A.   <u>False Statements</u>

7       1.   <u>May 2010</u>

8       On May 6, 2010, Oclaro filed a Form 424(b)(5) Prospectus Supplement with the SEC for a

9   secondary offering of 6.9 million shares of common stock to the public.  *See* SAC ¶¶ 2, 4, 40.  In the

10  SEC filing, Oclaro stated that: (1) "We are currently seeing a return of customer demand which had

11  decreased as a result of economic conditions in the preceding 18 to 24 months"; and (2) "customer

12  demand has recently increased in our markets."  SAC ¶ 40.

13      Plaintiffs allege that the above statements were false because, in fact, Oclaro "had

14  experienced a material decline in customer order trends in [April 2010]."  SAC ¶ 45.  Plaintiffs

15  claim that, as a result of the April 2010 decline, Oclaro's book-to-bill ratio declined from 1.35 (in

16  March 2010) to just over 1 (in June 2010).  *See* SAC ¶¶ 6-7.  A book-to-bill ratio is the ratio of

17  orders taken (booked) to products shipped and bills sent (billed).  It is used as a tool in determining

18  whether demand for a product is rising or falling.  "'A ratio of above 1 implies that more orders were

19  received than filled, indicating strong demand, while a ratio below 1 implies weaker demand.'"

20  SAC at 3 n.4.

21      2.   <u>June 2010</u>

22      In June 2010, Mr. Turin made statements at a conference (the RBC conference), indicating

23  that (1) Oclaro was experiencing a surge in customer demand and that (2) customer demand was true

24  customer demand – *i.e.*, not just a reflection of customers building up their inventories – which

25  Oclaro knew because (a) it was close to its customers and therefore had visibility into what their

26  ///

27  ///

28  ///

2

1   needs were[1] and (b) the book-to-bill ratio did not stay at the level of 1.35 (from March 2010).[2]  *See*

2   SAC ¶¶ 8, 47-48.

3          According to Plaintiffs, these statements were false because, as noted above, there had

4   actually been a decline in customer demand in April 2010.  *See* SAC ¶ 49.  Plaintiffs also claim that

5   the statement about Oclaro's visibility into its customers needs was false because a confidential

6   witness – a former Oclaro vice president of sales – confirmed that "purported close customer

7   relationships could not be converted in any way into confidence in the strength of firmness of

8   customer orders."  SAC ¶¶ 13; *see also* SAC ¶¶ 32, 49, 76.  According to the confidential witness,

9   "Oclaro's customers were often reluctant to provide detailed information about their own needs to

10  that suppliers like Oclaro would not dedicate manufacturing capacity to other customer's needs,"

11  and "these nuances are known to those who are experienced in the industry" as well as to Mr. Turin

12  and Mr. Couder specifically.  SAC ¶ 76(c).  Thus, at best, Defendants "only had good visibility or a

13  'good grip' into customer demand for about two weeks forward" but, "beyond a couple [of] weeks, .

14  . . visibility into what customers might do with orders scheduled for even 30 days out was 'a reach'

15  and beyond that was 'a crap shoot.'"  SAC ¶ 76(d).

16         3.   July and August 2010

17         On July 29, 2010, Oclaro issued a press release announcing its 4Q10 and FY10 financial

18  results.  *See* SAC ¶ 52.  In the same press release, Oclaro reported "accelerated and increasing

19  financial forecasts," in particular, for 1Q11.[3]  SAC ¶ 52.  For example, for 1Q11, revenues were

20  expected to be in the range of $120 to $126 million, and non-GAAP gross margins in the range of 31

21  to 33%.  *See* SAC ¶ 53.

---

22   [1]  Mr. Turin stated: "'[W]e're pretty close to our customers and pretty close to what they're
23   doing from a forecast and volume point of view.'" SAC ¶ 48.

24   [2]  Mr. Turin suggested that, if the book-to-bill ratio had stayed high "for a couple of quarters,
     then you might be building up something in the system" – *i.e.*, the customers might be building up
25   their inventories.  SAC ¶ 48.

26       Mr. Turin and Mr. Couder also suggested that the customer demand was actually based on
     true end user need "in part because of the short lead times associated with customer demand
27   requirements."  SAC ¶ 34 (quoting a statement by Mr. Turin that "'I don't think ultra short lead
     times are consistent with an inventory rebuild'").

28   [3]  1Q11 would end on October 2, 2010.  *See* SAC ¶ 53.

3

United States District Court

For the Northern District of California

1    On July 29, 2010, Oclaro also held a conference call to discuss the 4Q10 and FY10 financial

2    results.  During the call, Mr. Turin made statements about Oclaro's current strong customer demand.

3    *See* SAC ¶ 54.  He also made statements about how Oclaro was expected to perform in 1Q11,

4    consistent with the press release described above, and even beyond.  *See* SAC ¶¶ 56-57.  Similar to

5    above, Mr. Turin attributed the customer demand to true customer demand and not inventory

6    buildup by customers.  *See* SAC ¶ 58.

7    Finally, during the July 29, 2010, conference call, Mr. Turin suggested that Oclaro would

8    meet its 1Q11 forecast because, as of that date, "85% to 90% of orders needed to meet [the] 1Q11

9    outlook were already secured," with these "order figures represent[ing] end user demand, rather than

10   customers stocking up on inventory."  SAC ¶ 11; *see also* SAC ¶¶ 58-59.  Mr. Turin declined to

11   answer analyst questions about whether the absolute level of orders had declined.[4]  *See* SAC ¶ 59.

12   Plaintiffs suggest that this was because Mr. Turin knew that orders had declined, not increased, from

13   the quarter ending March 2010.  *See* SAC ¶ 76(e).  Plaintiffs indicate that Mr. Turin was aware of

14   the decline because he got weekly bookings reports and "thus [was] aware of order flows on a

15   weekly basis."  SAC ¶ 45.

16   Shortly thereafter, on August 11, 2010, Mr. Turin made comments during a conference (the

17   Morgan Keegan conference), during which he reiterated that (1) Oclaro had 90% coverage for 1Q11

18   and (2) customer demand was strong for all Oclaro products.  *See* SAC ¶ 73.  When Mr. Turin was

19   questioned about his claim of 90% coverage, he indicated that he was confident about the number

20   because Oclaro had only a few large customers and had close relationships with those customers.

21   *See* SAC ¶¶ 74-75.  This visibility "virtually removed the risk of inventory build up and order

22   cancellations."  SAC ¶ 74.  Mr. Turin also indicated that Oclaro's customers had "'push[ed] most of

23   the inventory risk back on us . . . . There's not a lot of room in their food chains to build up

24   inventory.'"  SAC ¶ 75.

25   ///

26   ///

27

28   ───────────────

[4]  In third-party reports, analysts repeated the statements that had been made during the
conference call.  *See* SAC ¶¶ 71-72.

United States District Court

For the Northern District of California

1    Plaintiffs maintain that the above statements were false because, as noted above,  a

2    confidential witness – a former Oclaro vice president of sales – has reported that Oclaro does not in

3    fact have visibility into customer needs.  *See generally* SAC ¶ 76.

4    B.    Disclosures of Truth

5    As alleged in the SAC, the truth was partially disclosed on July 29, 2010, and subsequently

6    on October 28, 2010.

7    Plaintiffs allege that there was a partial disclosure on July 29, 2010, because, during the

8    conference call on that day, Mr. Turin admitted that there was "'a little bit of a slowdown in early

9    April [2010] as people digested the huge order flow in March.'"  SAC ¶ 59.  Plaintiffs allege that,

10   although there was a decrease in Oclaro's stock price as a result of this disclosure in July, *see, e.g.*,

11   SAC ¶¶ 66-67; SAC at 26 n.7 (pointing to analyst reports suggesting a link between the decrease in

12   the book-to-bill ratio to the decline in stock price), the stock price remained artificially inflated

13   because of Defendants' "continued misleading statements concerning increasingly strong customer

14   demand, claims of significant visibility into customer needs, and [claims] that the Company already

15   had 85% to 90% of the order coverage . . . needed to meet its increased 2Q11 forecasts."  SAC ¶ 70.

16   According to Plaintiffs, the final disclosure took place on October 28, 2010, when Oclaro

17   issued a press release in which it reported, *inter alia*, its 1Q11 financial results (ending October 2,

18   2010).  *See* SAC ¶ 82.  Previously, Oclaro had predicted – for 1Q11 – revenues in the range of $120

19   to $126 million and non-GAAP gross margins in the range of 31 to 33%.  *See* SAC ¶ 53.  As it

20   turned out, Oclaro's revenues were on the low end of the range for 1Q11 ($121 million) and it

21   missed its gross margins (29%).  *See* SAC ¶ 82.  Apparently, these results were due to a decrease in

22   customer demand, with customer cancellations beginning in at least the second week of September

23   2010.  *See* SAC ¶¶ 82(d), 84, 87-88.  During a conference call on October 28, 2010, Mr. Couder

24   admitted to customer cancellations in September 2010 (inventory corrections) and to limited

25   visibility into customer needs.  *See* SAC ¶ 84.

26   C.    Claims

27   Based on, *inter alia*, the above allegations, Plaintiffs have asserted two federal securities

28   claims against Oclaro and its executives Mr. Couder and Mr. Turin:

United States District Court

For the Northern District of California

(1)     Violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

(2)     Violation of § 20(a) of the Act.

In the pending motion to dismiss, Defendants seek dismissal of both claims.

## II.   DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

In ruling on a motion to dismiss, a court may consider not only the complaint itself but also documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  In the instant case, Defendants have filed a request for judicial notice.  Plaintiffs have made a partial objection to the request.  Where it is necessary for the Court to make a ruling, it has so indicated in this order.  In essence, the Court may take judicial notice of everything except for the presentations/handouts given at conferences.  (This would not include the July 2010 conference call headed up by Oclaro itself.)

///

///

B.      Elements of § 10(b)/10b-5 Claim

As noted above, Plaintiffs have asserted two claims against Defendants: (1) a § 10(b)/10b-5 claim and (2) a § 20(a) claim.  Section 10(b) and Rule 10b-5 essentially impose liability for securities fraud.  There are five elements that must be proven to establish a violation of Rule 10b-5.  More specifically, a plaintiff must show "'(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.'"  *Id.* at 990.  As for § 20(a), it essentially provides for derivative liability; that is, it "makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations."  *Id.*

Because Plaintiffs have brought securities fraud claims, Rule 12(b)(6) is not the only governing legal standard; so too are Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  As for the PSLRA, it requires that a plaintiff alleging securities fraud

> "plead with particularity both falsity and scienter."  Thus, to properly allege falsity, a securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed."  To adequately plead scienter, the complaint must now "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."

*Zucco*, 552 F.3d at 990-91 (emphasis added).

In the instant case, Defendants challenge Plaintiffs' securities fraud claims on the ground that Plaintiffs have failed to adequately plead both falsity and scienter.  Defendants also argue that Plaintiffs have inadequately pled loss causation.

B.      Falsity

1.      May and June 2010 Statements

Plaintiffs assert that Defendants made false and misleading statements in May and June 2010 by referring to strong current customer demand when, in fact, just in April 2010, Oclaro had

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    experienced a slowdown in such demand. Previously, the Court held that there were insufficient

2    allegations that the slowdown was material:

> As the complaint currently stands, there is essentially no indication
> that the slowdown was significant or material. For example, the
> slowdown was only for "a little bit." FAC ¶ 58. Furthermore, it
> appears that there was a slowdown only from "the huge order flow
> [that Oclaro had] in March." FAC ¶ 58. There is nothing to indicate
> that the slowdown meant that Oclaro's order levels had, *e.g.*, dropped
> below normal or was instead a drop relative to an unusually strong
> March. This is particularly true since it appears that the performance
> for the entire quarter met expectation.

8    Docket No. 58 (Order at 3).

9        In their papers, Defendants argue that Plaintiffs have still failed to establish that the April

10   2010 slowdown was material. Defendants emphasize that the huge customer demand in March was

11   the anomaly and suggest that the April slowdown was just part of a trend back to more normal or

12   rational numbers by June. *See* Mot. at 5. Moreover, there is no dispute that Oclaro had a strong

13   quarter, exceeding its guidance. *See* Mot. at 6.

14       Defendants' argument is not without force. While this is a close question, the Court

15   concludes that given the inferences that must be drawn in Plaintiffs' favor and the applicable

16   standard of materiality, a dismissal under Rule 12(b)(6) is not warranted. "For purposes of securities

17   fraud, 'materiality depends on the significance the reasonable investor would place on the withheld

18   or misrepresented information.' A statement is material if 'a reasonable investor would have

19   considered it useful or significant.'" *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011).

20   Even if March was the anomaly, that does not necessarily mean that a reasonable investor would

21   deem a subsequent decline – even if to more regular levels – unimportant. As a point of comparison,

22   in *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd* 131 S. Ct. 1309

23   (2011), the Ninth Circuit disagreed with the district court's conclusion that the plaintiffs had failed

24   to adequately allege materiality because the number of complaints of which the defendants were

25   aware was not statistically significant. The court emphasized: "In relying on the statistical

26   significance standard to determine materiality, the district court made a decision that should have

27   been left to the trier of fact." *Id.* at 1179. "Questions of materiality . . . involv[e] assessments

28   peculiarly within the province of the trier of fact. Thus, the ultimate issue of materiality [is]

United States District Court

For the Northern District of California

1    appropriately resolved as a matter of law only where the omissions are so *obviously* important to an

2    investor, that reasonable minds cannot differ on the question of materiality." *Id.* at 1178 (emphasis

3    added; internal quotation marks omitted); *see also Matrixx*, 131 S. Ct. at 1318-19 (rejecting "a

4    bright-line rule that reports of adverse event associated with a pharmaceutical company's products

5    cannot be material absent a sufficient number of such reports to establish a statistically significant

6    risk that the product is in fact causing the events").

7      That a reasonable investor might deem the decline in the instant case important is supported

8    by allegations in Plaintiffs' complaint – in particular, allegations that (1) the April 2010 downturn

9    was responsible for the decline in the book-to-bill ratio from 1.35 in March 2010 to just over 1 in

10   June 2010, *see* SAC ¶ 63, and that (2) the July 2010 disclosure of the decline in the book-to-bill ratio

11   led to an immediate decline in the stock price.  *See* SAC ¶ 65; *No. 84 Employer-Teamster Joint*

12   *Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003)

13   (noting that even if slightly delayed decline in stock price after a disclosure supports a finding of

14   materiality).  The fact that several securities analysts posited the stock price drop was due, at least in

15   part, to the decline in the book-to-bill ratio also supports a finding of materiality.  *See* SAC ¶ 66

16   (noting that the Bloomberg report stated: "Some investors may be disappointed in the deceleration in

17   [Oclaro] book-to-bill"); SAC ¶ 67 (noting that the Auriga report stated: "[T]his deceleration may

18   disappoint certain class of investors"; although adding that "the steady growth prospects should be

19   seen as a positive by longer-term shareholders"); SAC at 26 n.7 (noting that Stifel report noted: "The

20   undue weakness in the stock and sector was likely due to investors interpreting a sharp fall in the

21   book-to-bill . . . as a sign that the optical cycle was ending and the industry would return to a trend

22   of declining profitability as supply exceeds demand after several quarters of the industry being

23   supply constrained").

24     In their papers, Defendants argue that there were other reasons for the decline in the stock

25   price, *see, e.g.*, Reply at 4, 14-15, but this is really a loss causation argument rather than one of

26   materiality.  As noted above, Defendants also suggest that the April 2010 slowdown was not

27   material because Oclaro actually exceeded its guidance for the quarter that covered the May and

28   June 2010 statements.  *See* Mot. at 6.  While this is certainly a significant fact that favors

Defendants, it does not establish as a matter of law that the April 2010 decline was not material.  As

Plaintiffs point out, in *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), the Second

Circuit found the lower court's materiality analysis problematic precisely because it

> place[d] too much emphasis on . . . the fact that a loss in one portfolio
> company might be offset by a gain in another portfolio company.  [The
> defendant] is not permitted, in assessing materiality, to aggregate
> negative and positive effects on its performance fees in order to avoid
> disclosure of a particular material negative event.  *Cf.* SAB No. 99,
> Fed. Reg. at 45,153 (noting in the context of aggregating and netting
> multiple misstatements that "[r]egistrants and their auditors first
> should consider whether each misstatement is material, irrespective of
> its effect when combined with other misstatements").  Were we to
> hold otherwise, we would effectively sanction misstatements in a
> registration statement or prospectus related to particular portfolio
> companies so long as the net effect on the revenues of a public private
> equity firm like [the defendant] was immaterial.

*Id.* at 719.  Furthermore, in *Fecht v. Price Co.*, 70 F.3d 107 (9th Cir. 1995), the Ninth Circuit

implicitly rejected the lower court's reasoning that, as a matter of law, "the defendants' failure to

disclose the losses sustained by the warehouses opened in the expansion program was not a material

omission because it is the profitability of the Company as a whole, not any one particular aspect of

the Company's operations, that is significant."  *Id.* at 1080 (emphasis omitted).

For the reasons stated above, the Court holds that Plaintiffs have alleged enough facts which,

while not very compelling, suffice to support a finding of materiality for purposes of Rule 12(b)(6)

where all reasonable inferences are drawn in Plaintiffs' favor.  To the extent Plaintiffs claim that

there were statements in June 2010 about good customer visibility which were false, that is, in

essence, addressed in the next section below.

   2. <u>July and August Statements</u>

For the July and August statements, Plaintiffs seem to arguing falsity with respect to

statements that Oclaro already had 85-90% order coverage for 1Q11; statements that orders

represented true end-user demand and not an inventory buildup; and statements that Defendants had

"a great deal of visibility" into what their customer needs are.  SAC ¶ 76(a).  Plaintiffs also argue

that forecasts about 1Q11 and beyond were false and misleading in that they were premised on

purported visibility into customer demand and purported order coverage of 85-90%.  These

statements are all related.  In other words, Plaintiffs seem to be taking the position that:  (1)

**United States District Court**
For the Northern District of California

1    statements about 85-90% coverage were false and misleading because Defendants did not

2    adequately disclose the risk that these orders could be cancelled and in fact suggested that the orders

3    were firm by touting good customer visibility; and (2) statements about true end-user demand were

4    false and misleading because Defendants did not actually know this to be the case because they

5    lacked good customer visibility although they claimed to the contrary.  Thus, this claim of falsity

6    turns on Defendants' claims of good customer visibility.  According to Plaintiffs, Defendants lacked

7    good customer visibility; in support of this allegation, Plaintiffs rely on a confidential witness known

8    as FE1.

9        As pled in the complaint, "FE1 is a former Oclaro Senior Vice President of Sales who

10   worked at the Company between 2007 and 2011.  FE1 was responsible for sales of all Oclaro's

11   products . . . ."  SAC ¶ 76(b).  According to FE1, "Oclaro's customers were often reluctant to

12   provide detailed information about their own needs so that suppliers like Oclaro would not dedicate

13   manufacturing capacity to other customer's needs."  SAC ¶ 76(c).  Furthermore, according to FE1,

14   even though Mr. Turin "regularly met with top executives at Oclaro's key customer accounts," and

15   even though there were "good relationships with customers," Defendants "only had good visibility

16   or a 'good grip' into customer demand for about two weeks forward"; "the Company was not likely

17   to receive cancellations of orders scheduled to be delivered less than a couple weeks out."  SAC ¶

18   76(d).  "[B]eyond a couple [of] weeks, . . . visibility into what customers might do with orders

19   scheduled for even 30 days out was 'a reach' and beyond that was 'a crap shoot.'"  SAC ¶ 76(d).

20       Defendants challenge Plaintiffs' reliance on FE1 in three way.  First, they argue that FE1's

21   statements lack foundation.  Second, they argue that the statements are lacking in factual

22   particularity.  Finally, they argue that FE1's explanation of Oclaro's visibility into customer demand

23   is consistent with Defendants' contemporaneous statements about customer visibility.

24       As to the first argument, Defendants fail in any substantive way to establish why FE's

25   statements are lacking in foundation.  In fact, Ninth Circuit case law indicates that a court's concern

26   with respect to a confidential witness is whether he or she is "described with sufficient particularity

27   to establish [his or her] reliability and personal knowledge" – *i.e.*, "'with sufficient particularity to

28   support the probability that a person in the position occupied by the source would possess the

1    information alleged.'" *Zucco*, 552 F.3d at 995 (discussing confidential witnesses whose statements

2    were introduced to establish scienter, as opposed to falsity).  Given that FE1 was a former senior

3    vice president responsible for all sales of Oclaro, it is a fair inference that he or she has knowledge

4    about what visibility Oclaro had into customers' needs.

5         As for the second argument, Defendants seem to contend that FE1's statements are lacking in

6    particularity because he or she fails to allege any specific information regarding customer orders

7    and/or cancellations.  *See* Mot. at 8; Reply at 6.  This argument is not particularly persuasive

8    because it is not clear why FE1 would have to point to specific customers orders and/or

9    cancellations simply to establish the falsity of a claim that Defendants had good customer visibility.

10        Finally, with respect to the third argument, it is hard to say, as a matter of law, that

11   Defendants' public statements about customer visibility are entirely consistent with FE1's

12   statements.  As alleged in the complaint, Mr. Turin stated the following at the Morgan Keegan

13   conference in August 2010:

14        "[W]e're very close to our customers.  The customer base we support
          are the major telecomm equipment companies and that's a close
15        relationship.  If I had 500 customers of the same size and you couldn't
          drill down to the different areas within the business, you would have
16        less visibility. *But we have a great deal of visibility with these guys.*
          We've not seen order cancellations.  When we come to a quarter and
17        there are orders that are unfulfilled, those tend to roll into the next
          quarter."

18

19   FAC ¶ 75 (emphasis added).  There were no real qualifications about customer visibility – *e.g.*, that

20   visibility was only short-term at best, as FE1 contends.

21        Admittedly, Defendants did make other public statements about customer orders.  For

22   example, in an SEC filing, Oclaro stated:

23        Some customers provide us with their expected forecasts for our
          products several months in advance, but many of these customers may
24        decrease, cancel or delay purchase orders already in place, and the
          impact of any such actions may be intensified given our dependence
25        on a small number of large customers.  If any of our major customers
          decrease, stop or delay purchasing our products for any reason, our
26        business and results of operations would be harmed.  Cancellation or
          delays of such orders may cause us to fail to achieve our short-term
27        and long-term financial and operating goals and result in excess and
          obsolete inventory.

28

Skola Decl., Ex. 5, at 40 (10Q).  These statements go more toward the issue of whether Defendants are immune from liability based on the safe harbor provision of the PSLRA or the bespeaks caution doctrine discussed below.  To the extent Defendants rely on Mr. Couder's statement, in the July 2010 conference call that "our customers have a very short visibility into carrier orders [a]nd, therefore, we get very short-term orders," Skola Decl., Ex. 3, at 9, that statement is more along the lines of what FE1 asserts.  However, short-term orders do not necessarily preclude visibility into customer needs on a longer-term basis.  Even if there were only short-term orders, that does not mean customers could not still give guidance to Defendants about what their needs would be on a longer-term basis.  Thus, again, it is hard to say, as a matter of law, that this statement is consistent with what FE1 contends.

The Court thus concludes that Plaintiffs have adequately alleged falsity with respect to the July and August 2010 statements as well.  The Court notes, however, that, while a reasonable jury could find falsity based on the allegations in the SAC, a reasonable jury could also decline to find such.  The general nature of the allegedly false statements makes this a less than compelling case.  Moreover, a reasonable jury could find that statements about 85-90% coverage were not misleading because the fact of such coverage at the time was true.  A reasonable jury could also find that statements about Oclaro's having "a great deal of visibility with [customers]," SAC ¶ 75, were not misleading in that Defendants did have close relationships with its customers (as FE1 essentially admits, *see* SAC ¶ 76(d)), Defendants did have visibility into customer needs for at least a few weeks out, and there had not been a history of order cancellations.  The Court only rules that when viewed in Plaintiffs' favor, the allegations that Defendants' statements were misleading are sufficient to survive a Rule 12(b)(6) motion.

C.      Safe Harbor/Bepeaks Caution

Defendants argue that, even if there is enough in the SAC to establish falsity, the safe harbor provision of the PSLRA and/or the bespeaks caution doctrine immunize them from liability.

Under the PSLRA's safe harbor provision:

> a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that –

United States District Court

For the Northern District of California

(A)      the forward-looking statement is –

(i)      identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .

15 U.S.C. § 78u-5(c)(1).  Because the bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision, *see Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (noting that the PSLRA safe harbor provision codifies the bespeaks caution doctrine for forward-looking statements); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (noting that "[t]he PSLRA created a statutory version of [the bespeaks caution] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements"), the Court addresses the two protections simultaneously and without differentiation.  *See, e.g.*, *In re Copper Mt. Secs. Litig.*, 311 F. Supp. 2d 857, 876 (N.D. Cal. 2004) (stating that "it is appropriate to consider the two protections simultaneously").

   1. <u>May and June 2010 Statements</u>

   As noted above, Plaintiffs claim that the comments in May and June 2010 about strong current demand were materially false or misleading because of the April 2010 slowdown.  Defendants admit that the safe harbor provision and the bespeaks caution doctrine apply to forward-looking statements only, and here Plaintiffs are challenging as false or misleading statements about strong *current* customer demand.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) (noting that "descriptions of the present aren't forward-looking").  Defendants argue that, nevertheless, the safe harbor provision and bespeaks caution doctrine are applicable because, even though the statements may be about current or present demand, that demand is being used to make predictions about the future, and, under 15 U.S.C. § 78u-5(i)(1)(D), not only are predictions about the future protected but also "any statement of the assumptions underlying or relating [thereto]."  15 U.S.C. § 78u-5(i)(1)(D).

   Defendants do have case authority to support their position, namely, *Hockey v. Medhekar*, No. C-96-0815 (MHP), 1997 WL 203704 (N.D. Cal. Apr. 15, 1997) (Patel, J.), and *In re Metawave*

1    *Communications Corp. Securities Litigation*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003).  In *Hockey*,

2    a company's predictions of increasing earnings were based on past or present facts, including robust

3    product demand.  According to Judge Patel, statements about these past or present facts were

4    covered by the safe harbor provision because they were "'assumptions underlying or relating to'

5    statements of future economic performance."  *Id.* at *5.  Similarly, in *In re Metawave*

6    *Communications Corp. Securities Litigation*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003), the

7    company projected favorable results in the future based on existing demand.  According to the court,

8    the statements about existing demand "are forward-looking statements because they are

9    'assumptions underlying or relating to' a financial projection or future economic performance."  *Id.*

10   at 1085.

11        While *Hockey* and *Metawave* support Defendants' position, they are in this Court's view

12   problematic.  Most notably, neither case explains how a past or present *fact* can be deemed an

13   "assumption."  Only assumptions underlying a prediction about the future are protected by the safe

14   harbor provision.  *See Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999) (noting that

15   "[o]bserved facts [about, *e.g.*, depressed customer orders] are not 'assumptions,' and they are not

16   any kind of prediction, either, that would put them within the definition of a forward looking

17   statement").

18        Moreover, there are a number of cases which expressly hold that statements about past or

19   present demand are not covered by the safe harbor provision.  For example, in *Makor Issues &*

20   *Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008), the Seventh Circuit noted that, when the

21   company

22           told the world that sales of its [product] were "still going strong," it
             was saying both that current sales were strong and that they would
23           continue to be so, at least for a time, since the statement would be
             misleading if [the company] knew that its sales were about to collapse.
24           The element of prediction in saying that sales are "still going strong"
             does not entitle [the company] to a safe harbor with regard to the
25           statement's representation concerning current sales.

26   *Id.* at 705; *see also Sgalambo v McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) (noting that

27   "[m]any of the alleged misstatements are not forward-looking because they either state a present or

28   historical fact alone or incorporate forward-looking aspects into statements of present or historical

fact" – *e.g.*, "[s]tatements reporting test results from the wells and predicting future well performance based on those results"); *Backe v Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1160 (S.D. Cal. 2009) (noting that "[p]laintiff alleges statements other than forward-looking statements that were false and misleading, such as financial results and statements concerning present product demand").

The Court finds these cases persuasive. The fact remains that a statement about a past or current fact can demonstrably be proven false. That is what distinguishes such facts from forward-looking predictions. The Court rejects Defendants' contention that the safe harbor provision or the bespeaks caution doctrine protects them from liability.

2.      July and August 2010 Statements

As above, Defendants argue that, even if they made any false or misleading statements in July and August 2010, those statements are protected by the safe harbor provision in the PSLRA or the bespeaks caution doctrine.

Similar to above, Plaintiffs contend that statements about current or present demand are not covered by either the safe harbor provision or the bespeaks caution doctrine as they are not forward looking. As to the forecast for 1Q11 and beyond, Plaintiffs do not dispute that they are, in essence, forward looking, thus putting the safe harbor provision and bespeaks caution doctrine into play. Plaintiffs argue, however, that any purported warnings were inadequate – at the very least, the Court cannot rule on their adequacy as a matter of law.

As a general matter, "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning. The cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Copper Mt. Secs. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004); *see also Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009) (stating that, "[t]o suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge'"); *Harris*, 182 F.3d at 807 (stating that, "when an investor has been warned of risks of a significance similar to that actually

1   realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision

2   about it according to her own preferences for risk and reward").

3       The statements at issue in July and August 2010 can be broken down into three groups: (1)

4   statements made in Oclaro's press release of July 29, 2010; (2) statements made during Oclaro's

5   conference call with analysts and investors, also on July 29, 2010; and (3) statements made during

6   the Morgan Keegan conference in August 2010.

7                a.   July 29, 2010 Press Release

8       A copy of the July 29, 2010, press release can be found in Oclaro's 8K filed on July 29,

9   2010.  *See* Skola Decl., Ex. 2 (press release).  In the press release, Oclaro made predictions about

10  how it would fare in 1Q11.  With respect to those predictions, Oclaro noted:

11          These statements are forward looking and actual results may differ
            materially.  Please see the Safe Harbor Statement in this earnings
12          release for a description of the important risk factors that could cause
            actual results to differ, and refer to Oclaro, Inc.'s most recent annual
13          and quarterly reports on file with the Securities and Exchange
            Commission (SEC) for a more complete description of the risks.
14

15  Skola Decl., Ex. 2, at 2.  The Safe Harbor Statement in the press release provided as follows:

16          There are a number of important factors that could cause actual results
            or events to differ materially from those indicated by such forward-
17          looking statements, including the impact of continued uncertainty in
            world financial markets and any resulting reduction in demand for our
18          products . . . as well as the factors described in Oclaro's most recent
            annual report on Form 10-K, most recent quarterly reports on Form
19          10-Q and other documents we periodically file with the SEC.

20  Skola Decl., Ex. 2, at 3.

21      Oclaro's 10Q filed on May 4, 2010, identified multiple risks related to its business, including

22  the following:

23  •   "[c]ontinued uncertain demand has had, and may continue to have, a material adverse effect

24      on our results of operations";

25  •   "[s]ome customers provide us with their expected forecasts for our products several months

26      in advance, but many of these customers may decrease, cancel or delay purchase orders

27      already in place, and the impact of any such actions may be intensified given our dependence

28      on a small number of large customers"; and

**United States District Court**
For the Northern District of California

- "[c]ancellation or delays of such orders may cause us to fail to achieve our short-term and long-term financial and operating goals and result in excess and obsolete inventory." Skola Decl., Ex. 4, at 40 (10Q).

It is a close call as to whether the language above constitutes meaningful cautionary language such that the safe harbor and/or bespeaks caution protection should apply. Notably, the warnings include "references to specific factors that were either the same or of similar significance to the actual causes of [Oclaro's] downturn." *Copper Mt.*, 311 F. Supp. 2d at 882. However, arguably, the warnings were not sufficient because they were not enough to counter Oclaro's more specific professed visibility into customer demand resulting from its close relationships with its customers. *Cf. SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (noting that "adequate cautionary language would have disclosed that – in September 2001, when the multi-million dollar profit projections were made – [the company was] operating at a loss"; adding that "[e]ven the statement '[t]he Company . . . has not yet generated any operating profit' fails to adequately caution how unrealistic [company's] profit projections were because . . . it fails to disclose that the Company was currently *losing* money") (emphasis in original). At least a reasonable jury could so find.

Under Ninth Circuit law, if there is a legitimate factual dispute as to whether that cautionary language is sufficient, then dismissal is not warranted. *See, e.g.*, *Livid Holdings*, 416 F.3d at 947 (stating that "[d]ismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading'"); *Fecht*, 70 F.3d at 1082 (in discussing bespeaks caution doctrine, stating that "[a] motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include '*enough* cautionary language or risk disclosure' that 'reasonable minds' could not disagree that the challenged statements were not misleading") (emphasis in original); *see also In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964, 972 n.12 (N.D. Cal. 2009) ("find[ing] that the application of the PLSRA safe harbor to any purely forward-looking statements involves a factual

1    dispute that is not appropriately resolved at the pleading stage"). The Court therefore cannot dismiss

2    the claims based on the statements made in the press release.

3                        b.    July 29, 2010 Conference Call

4            Similar to above, Oclaro made predictions about 1Q11 in the July 29, 2010, conference call

5    with analysts and investors.  During the conference call, the following cautionary statements were

6    made:

7                    Today's statements made about management's future
             expectations, plans or prospects of Oclaro and its business, including
8            statements concerning future financial targets and financial guidance .
             . . and Oclaro's plans, objectives, expectations and intentions with
9            respect to future operations, financial objectives, products and growth
             opportunities, and any assumptions underlying these statements
10           constitute forward-looking statements for the purposes of the Safe
             Harbor provisions of the [PSLRA].

11

12                   There are a number of important factors that could cause actual
             results or events to differ materially from those indicated by such
13           forward-looking statements, including the impact of continued
             uncertainty in the world financial markets and any resulting reduction
14           in demand for our products . . . as well as the factors described in
             Oclaro's most recent annual report on form 10-K, most recent
15           quarterly reports on form 10-Q, and other documents we periodically
             file with the SEC.

16   Skola Decl., Ex. 3, at 1-2 (conference call).  As noted above, Oclaro's 10Q filed on May 4, 2010

17   identified risks related to customer demand.

18           The published transcript of the conference call included an additional warning[5]:

19                   In the conference calls upon which Event Transcripts are
             based, companies may make projections or other forward-looking
20           statements regarding a variety of items.  Such forward-looking
             statements are based upon current expectations and involve risks and
21           uncertainties.  Actual results may differ materially from those stated in
             any forward-looking statement based on a number of important factors
22           and risks, which are more specifically identified in the companies'
             most recent SEC filings.  Although the companies may indicate and
23           believe that the assumptions underlying the forward-looking
             statements are reasonable, any of the assumptions could prove
24           inaccurate or incorrect and, therefore, there can be no assurance that
             the results contemplated in the forward-looking statements will be
25           realized.

26

27   _____

28       [5]  It does not appear that this warning was given during the conference call, but rather was
     added when the conference call was transcribed and published.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  Skola Decl., Ex. 3, at 15.

2      The analysis above with respect to the July 29, 2010, press release is largely applicable here

3  as well.  In fact, the above statements appear, if anything, more akin to non-specific boilerplate

4  warnings insufficient to confer immunity.  *See In re Copper Mt. Secs. Litig.*, 311 F. Supp. 2d at 882.

5  At the very least, reasonable minds could disagree as to the adequacy of the warnings (in particular,

6  those warnings incorporated by reference from the 10Q), and so dismissal is not warranted with

7  respect to the claims based on the conference call.

8              c.      August 2010 Morgan Keegan Conference

9      As noted above, the August 2010 statements were statements made by Oclaro at the Morgan

10 Keegan conference.  The cautionary language to which Defendants point is contained in a document

11 which appears to be a slide presentation.  *See* Skola Decl., Ex. 9 (Morgan Keegan conference

12 transcript); Skola Decl., Attachment C, at 16 (chart on cautionary language).  Defendants have asked

13 the Court to take judicial notice of the document but the document does not meet the standards of

14 Federal Rule of Evidence 201.  *See* Fed. R. Evid. 201(b) (providing that "[t]he court may judicially

15 notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the

16 trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources

17 whose accuracy cannot reasonably be questioned").  The Court therefore declines to dismiss the

18 claims based on the statements made at the Morgan Keegan conference at this time.

19 D.      Scienter

20      In addition to the element of falsity, Defendants challenge the adequacy of Plaintiffs'

21 pleading of the element of scienter.  As noted above, "[t]o adequately plead scienter, the complaint

22 must now 'state with particularity facts giving rise to a *strong inference* that the defendant acted

23 with the required state of mind.'"  *Zucco*, 552 F.3d at 991 (emphasis added).  "[W]hen 'determining

24 whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into

25 account plausible opposing inferences.'"  *Id.*  "[A] securities fraud complaint will survive a motion

26 to dismiss under Federal Rule of Civil Procedure 12(b)(6) 'only if a reasonable person would deem

27 the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw

28 from the facts alleged.'"  *Id.* (emphasis in original).  "The court must determine whether 'all of the

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* Hence, the element scienter under the PSLRA is subject to a more rigorous review than falsity or materiality.

### 1.   May and June 2010 Statements

The basic issue here is whether there are allegations supporting a strong inference that Defendants knew of the April 2010 slowdown and that the April 2010 slowdown belied Oclaro's claim of a "return to customer demand" and a recent increase and "surge" in customer demand. Based on the SAC, Plaintiffs seem to take the position that Defendants knew of the slowdown because, as Mr. Turin admitted during the July 2010 conference call, "we get weekly bookings reports." SAC ¶ 45 & Ex. 1, at 16 (conference call). Plaintiffs further argue that scienter can be inferred – at least with respect to the May 2010 statements – based on Defendants' motive to make misleading statements about strong current customer demand, *i.e.*, to ensure that the stock offering in May 2010 would be profitable, thus "enabl[ing] Oclaro to spend $19.5 million of the cash proceeds to make strategic investments [*e.g.*, an alliance with ClariPhy] and to acquire Mintera," both critical to Oclaro's future success. SAC ¶ 30.

### a.   Weekly Bookings Reports

Plaintiffs' reliance on the weekly bookings reports as a basis to establish knowledge is problematic in light of Ninth Circuit case law.

The Ninth Circuit has noted that

> [t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement. Past securities fraud litigants have relied on the fact that corporations typically produce internal reports, and have alleged that such reports contained negative information without ever having seen any particular documents. At its worst, this strategy allowed plaintiffs to bring securities fraud suits with little more basis than the fact that the stock price had fallen. We have held that "a proper complaint which purports to rely on the existence of internal reports would contain at least *some specifics from those reports* as well as such facts as may indicate their reliability."

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (emphasis added).

21

United States District Court

For the Northern District of California

1    In the instant case, even if the Court were to assume that the weekly bookings reports

2    identified by Plaintiffs were reliable, Plaintiffs have not provided any specifics about those reports.

3    Presumably, they show something about order bookings, but it is not clear whether, *e.g.*, the

4    information about bookings would be presented in such a way that Defendants would recognize a

5    monthly decline or, more to the point, a trend significant enough such that Defendants'

6    representation of a recent increase or surge in customer demand was likely knowingly or recklessly

7    false and misleading.  The Court concludes Plaintiffs have failed to make a "strong showing" of

8    scienter with respect to these representations.

9    In *In Re Silicon Graphics Securities Litigation*, 183 F.3d 970 (9th Cir. 1999), *abrogated on*

10   *other grounds as stated in South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008), the

11   plaintiff argued that the company's officers made positive statements about the company even

12   though they knew from internal reports that there were problems.  *See id.* at 984.  The plaintiff

13   identified three specific internal reports and even identified the specific problems that the reports

14   exposed.  *See id.* at 984 (noting that, according to the plaintiff, "the Flash reports, Financial

15   Statements/Packages and Stop Ship reports announced that: (1) SGI was not shipping the Indigo2

16   workstation in volume; (2) North American and European sales remained slow; and (3) SGI would

17   not meet its revenue and growth targets for FY96").  According to the plaintiff, "the officers

18   conducted several meetings during which they entered into a 'conspiracy of silence' whereby they

19   agreed to downplay the seriousness of the company's problems." *Id.* at 985.

20   The Ninth Circuit held that the plaintiff had failed to "plead facts to corroborate her

21   allegations." *Id.*

22        She does not mention, for instance, the sources of her information with
          respect to the reports, how she learned of the reports, who drafted
23        them, or which officers received them.  *Nor does she include an*
          *adequate description of their contents* which we believe – if they did
24        exist – would include countless specifics regarding ASIC chip
          shortages, volume shortages, negative financial projections, and so on.
25        We would expect that a proper complaint which purports to rely on the
          existence of internal reports would contain *at least some specifics from*
26        *those reports* as well as such facts as may indicate their reliability.

27             In the absence of such specifics, we cannot ascertain whether
          there is any basis for the allegations that the officers had actual or
28        constructive knowledge of [the company's] problems that would cause

22

their optimistic representations to the contrary to be consciously misleading.

*Id.* (emphasis added).

Similarly, in *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002), the Ninth Circuit concluded that there were insufficient allegations establishing a strong inference of scienter. The plaintiff in *Lipton* claimed that the company "knew that patient demand [for a drug manufactured by the company] was flat because the company had access to (1) internal reports on sales data and (2) . . . patient demand data [provided by IMS, an information vendor]. According to plaintiffs, both types of data informed the defendants that 1Q99 sales would be lower than investors were led to believe." *Id.* at 1035.

We first address plaintiffs' allegation that PathoGenesis "could regularly track its sales data" to show that the defendants knew or should have known that patient demand for TOBI [the drug] was flat during the class period. In *Silicon Graphics*, we explained that a "proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." Here, plaintiffs merely assert in conclusory terms that the defendants had access to internal data demonstrating a decline in sales of TOBI. Plaintiffs do not identify any internal reports of "sales data," much less plead, in any detail, the *contents* of any such report or the purported data. Without this information, as was the case in *Silicon Graphics*, "we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge" of flat patient demand "that would cause their optimistic representations to the contrary to be consciously misleading."

We next address the claim that defendants had access to IMS data that allegedly informed the defendants that patient demand for TOBI was flat. The plaintiffs' complaint states: "Based on the IMS data available, defendants knew, or were reckless in not knowing, and failed to disclose that patient demand for TOBI was flat (and not increasing) during the Class Period." But again, this allegation does not give rise to a strong inference that defendants acted with deliberate or conscious recklessness. Although plaintiffs refer to the existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do not allege with particularity *any specific information* showing that prescription data informed defendants that patient demand for TOBI was flat. Plaintiffs do not mention a specific IMS document relied on by defendants such as a particular IMS report, graph or chart. Nor do they detail with particularity the *content* of such data. Rather, plaintiffs merely allege that PathoGenesis tracked patient demand using data provided by IMS and that this data supposedly indicated that patient demand was flat. As we held in *Silicon Graphics*, negative characterizations of reports relied on by

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA. We hold that plaintiffs' allegations of negative internal reports and IMS data are insufficient to demonstrate deliberate or conscious recklessness.

*Id.* at 1035-36 (emphasis added).

In contrast to *Silicon Graphics* and *Lipton*, the Ninth Circuit did in *Nursing Home*, 380 F.3d at 1226, conclude that the scienter requirement had been met. There, the plaintiffs alleged that the company maintained a database with sales information and that, because "the top executives admit to having monitored the database, Oracle must have been aware that it was not going to meet its sales projections earlier in the third quarter, and that its statements to the contrary were therefore made with scienter." *Id.* at 1231. The court acknowledged that,

> [a]t first glance, these allegations might seem comparable to those made in *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002). There, plaintiffs alleged that defendant corporation PathoGenesis "could regularly track its sales data" and that the company "tracked patient demand using data provided by IMS [Health, an information vendor, which] indicated that patient demand was flat." We held that such allegations were insufficient to plead scienter under the PSLRA because, although "plaintiffs referred to the existence of the IMS data and made a general assertion about what they think the data showed," they had no hard numbers or other specific information.
>
> By contrast, Plaintiffs here have hard numbers and make specific allegations regarding large portions of Oracle's sales data. The Complaint contains specific statements from former employees and managers in various regions of the United States (and working in a number of different departments) testifying to a major slowdown in sales. . . .
>
> . . . .
>
> [A] number of large deals were either lost or delayed early in the third quarter. Four of those deals alone would have totaled up to $ 186 million. These deals account for nearly 75% of the total third-quarter shortfall. It was clear by December 2000 and January 2001 that these deals had either fallen through entirely or would not take place during the third quarter. It is reasonable to believe that Oracle had known, prior to its March 1 report, that it would not reach its projected earnings, particularly since Ellison acknowledged that "I was involved in an awful lot of these deals."

///

///

24

United States District Court

For the Northern District of California

*Id.* at 1231-32.  The court went on to take note of, *inter alia*, suspicious insider trading by Mr. Ellison and improper revenue accounting records which also contributed to its conclusion that the knowledge requirement had been met.  *See id.* at 1232-33.

The instant case is closer to *Silicon Graphics* and *Lipton* rather than *Nursing Home*.  Here, Plaintiffs present no specific evidence as to the content of the weekly booking reports.  There is no evidence what those reports disclosed of actual sales, absolute numbers of bookings, or anything else.  There is no evidence that the reports actually revealed the decline in book-to-bill ratio from March to April 2010.  Even if the reports did reveal that decline, that would not establish a strong inference of scienter because there is no evidence that Defendants' awareness of a one-month decline in that statistic, particularly when viewed in the context of strong March sales and a good quarter, negated in Defendants' mind the accuracy of Oclaro's more general claim of a recent increase in consumer demand.  Indeed, not only were sales for the relevant quarter consistent with Defendants' expectations, the book-to-bill ratio for April 2010 was still 1, a generally positive indicator of demand.

The instant case stands in contrast to *Nursing Home*, where there were many factors other than a decline in sales that led to the Ninth Circuit's to find that the allegations of scienter were adequate.  The sales decline in *Nursing Home* was likely known by top executives because:  (1) there was a major drop in sales and (2) Mr. Ellison's admitted that he had personal involvement in those sales.  Here, the drop in a one-month indicator for April 2010 was not demonstrated to be within Defendants' knowledge under the allegations in the complaint and in any event, even if it was, that does not establish a strong indicator that Oclaro's general statements about a recent increase in consumer demand were knowingly or recklessly false.

> b.   Core Operations

As noted above, Plaintiffs seem to have argued scienter on the part of Defendants based on the weekly bookings reports alone.  However, to the extent Plaintiffs have suggested – or might suggest – that knowledge may be inferred because key officers would be aware of facts critical to Oclaro's core operations, such as sales volume, that argument has problems as well.

United States District Court
For the Northern District of California

The Ninth Circuit has held that the core-operations theory *by itself* is usually not enough to establish a strong inference of scienter. That is, "[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (although adding that the theory can be combined with other allegations to support a strong inference of scienter). Only in rare situations will the core operations theory be enough – *e.g.*, where a loss is of such magnitude to the company that it would be "'absurd'" for management not to know. *Id.* at 786. For example,

> [i]n *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), we permitted a securities plaintiff to rely on the core operations inference without particularized allegations about defendants' access to the relevant information. In *Applied Signal*, the defendants allegedly failed to disclose "stop-work orders" from its largest customers even though those orders had "a devastating effect on the corporation's revenue." The first stop-work order "halted between $ 10 and $ 15 million of work on the company's largest contract with one of its most important customers," and the second halted $ 8 million. The complaint alleged that only two government agencies made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company. Moreover, the defendants admittedly knew about the stop-work orders only two weeks after the alleged false statements. All of these factors put *Applied Signal* into the exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PLSRA.

*Id.* at 785 n.3.

In the instant case, Plaintiffs have claimed "actual exposure" based on the weekly bookings reports but, for the reasons discussed above, that position is problematic. There is no allegation that there was such a major decline in Oclaro's sales that it would be "absurd" for management not to know. Indeed, while we know there was a one-month decline in book-to-bill ratio, Plaintiffs made no allegation about the magnitude of any decline in sales in April 2010. Nor have Plaintiffs alleged there was a significant downward trend negating an otherwise strong quarter and which would have clearly signaled to management a problem of the magnitude in *Berson*.

///

///

1          c.      Motive

2          With respect to the statements in May 2010, Plaintiffs also argue that there was a clear

3   motive for Oclaro representing that customer demand was strong – *i.e.*, Oclaro wanted to

4   characterize itself as a strong company in order to have its May 2010 stock offering succeed.  The

5   problem for Plaintiffs is that motive *by itself* is not enough to establish a strong inference of scienter,

6   at least in the Ninth Circuit.  In *Silicon Graphics*, 183 F.3d at 970, the Ninth Circuit stated:

> [A]lthough facts showing mere recklessness or a motive to commit
> fraud and opportunity to do so may provide *some* reasonable inference
> of intent, they are not sufficient to establish a strong inference of
> deliberate recklessness.  In order to show a strong inference of
> deliberate recklessness, plaintiffs must state facts that come closer to
> demonstrating intent, as opposed to mere motive and opportunity.

11  *Id.* at 974 (emphasis added); *see also In re Terayon Communs. Sys.*, No. C 00-01967 MHP, 2002

12  U.S. Dist. LEXIS 5502, at *28, 33-34 (N.D. Cal. Mar. 29, 2002) (stating that "[f]acts showing mere

13  recklessness or a motive to commit fraud and an opportunity to do so may provide some reasonable

14  inference of intent, but they are not sufficient to establish a strong inference of deliberate

15  recklessness"; adding that "facts showing motive and opportunity to commit fraud can provide

16  confirming reasonable inferences that help establish a strong inference along with other

17  allegations").  More recently, the Ninth Circuit has emphasized:

> allegations of routine corporate objectives such as the desire to obtain
> good financing and expand are not, without more, sufficient to allege
> scienter; to hold otherwise would support a finding of scienter for any
> company that seeks to enhance its business prospects.

21  *In re Rigel Pharms., Inc. Secs. Litig.*, No. 10-17619, 2012 U.S. App. LEXIS 18743, at *39-40 (9th

22  Cir. Sept. 6, 2012).  While Plaintiffs claim there was a more specific motive here beyond routine

23  corporate objectives in that Oclaro was planning a May, 2010 stock offering, that only provides a

24  marginally stronger case for motive.  It is, however, not as strong as where those charged with

25  misstatements stood to gain personally, such as through insider trading.  *See Silicon Graphics*, 183

26  F.3d at 986 (noting that "'unusual' or 'suspicious' stock sales by corporate insiders may constitute

27  circumstantial evidence of scienter").  Moreover, the May stock offering provides no motive for the

28  subsequent June 2010 statement challenged herein.

United States District Court

For the Northern District of California

d.    Summary

The Court concludes that, even taking into consideration the facts alleged in the complaint collectively, Plaintiffs have failed to plead enough allegations to give rise to a strong inference of scienter for the May and June 2010 statements.

2.    July and August 2010 Statements

As noted above, the July and August 2010 statements turn on the alleged falsity of Defendants' claim that they had good visibility into customers' needs. Thus, the issue here is whether there are allegations giving rise to a strong inference that Defendants knew, in fact, that they did not have such visibility. Plaintiffs assert that Defendants had knowledge based on representations made by the confidential witness, FE1.

In *Zucco*, the Ninth Circuit noted that

> a complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.

*Zucco*, 552 F.3d at 995. Ultimately, the court held that, in the case before it, "the SAC describes the confidential witnesses' job titles and employment information with ample detail to satisfy [the] requirement that a complaint make apparent a confidential witnesses' position within the defendant corporation, [but] the SAC fails to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Id.* "Some of the confidential witnesses were simply not positioned to know the information alleged, many report only unreliable hearsay, and others allege conclusory assertions of scienter. These allegations are not sufficient to raise a strong inference of scienter because they demonstrate that the confidential witnesses are not reliable." *Id.* at 996.

Here, Plaintiffs have alleged enough to establish that FE1 was in a position within Oclaro with knowledge of Oclaro's sales experience and practices. However, some of FE1's assertions of *knowledge* of the part of Defendants are wholly conclusory. For example, in ¶ 76(d), Plaintiffs allege that "[D]efendants knew that the Company only had good visibility or a 'good grip' into

United States District Court

For the Northern District of California

1    customer demand for about two weeks forward."  SAC ¶ 76(d).  But Plaintiffs do not allege any

2    specific facts explaining the basis for the claim that Defendants had such knowledge.

3        Plaintiffs' strongest allegation on scienter is in ¶ 76(c).  Here, Plaintiffs allege that, according

4    to FE1, "Oclaro's customers were often reluctant to provide detailed information about their own

5    needs so that suppliers like Oclaro would not dedicate manufacturing capacity to other customer's

6    needs," and "these nuances are known to those who are experienced in the industry, and were known

7    to [Mr.] Turin and [Mr.] Couder."  SAC ¶ 76(c).  Although the claim that Mr. Turin and Mr. Couder

8    had knowledge of "these nuances" is in and of itself conclusory, presumably, Plaintiffs are making

9    the point that, as executives of Oclaro, Mr. Turin and Mr. Couder were likely experienced in the

10   industry, and therefore had the knowledge of customers' tendencies.

11       While this is Plaintiffs' best allegation in the SAC, the Court does not find that it is sufficient

12   to give rise to a *strong* inference of scienter.  First, Plaintiffs have essentially assumed that the

13   individual defendants were experienced in the industry by virtue of their position alone.  While it is

14   a fair inference that an executive would know of certain facts related to a company, *e.g.*, a major loss

15   to the company (*see* discussion, *supra*, discussing the core operations theory), it is not clear that an

16   executive would necessarily know details such as precisely how far out in advance Oclaro knew of

17   customer needs.  Second, while Defendants' statements about good customer visibility were

18   misleading – at least a reasonable jury could so find based on the allegations in the SAC – they were

19   not so dramatically misleading or outright false that the only reasonable inference is that Defendants

20   must have possessed the requisite intent in making them.  The statements were somewhat general

21   and, if they were misleading, they were not starkly so.  Given the generality and fluidity of the

22   statements regarding visibility, a strong inference of scienter requires more specific allegations than

23   made herein.  Finally, it is notable that there does not appear to be any motive for Defendants to

24   make the false or misleading statements about good customer visibility.  By this point in time, the

25   May 2010 stock offering had already been completed.  Furthermore, as Defendants point out, there

26   is no allegation or evidence of any suspicious insider trading by the individual defendants.

27       In their opposition, Plaintiffs argue that the Court should not take into account the lack of

28   any motive allegations because motive is not "required to allege scienter."  Opp'n at 19.  While the

United States District Court

For the Northern District of California

1    Court agrees that the absence of a motive allegation is not "dispositive," it is still a "relevant" fact,

2    as the Supreme Court has expressly stated.  *Matrixx*, 131 S. Ct. at 1324; *see also Cutsforth v.*

3    *Renschler*, 235 F. Supp. 2d 1216, 1250 (M.D. Fla. 2002) (stating that, "if a motive to commit fraud

4    can be a relevant [although not dispositive] circumstance supporting a claim of scienter, it would

5    seem that an inability to show motive can be a relevant circumstance indicating the lack of

6    scienter"); *accord In re Acterna Corp. Secs. Litig.*, 378 F. Supp. 2d 561, 576-77 (D. Md. 2005).

7         Plaintiffs assert that, even if the absence of a motive allegation is considered, the Court still

8    should not take into account the lack of any suspicious insider trading as a fact weighing against

9    scienter.  Plaintiffs maintain that, "because the SAC does not *rely* on insider trading allegations to

10   demonstrate scienter, . . . the absence of such allegations is irrelevant to the scienter analysis."

11   Opp'n at 19 (emphasis added).  The Court finds this argument problematic as well.  The Court is

12   obligated to take a "holistic approach" in evaluating scienter, *Rigel*, 2012 U.S. App. LEXIS 18743,

13   at *40, and, because the Court may take judicial notice of the individual defendants' Oclaro stock

14   sales (as reflected in the SEC Forms 4 which are public records),[6] the presence or absence of insider

15   trading is a fact that could be considered by the Court as a part of its holistic approach.[7]  *See, e.g.*,

16   *Acterna*, 378 F. Supp. 2d at 576-77 (taking note that "Plaintiffs have not alleged any concrete

17

18        [6] Although Plaintiffs have objected to Defendants' request for judicial notice of the SEC
     Forms 4, their objection is really one of relevance and not that the documents may not be judicially
19   noticed pursuant to the Federal Rule of Evidence 201.  *See* Docket No. 68 (Pls.' Rep. at 3-4).  The
     Court notes that, although it does not take judicial notice of the *truth* of the contents of the SEC
20   filings, *see In re Thornburg Mort., Inc. Secs. Litig.*, No. CIV 07-0815 JB/WDS, 2009 U.S. Dist.
     LEXIS 124549, at *14 (D.N.M. Dec. 21, 2009), Plaintiffs have not made any claim that the contents
21   of the documents are not true.  The Court therefore takes judicial notice of the SEC Forms 4 and has
     no basis for believing that the truth of the documents is in dispute.

22        [7] The Court respectfully disagrees with Judge White's statement in *In re Pixar Securities*
     *Litigation*, 450 F. Supp. 2d 1096 (N.D. Cal. 2006), that, in two prior cases from this District, "the
23   plaintiffs did not rely on allegations of insider trading to establish scienter" and "[t]herefore, the
     courts found that the failure to allege selling or trading did not negate the inference of scienter."  *Id.*
24   at 1107.  In *In re Nuko Information Systems, Inc. Securities Litigation*, 199 F.R.D. 338 (N.D. Cal.
     2000), Judge Infante stated that "[a] fair reading of this SAC does not suggest claims of insider
25   trading" but rather a claim that "Defendants knowingly overstated revenues for 1Q97 in an attempt
     to inflate Nuko's stock prices and secure a deal with Internext"; thus, "[u]nder these circumstances,
26   the absence of Defendants' selling or trading has little bearing on determining whether Plaintiffs'
     have adequately pleaded scienter."  *Id.* at 344-45.  In *In re U.S. Aggregates, Inc.*, No. C 01-1688
27   CW, 2003 U.S. Dist. LEXIS 12168 (N.D. Cal. June 24, 2003), Judge Wilken simply indicated that
     certain evidence, including the lack of any evidence of insider trading, was not enough to negate an
28   inference of bad motive.  *See id.* at *12-13.

United States District Court

For the Northern District of California

1    benefits that could be realized by the alleged false statements" – *e.g.*, that "the individual Defendants

2    sold any stock during the class period, thereby taking advantage of their fraudulent scheme to

3    artificially inflate the company's share price"; concluding that "[t]his shortfall, coupled with the

4    weak inferences to be drawn from Plaintiffs' other allegations, undermines Plaintiffs' assertion that

5    the individual Defendants acted with the required state of mind").

6            The Court also notes that Plaintiffs' position is in some tension with the Ninth Circuit's

7    recent decision in *Rigel*.  In *Rigel*, the plaintiffs did not allege that the individual defendants had

8    actually engaged in insider trading in their complaint; rather, they simply alleged that the "individual

9    defendants knew that the value of their stock options would increase if [the company] reported

10   positive results from the clinical trial."  *Rigel*, 2012 U.S. App. LEXIS 18743, at *40-41.  Even

11   though the plaintiffs did not allege actual insider trading, the Ninth Circuit still took into account the

12   lack of insider trading.  The Ninth Circuit noted: "[B]ecause none of the defendants [actually] sold

13   stock during the period between the allegedly fraudulent statements and the subsequent public

14   disclosure of the detailed data, which is the period during which they would have benefitted from

15   any allegedly fraudulent statements, the value of the stock and stock options does not support an

16   inference of scienter."  *Id.* at *41.

17           In sum, taking a "holistic approach" in evaluating scienter, *id.* at *40, the Court finds that

18   there are insufficient allegations to give rise to a strong inference of scienter with respect to the

19   allegedly misleading statements made by Defendants in July and August 2010.

20   E.      Loss Causation

21           Because Plaintiffs have failed to make an adequate showing on scienter in their SAC,

22   dismissal of the complaint is warranted.  The Court, however, still provides some analysis on the

23   issue of loss causation as that has some bearing on whether Plaintiffs should be given leave to

24   amend their complaint.

25           Loss causation is the "causal connection between the material misrepresentation and the

26   loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  According to Defendants, Plaintiffs

27   have failed to adequately plead loss causation because (1) the partial disclosure on July 29, 2010,

28   and the final disclosure on October 28, 2010, did not actually correct anything that Oclaro had said

31

1   previously, and (2) Plaintiffs have failed to demonstrate that the decline in the stock price was not

2   due to other reasons – for example, that the decline was part of a sector-wide downturn or due to

3   other negative news about Oclaro that was disclosed on the same date.

4          1.   Correction

5          Defendants' first argument is not persuasive.  As discussed above, Plaintiffs allege that, on

6   July 29, 2010, Oclaro disclosed for the first time the slowdown in April; this was plausibly

7   contradictory to its statements in May and June that there was a current increase or surge in

8   customer demand.  At the very least, a reasonable jury could find the comments about current

9   customer demand to be misleading given what had taken place in April[8] and that the later disclosure

10  of the book-to-bill ratio was corrective.

11         As for the disclosure on October 28, 2010, the most notable correction was that 1Q11 results

12  were not as strong as predicted (there was a miss on gross margin and adjusted EBITDA, even

13  though revenues were met).  There was also arguably a correction through Oclaro's disclosure that it

14  had limited visibility into customer demand and that the decline in orders was due to an inventory

15  correction (*i.e.*, demand was not based in fact on true end-user demand).

16         2.   Other Causes for Stock Price Decline[9]

17         As for Defendants' second argument, it too is not convincing.  Defendants correctly point out

18  that, in *Dura*, 544 U.S. at 336, the Supreme Court noted that a decline in stock price may be due to

19  reasons other than fraud – *e.g.*, "changed economic circumstances, changed investor expectations,

20  new industry-specific or firm-specific facts, conditions, or other events."  *Dura*, 544 U.S. at 343.

21  However, this statement must be taken in the proper context.

22

23         [8]  The Court need not address Defendants' contention that Plaintiffs' event study, used to
24  show materiality and/or loss causation with respect to the July 2010 drop in stock price, was flawed.
    As Plaintiffs point out, reliance on an event study is not necessary at the pleading stage.  *See* Opp'n
25  at 23.

26         [9]  Defendants have asked the Court to take judicial notice of a decline in stock price in other
    companies in the same industry.  Plaintiffs' objection is overruled because the value of stock "can be
27  accurately and readily determined from sources whose accuracy cannot reasonably be questioned."
    Fed. R. Evid. 201(b)(2).  Plaintiffs admitted as much in their opposition brief to the first motion to
28  dismiss.  *See* Docket No. 50 (Opp'n at 24 n.10) (stating that a court may take judicial notice of the
    stock price of a publicly traded company).

United States District Court
For the Northern District of California

1    In *Dura*, the Supreme Court characterized the Ninth Circuit decision under review as holding

2  that all that a securities fraud plaintiff had to do to establish loss causation was establish an inflated

3  price on the day of misrepresentation.  *See Dura*, 544 U.S. at 342.  The Court stated that this legal

4  holding was not correct, explaining as follows:

5              For one thing, as a matter of pure logic, at the moment the transaction
             takes place, the plaintiff has suffered no loss; the inflated purchase
6              payment is offset by ownership of a share that at that instant possesses
             equivalent value.  Moreover, the logical link between the inflated
7              share purchase price and any later economic loss is not invariably
             strong.  Shares are normally purchased with an eye toward a later sale.
8              But if, say, the purchaser sells the shares quickly *before* the relevant
             truth begins to leak out, the misrepresentation will not have led to any
9              loss.  If the purchaser sells later *after* the truth makes its way into the
             marketplace, an initially inflated purchase price *might* mean a later
10            loss.  But that is far from inevitably so.  When the purchaser
             subsequently resells such shares, even at a lower price, that lower
11            price may reflect, not the earlier misrepresentation, but changed
             economic circumstances, changed investor expectations, new
12            industry-specific or firm-specific facts, conditions, or other events,
             which taken separately or together account for some or all of that
13            lower price.

14 *Id.* at 342-43 (emphasis added).  The Court's explanation as to why it was rejecting the Ninth

15 Circuit's holding cannot be equated with a requirement that a plaintiff must plead that a stock price

16 did not decline for reasons other than fraud.

17    Moreover, in *Dura*, the Supreme Court agreed with the principle that loss causation is

18 established where a plaintiff alleges that, after the truth becomes known, the price of the stock falls.

19 As the Court stated in *Dura*, "the Restatement of Torts, in setting forth the judicial consensus, says

20 that a person who 'misrepresents the financial condition of a corporation in order to sell its stock'

21 becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts . . .

22 become generally known' and 'as a result' share value 'depreciate[s].'"  *Id.* at 344; *see also id.* at

23 347 (stating that "[t]he complaint's failure to claim that Dura['s] share price fell significantly after

24 the truth became known suggests that the plaintiffs considered the allegation of purchase price

25 inflation alone sufficient").  The Ninth Circuit has confirmed that this is all that is required post-

26 *Dura*.  *See, e.g.*, *Berson*, 527 F.3d at 990 (indicating that, "where defendants overstated the firm's

27 revenues, and where stock prices dropped immediately after defendants revealed the firm's 'true

28 financial condition,' plaintiffs adequately pled loss causation"); *In re Daou Sys.*, 411 F.3d 1006,

United States District Court

For the Northern District of California

1027 (9th Cir. 2005) (concluding that "the TAC's assertions of a steep drop in Daou's stock price following the revelation of Daou's true financial situation are sufficient to enable the complaint to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)").

At the end of the day, all that Plaintiffs have to do at this juncture of the proceedings is "*plausibly* establish loss causation," not definitively establish it. *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (emphasis added). "[Any] skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* Because, as discussed above, Plaintiffs have tied a decline in the stock price to a revelation of the "truth" on July 29, 2010, and October 28, 2010, the motion to dismiss on the ground that loss causation has not been adequately pled is without merit.

Moreover, the Court notes that Plaintiffs have made allegations in their complaint that the decline in stock price was not attributable to an industry-wide downturn, as Defendants have suggested. In particular, Plaintiffs have pointed out that, unlike Oclaro, Oplink (a competitor) did not experience demand/order softness and further beat analyst estimates for 1Q11. *See* SAC ¶¶ 90-92. In their opposition brief, Plaintiffs further point out that, even though Oplink did experience a downturn on October 28, 2010, the next day, it had an upsurge presumably because the market had had a chance to take into account its positive 1Q11 results. *See* Opp'n at 24.

Furthermore, Plaintiffs alleged that the July 2010 drop in stock price was attributed, at least by some analysts, to the decline in the book-to-bill ratio, which was a result of the April 2010 slowdown. Therefore, even if there was other negative news about Oclaro that was disclosed in July 2010, *see* Reply at 14-15, the particular disclosure about the April 2010 slowdown is alleged to have had some significance. Even with an industry downturn, or even with other negative news about Oclaro, that does not preclude the possibility that a decline in stock price was attributable at least in part to a securities fraud. The Ninth Circuit has noted that

> [a] plaintiff is not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value" in order to establish loss causation. "As long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages."

*Daou*, 411 F.3d at 1025 (emphasis in original).

### III.    CONCLUSION

For the foregoing reasons, the Court rejects Defendants' arguments that Plaintiffs' SAC is lacking with respect to allegations of falsity and loss causation and that, as a matter of law, Defendants' conduct is immunized by the safe harbor provision or bespeaks caution doctrine.  The Court, however, agrees with Defendants that Plaintiffs have failed to make sufficient allegations to give rise to a strong inference of scienter and, on that basis, grants Defendants' motion to dismiss.

The only question remaining is whether Plaintiffs should be given leave to amend.  Because the Court cannot say at this juncture that amendment would be futile (the Court's prior order granting Defendants' motion to dismiss addressed only the issue of falsity, not scienter), the Court shall allow Plaintiffs one final opportunity to amend their complaint.

Plaintiffs shall have thirty (30) days from the date of this order to file their third amended complaint.  If no amended complaint is timely filed, then the Clerk of the Court shall enter judgment in favor of Defendants and close the file in this case.

This order disposes of Docket No. 63.


IT IS SO ORDERED.


Dated:  September 21, 2012

_____
EDWARD M. CHEN
United States District Judge

35