1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   SUNNY S. SARKIS (258073)
3  Post Montgomery Center
   One Montgomery Street, Suite 1800
4  San Francisco, CA  94104
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   shawnw@rgrdlaw.com
6  ssarkis@rgrdlaw.com
            – and –
7  JULIE A. KEARNS (246949)
   655 West Broadway, Suite 1900
8  San Diego, CA  92101
   Telephone:  619/231-1058
9  619/231-7423 (fax)
   jkearns@rgrdlaw.com
10
   Lead Counsel for Plaintiffs
11
   [Additional counsel appear on signature page.]
12
                        UNITED STATES DISTRICT COURT
13
                       NORTHERN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| CURTIS AND CHARLOTTE WESTLEY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| OCLARO, INC., ALAIN COUDER and JERRY TURIN, | ) ) ) |
| Defendants. | ) ) |
| In re OCLARO, INC. DERIVATIVE LITIGATION | ) ) |
| | ) |
| This Document Relates To: | ) ) |
| *Westley v. Oclaro, Inc., et al.*, C11-02448-EMC. | ) ) |
| | ) |

No. C11-02448-EMC
and related consolidated action
(Lead Case No. C11-3176-EMC)
(Derivative Action)

Lead Case No. C11-3176-EMC
(Derivative Action)

DEMAND FOR JURY TRIAL

                    THIRD AMENDED COMPLAINT FOR VIOLATION OF THE
                              FEDERAL SECURITIES LAWS

816811_1

1

**TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION AND OVERVIEW ....................................................................1

4 JURISDICTION AND VENUE ...........................................................................8

5 PARTIES ..............................................................................................................8

6     Oclaro's and the Individual Defendants' Business and Economic Motivation to
        Mislead Investors During the Class Period............................................12

7

SOURCES OF INFORMATION ........................................................................13

8

BACKGROUND TO THE CLASS PERIOD .....................................................14

9

FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS
10     ISSUED DURING THE CLASS PERIOD .............................................17

11     Oclaro Purchases Mintera Corporation for $12 Million in Cash with Proceeds
        from the Offering .....................................................................................22

12

13     Defendants Admit Knowledge of Decline in Customer Orders Trend in April
        2010 yet Reject the Notion of Declining Trends in Demand, Increase
        1Q11 Forecast – Stock Price Declines but Remains Artificially Inflated ...........27

14

15     The July 29, 2010 Disclosure of April 2010 Order Decline and Its Impact on the
        Quarterly Book-to-Bill Ratios, Including Investor Response and Stock
        Price Decline, Demonstrates the Materiality of the Information Omitted at
16         the Time of the Offering ..........................................................................29

17     Defendants' Continued False and Misleading Statements Boasting of Strong
        Customer Demand, Visibility into Customer Ordering Trends, and
18         Increased 1Q11 Financial Forecasts .......................................................33

19     Oclaro Announces Huge Earnings Miss Due to Sharp Declines in Customer
        Demand and Order Cancellations ............................................................43

20

21     Key Industry Competitor Oplink Reports Above Estimate Results, Says Oclaro
        Excuses Incredible; Analysts Note Inconsistencies and Stock Price Tanks ..........47

22 LOSS CAUSATION/ECONOMIC LOSS .........................................................49

23 THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE
    AND MISLEADING STATEMENTS ....................................................51
24

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ..........53
25

CLASS ACTION ALLEGATIONS ...................................................................54
26

COUNT I ............................................................................................................55
27

28     For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants ..........55

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC      - i -

1

2                                                                          **Page**

3 COUNT II .................................................................................................................56

4          For Violation of §20(a) of the 1934 Act Against All Defendants ....................................56

5 PRAYER FOR RELIEF ...........................................................................................56

6 JURY DEMAND ....................................................................................................57

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                          - ii -

1

**INTRODUCTION AND OVERVIEW**

2    1.    This is a securities class action on behalf of all persons who purchased or otherwise

3 acquired the common stock of Oclaro, Inc. ("Oclaro" or the "Company") between May 6, 2010 and

4 October 28, 2010, inclusive (the "Class Period"), against Oclaro and certain of its officers and/or

5 directors for violations of the Securities Exchange Act of 1934 ("1934 Act"). Throughout the Class

6 Period – and more specifically in May, June, July and August 2010 – the Company and certain of its

7 top executives made false and misleading statements to the investment community concerning

8 purported current and increasingly strong customer demand for Oclaro's products.[1] In addition,

9 defendants made false and misleading statements in July and August 2010 in issuing (and then

10 reaffirming) Oclaro's increased revenue and earnings guidance for first quarter 2011 ("1Q11")

11 (ended October 2, 2010)[2] and accelerated margin guidance for the calendar year 2010 at a time they

12 were aware of facts seriously undermining the reasonableness of these projections. In July and

13 August 2010, defendants also misrepresented to the market the significance of Oclaro's close

14 customer relationships by inaccurately boasting that these relationships provided them with

15 knowledge of existing order firmness (*i.e.*, **not** double order or order at risk of cancellation) as well

16 as future customer needs.

17    2.    On May 6, 2010, the first day of the Class Period, the Company filed a Form

18 424(b)(5) Prospectus Supplement (the "Prospectus Supplement") with the U.S. Securities and

19 Exchange Commission ("SEC") for a secondary offering of 6.9 million shares of the Company's

20 ─────────────────

21 [1]    Pursuant to the Court's September 21, 2012 Order Granting Defendants' Motion to Dismiss
Second Amended Complaint (Dkt. No. 79) (the "September 21 Order") and January 10, 2013 Order
22 Granting in Part Plaintiffs' Motion for Leave to File Motion for Reconsideration (Dkt. No. 107) (the
"January 10 Order"), plaintiffs have already adequately alleged, with the requisite particularity under
23 the Private Securities Litigation Reform Act of 1995 ("PSLRA") and governing case law, that
defendants made the materially false and misleading May and June 2010 statements set forth herein
24 with scienter. *See* September 21 Order at 7-10, 14-16, 32-34; January 10 Order at 4-9. The
September 21 Order also held plaintiffs had sufficiently alleged the material falsity with regard to
25 defendants' July and August 2010 misrepresentations. *See id.* at 10-13, 16-20, 32-34. Plaintiffs'
amendments in the instant complaint, therefore, focus on the narrow issue of defendants' scienter as
26 to their July and August 2010 false statements.

[2]    Oclaro's fiscal year 2010 ("FY10") ended on July 3, 2010, and its FY11 ended on July 2,
27 2011.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                                      - 1 -

1    common stock to the public.  Each share was offered at a price of $12.00 (the "May 6 Offering").[3]

2    The Prospectus Supplement assured investors the Company was "currently" experiencing

3    "increased" and improved customer demand.

4          3.        Although defendants told the market that proceeds from the May 6 Offering were

5    intended for general corporate purposes, analysts unequivocally concluded the Company intended to

6    use the cash to execute strategic acquisitions or investments to fill gaps or bolster weaknesses in its

7    product line.  According to defendants, acquisitions were crucial to Oclaro's "make-or-buy" business

8    strategy, which meant the Company would expend the resources necessary to either "make" – *i.e.*,

9    design based on internal research and development, or "buy" – *i.e.*, acquire a company along with its

10   technologies, the optical network products in demand by industry customers.

11         4.        Moreover, defendants bragged that the Company was currently and recently

12   experiencing a return of customer demand:

13         ***We are currently seeing a return of customer demand which had decreased as a***
14         ***result of adverse economic conditions in the preceding 18 to 24 months***.

15                                  *        *        *

16         ***As customer demand has recently increased in our markets***, and in adjacent
     markets, lead times for the purchase of certain materials and equipment from
17   suppliers required to meet this demand have increased and in some cases have
     limited our ability to rapidly respond to increased demand . . . .

18         5.        On May 12, 2010, Oclaro completed the Offering pursuant to the Prospectus

19   Supplement, netting proceeds of approximately $77.2 million from the Offering after deducting

20   underwriting costs and other expenses.  The cash proceeds from the Offering allowed the Company

21   to ***double*** its cash position from $55.7 million at the end of 3Q10 (ended April 3, 2010) to $111

22   million at the end of 4Q10 (ended July 3, 2010).

23

24

25   _____

26   [3]      The May 6, 2010 Prospectus Supplement updated information in the Bookham, Inc.
     ("Bookham") Prospectus dated October 19, 2007, which was included in the October 17, 2007
27   Bookham Shelf Registration Statement (Registration No. 333-145665) (the "Registration
     Statement").

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
     02448-EMC                                                                        - 2 -

6.     Defendants failed to disclose, however, that they knew even before the issuance of the May 6, 2010 Prospectus Supplement that in April 2010, the Company in fact experienced a material decline in order trends, which would materially impact the Company's quarterly book-to-bill ratio. These facts would later be admitted by defendants and those disclosures would result in significant stock price declines.  *See* ¶¶67-77.  In the interim, however, the Company, based on the false statements in the Prospectus Supplement that caused the Offering proceeds to be artificially inflated, doubled its cash position, enabling it to make two strategic acquisitions.

7.     Defendants' failure to disclose in the Prospectus Supplement that, rather than currently experiencing "increased" customer demand at the time the Prospectus Supplement was issued on May 6, 2010, Oclaro and the Individual Defendants (as defined herein) knew that the Company had in fact suffered a material decline in customer orders and demand in April 2010, and violated Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303.  As described in detail in ¶¶67-77, *infra*, it was not until July 29, 2010 that defendants revealed the previously known April 2010 decline in orders, along with the resulting decrease in Oclaro's quarterly book-to-bill ratio.  Item 303 requires reporting companies, such as Oclaro, to disclose in such a prospectus supplement any known trends or uncertainties reasonably expected to have a favorable or unfavorable impact on the Company's sales, revenues or earnings.  17 C.F.R. §229.303.  This April 2010 decline was undoubtedly material because it caused Oclaro's quarterly book-to-bill ratio to decline from 1.35 in March 2010 to just above 1.0 for June 2010, and analysts acknowledged this disappointing news.[4]

8.     In combination with the failure to disclose the known April 2010 decline in order trends, following the May 6 Offering, defendants repeated statements to investors touting the strength of "continuing" customer demand as well as their visibility into the Company's performance

---

[4]     According to http://www.investopedia.com/terms/b/booktobill.asp (as of April 17, 2012), "Book-to-Bill Ratio" is:  "The ratio of orders received to units shipped and billed for a specified period, generally a month or quarter.  The book-to-bill ratio is a widely used metric in the technology industry, specifically in the semiconductor equipment sector.  *It is closely watched by investors and analysts for an indication of the performance and outlook for individual companies and the technology sector*.  A ratio of above 1 implies that more orders were received than filled, indicating strong demand, while a ratio below 1 implies weaker demand."

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                          - 3 -

1   in both the short term – through 1Q11 – and also for the remainder of the calendar year ("CY")

2   2010.  On May 25, 2010, for example, defendant Turin told the investment community at the B.

3   Riley & Co., LLC Investor Conference that Oclaro was currently seeing "*significant demand*" and a

4   "*significant growth in demand*."  Similarly, two weeks later, during a June 9, 2010 presentation at

5   the RBC Technology, Media & Communications Conference (the "RBC Conference"), Turin

6   reiterated that Oclaro was continuing to experience a "*very, very significant surge in demand we've*

7   *seen in the first six months*."

8         9.     In response to specific analyst questioning, moreover, defendants assured investors

9   that this strong demand by Oclaro's customers was based upon actual end-user demand, rather than a

10  buildup in inventory stockpiles by customers.  On June 9, 2010 at the RBC Conference, Turin

11  bragged of Oclaro's visibility into true customer needs based upon its close relationships with its

12  customers stating, "*we're pretty close to our customers and pretty close to what they're doing from*

13  *a forecast and volume point of view*."[5]  As such, this purported visibility did *not* concern solely

14  *future* orders, but rather, according to defendants, also provided support for their assurances that

15  orders that had already been placed – and thus included in the Company's "order coverage" – were

16  not the product of inventory hoarding or double ordering and had *little risk* of being cancelled.  *See*

17  ¶66.

18        10.    On July 29, 2010, the Company issued a press release announcing its 4Q10 and FY10

19  financial results.  In discussing these results, defendants reiterated the continuing strength of

20  customer demand for Oclaro's products.  More importantly, defendants issued accelerated and

21  increasing revenue and margins forecasts that were false and misleading to the market.[6]

22  _____

23  [5]     The Court held in its September 21 Order that because defendants' May and June 2010
    misrepresentations set forth herein concerned *current* fact, and were *not* forward-looking, neither the
24  PSLRA's Safe Harbor provision nor the bespeaks caution doctrine insulates them from liability as to
    these statements.  *Id*. at 14-16.
25
    [6]     Following a lengthy analysis, and as more specifically noted herein where appropriate, the
26  Court ruled that defendants *cannot* invoke the Safe Harbor provision or bespeaks caution doctrine as
    to their July and August 2010 misstatements, *including* with respect to the admittedly forward-
27  looking false and misleading forecasts for 1Q11 and CY11 issued by defendants on July 29, 2010
    and reaffirmed on August 11, 2010.  September 21 Order at 13, 16-20.
28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                          - 4 -

11.     Likewise, during the Company's conference call on July 29, 2010 to discuss its 4Q10 and FY10 financial results, defendants disclosed for the first time that Oclaro had experienced a decrease in customer demand and orders in April 2010, which resulted in a decline in the Company's quarterly book-to-bill ratio of 1.35 for the quarter ending March 2010 to just over 1.0 for the quarter ending June 2010:[7]

> [Analyst:] *My questions are regarding orders and book-to-bill. You mentioned that book-to-bill being 1.35, approximately in March was right around one in June. So did the actual level of orders – absolute levels decline quarter-over-quarter?*
>
> *      *      *
>
> [Turin:] *Trends point of view*, I think we, and from what I gather, a lot of folks in this space and similar spaces maybe *saw a little bit of a slowdown in early April as people digested the huge order flow in March*. And then that seemed to stabilize and it's been real nice levels since then, and *we feel good about our coverage right now*.
>
> *      *      *
>
> [Couder:] What we can say is that *April in terms of orders was a little slow. But May and June were very strong*. So it was probably during the March quarter, we had 1.3, maybe. But clearly the business is picking up in May and June and into July as well.

12.     Because the quarterly book-to-bill ratio decline for the quarter ending June 2010 resulted from April 2010 events, this announcement revealed that defendants knew prior to the May 6 Offering that orders and demand had decreased. These disclosures that the Company had experienced a sales decline in April 2010, prior to the May 6 Offering, and that this decline had reduced the Company's quarterly book-to-bill ratio from 1.35 to just above 1.0, caused an immediate sharp decline in stock price, evidencing the materiality of the information and the impact of defendants' failure to disclose it. For example, on July 30, 2010, Bloomberg issued a report entitled "Oclar[o] down as much as 11% on 4Q report . . . ." The Bloomberg report specifically tied the stock price decline to investors' "disappoint[ment] in the deceleration in OCLR book-to-bill."

---

[7]     Technically, the 3Q10 quarter ended April 3, 2010 and the 4Q10 quarter ended July 3, 2010; however, for the sake of consistency, in light of the Court's and parties' previous references, plaintiffs will continue to use March 2010 to refer to 3Q10 and June 2010 to refer to 4Q10.

July 30 (Bloomberg) – *Oclar[o] down as much as 11% after reporting fiscal 4Q results* . . . .

- OCLR 4Q sales $112.7m vs est $114m; adj EPS 24c vs est 19c, may include 4c FX gain: [Auriga] analyst Chandan Sarkar

- *Some investors may be disappointed in the deceleration in OCLR book-to-bill* [8]

13.    Notwithstanding these disclosures, defendants continued to falsely and repeatedly assure investors that Oclaro continued to experience "strong demand" for its products.  Turin further assured investors that as of July 29, 2010, "*between 85% and 90%*" of orders needed to meet Oclaro's 1Q11 outlook were already secured, and that these strong order figures represented end-user demand rather than customers stocking up on inventory.  When specifically asked by an industry analyst, however, to provide the figure for the "absolute level of orders," Turin and Couder refused, with Turin misleadingly assuring the analyst the order "coverage with the guidance gives you that number."

14.    Then on August 11, 2010, at the Morgan Keegan Technology Conference, Turin justified his statement that customer demand remained "strong across all of [Oclaro's] products" by explicitly assuring investors that as of the previous week:  "*[W]e are over 90% order covered for [the] quarter*, which is an extraordinary level for our business.  Typically, when we give guidance, we are maybe 60% to 65% range and we feel good."  Turin further confirmed the reasonableness of this confidence was because Oclaro was "*very close to our customers . . . we have a great deal of visibility with these guys*."  But, this assurance did *not* relate solely to *future* orders, and like Turin's June 9 statement that defendants were "pretty close to [Oclaro's] customers," was intended to (and did) quell investor concerns that orders already placed and included in this "order coverage" were not double orders or at risk of cancellation.

15.    In truth, however, a confidential former Executive Vice President ("VP") of Sales during the Class Period, later defined as FE1, reported that defendants knew the purported close

---

[8]    In its September 21 Order, the Court held plaintiffs have adequately alleged the April 2010 slowdown, and its omission from Oclaro's May 6 Offering documents and defendants' June 9 statements, to be material.  *Id*. at 7-10.

1   customer relationships could not be converted in any way into confidence in the strength of firmness

2   of customer orders.  *See* ¶84(f)-(i).  Furthermore, a former Oclaro Senior Manager of Product

3   Marketing later defined as FE2, reported that "blanket orders," which were ***not*** actual purchase

4   orders but rather were promises to place orders that typically contained provisions for not ultimately

5   doing so, were included in this "order coverage" – a fact concealed by defendants.  *See* ¶84(j)-(k).

6   Therefore, as defendants ultimately revealed in October 2010, orders were in fact cancelled and the

7   "visibility" of which defendants had bragged was limited.

8         16.    Then, before the market opened on October 28, 2010 and just weeks after a

9   technology conference in September 2010 in Torino, Italy, at which Oclaro executives spoke,

10  defendants disclosed that the Company had experienced a sharp drop-off in customer orders in

11  mid-September 2010.  As such, it had missed earnings per share ("EPS") forecasts by 95%,

12  reporting $0.01 per share for 1Q11 compared to analyst estimates of $0.22 per share.  The Company

13  also announced the following:

14         (a)    As opposed to revenues of up to $126 million, the Company posted only

15  $121 million;

16         (b)    As opposed to $0.22 EPS, the Company reported only ***$0.01*** EPS;

17         (c)    Gross margins were 29% as opposed to the analyst consensus of 33%, a

18  sequential decline from 4Q10;

19         (d)    Defendants actually knew of cancellations in the second week of September,

20  before Oclaro executives' September 2010 statements in conjunction with the technology conference

21  in Torino, Italy;

22         (e)    Visibility into customer demand levels was now severely limited; and

23         (f)    Customer inventories, which defendants assured had not been stockpiled, had

24  in fact become bloated and required correction.

25         17.    On this news, Oclaro's stock price declined 37% to close at $8.60 per share on

26  October 28, 2010, from a close of $13.68 per share on October 27, 2010, on extraordinarily high

27  trading volume of an approximately 1,400% increase from the previous day.

28

## JURISDICTION AND VENUE

18.     Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

19.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Oclaro's operations are headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

## PARTIES

20.     Lead Plaintiff Connecticut Laborers' Pension Fund (the "Fund") purchased Oclaro stock during the Class Period and was damaged by the conduct alleged herein.  The Fund was appointed lead plaintiff in this litigation by the Court's Order of September 12, 2011.  Dkt. No. 37.

21.     Named plaintiffs Curtis and Charlotte Westley purchased or acquired Oclaro stock during the Class Period and were damaged by the conduct alleged herein.

22.     Defendant Oclaro is headquartered in San Jose, California.  The Company is incorporated in Delaware and trades on the NASDAQ Global Market under the symbol "OCLR." Oclaro is the resulting company after the April 27, 2009 merger of Bookham and Avanex Corporation ("Avanex"), with Bookham becoming the parent company and changing its name to Oclaro, Inc. upon the close of the merger.   Similar to its peers, Oclaro is the product of numerous strategic mergers and acquisitions over several years.  The Company manufactures and distributes optical network components, modules and subsystems to the global telecommunications market. Oclaro is a global company, with chip fabrication facilities in the United Kingdom, Switzerland and Italy, and manufacturing sites in the United States, Thailand and China.  Oclaro operates two distinct business segments: Telecom and Advanced Photonic Solutions ("APS").  Telecom is responsible for the design, development, chip and filter level manufacturing, marketing, and selling of core optical network components, module and subsystem products to telecommunications systems vendors.

1   Telecom accounted for 87% of total Company revenues for FY10 (ended July 3, 2010).[9]  APS is

2   responsible for the design, manufacture, marketing, and selling of optics and photonics solutions for

3   markets, including material processing, printing, medical and consumer applications.   APS

4   accounted for 13% of total Company revenues for FY10.

5       23.    Defendant Alain Couder ("Couder") has served as Chairman of the Board of

6   Directors and Chief Executive Officer ("CEO") of Oclaro since July 2011.  Previously, and during

7   the Class Period, Couder served as President, CEO and director, positions he has held since August

8   2007.  Couder signed Oclaro's Class Period SEC filings and according to these filings, as Oclaro's

9   CEO, he is the Company's "chief operating decision maker."  At the time of the effective date of the

10  Registration Statement, Couder was a director of Bookham and signed the Registration Statement in

11  that capacity.

12      24.    In addition to having served as CEO and President of Bookham, prior to holding

13  these positions when the Company merged with Avanex and was renamed Oclaro, Couder also

14  served as CEO and President of numerous technology companies since 2002, including Solid

15  Information Technology Corporation, Confluent Software, Inc., IP Dynamics, Inc. and Packard Bell

16  NEC, Inc.  Furthermore, on Couder's LinkedIn page, he touts himself as having "***industry expertise***

17  *in* "***optical components***."  And he describes Oclaro as an "***optical components public company with***

18  ***a major focus on . . . consumer markets***."  He also labels himself as an "***Active Chairman and CEO***

19  ***of Oclaro which he built through M&A***."  Not only does this reflect the extensive experience

20  Couder has in the technology industry, but it also emphasizes how crucial the ClariPhy and Mintera

21  acquisitions were  to Oclaro's overall operations and financial success.

22      25.    During the Class Period, defendants further touted in Oclaro's September 9, 2010

23  Proxy Statement for the Annual Meeting of Stockholders, incorporated by reference into the

24  Company's FY10 Form 10-K filed with the SEC on September 1, 2010, that "***Mr. Couder's***

25  _____

26  [9]     The Company operates on a 52/53 week year ending on the Saturday closest to June 30.  The
27  fiscal year ended July 3, 2010 was a 53-week year, with the quarter ended January 2, 2010 being a
    14-week quarterly period.

28

    THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
    02448-EMC                                                                        - 9 -

1 *experience, through nearly 8 years of executive officer service with companies in a high growth*

2 *phase, gives him a unique perspective on the Company's business*."

3    26.    Defendant Jerry Turin ("Turin")[10] has served as Chief Financial Officer ("CFO") of

4 Oclaro since July 2008, and held this position during the Class Period.  Turin signed Oclaro's Class

5 Period SEC filings.  From April 2008 to July 2008, Turin served as VP of Finance, and from July

6 2005 to July 2008, he served as Corporate Controller.

7    27.    Turin, as CFO of Bookham prior to it acquiring Avanex and becoming Oclaro, was

8 touted on Bookham's website as having "***more than 20 years of combined accounting and***

9 ***corporate finance experience in the technology industry***" – including with Bookham since 2005.

10    28.    Furthermore, on Turin's LinkedIn page, he labeled himself as the Company executive

11 that: "***Rolled out the Oclaro story to the investor community***."  And highlighting the significance of

12 the Company's Offering to its overall success, Turin further takes credit for having "***Raised $75M in***

13 ***a 2010 secondary offering, conducted as a 're-branding' of Oclaro***."

14    29.    Defendants publicly and repeatedly conveyed to the investing public that Oclaro and

15 its executive officers, including Couder and Turin, were the beneficiaries of significant and ongoing

16 relationships with their customers (which were few as discussed *infra* at ¶31), and that such

17 relationships provided the Company with enhanced visibility not only of the strength of ***present***

18 orders, meaning little risk of inventory stockpiling or cancellations, but the Company's outlook from

19 a demand perspective as well.  For example:

20    •    On June 9, 2010, Turin stated: "***we're pretty close to our customers and pretty close***

21        ***to what they're doing from a forecast and volume point of view***."  *See* ¶54.

22    •    On August 11, 2010, Turin stated: "Also, ***we're very close to our customers***.  The

23        customer base we support are the major telecomm equipment companies and that's a

24        close relationship.  ***If I had 500 customers of the same size and you couldn't drill***

25

26    ———————————————

27    [10]    Couder and Turin are collectively referred to herein as the "Individual Defendants."

28

*down to the different areas within the business, you would have less visibility. But we have a great deal of visibility with these guys.*" *See* ¶83.

30.    Couder also told the market he *personally communicated* with Oclaro's customers. During the Company's July 29, 2010 conference call, he partially attributed the "bullish" 1Q11 guidance issued by defendants that same day to Oclaro's acquisition of Mintera (and thus its product lines), and stated "*I got 15 e-mail[s] back from customer[s]*, this was great because they like the Mintera technology and they want to work with us." *See* ¶68.

31.    The Company's SEC filings further explicitly disclosed that Oclaro depends on a limited number of customers for a significant percentage of its revenues. For example, in the fiscal years ended July 2, 2011, July 3, 2010 and June 27, 2009, its three largest customers accounted for 36%, 29% and 38% of total Company revenues, respectively. This concentration of customers – as opposed to Oclaro securing the majority of its orders from countless smaller, anonymous companies – coupled with defendants' self-proclaimed close relationships with the Company's customers, further supports the strong inference defendants were aware of sharp decreases in customer demand and orders before it was disclosed.

32.    As officers and controlling persons of a publicly held company whose common stock was, and is, traded on the NASDAQ Global Market and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

33.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions

1    therefrom, and were aware of their materially false and misleading nature. Because of their

2    executive and managerial positions with Oclaro, each of the Individual Defendants had access to

3    adverse undisclosed information about Oclaro's financial condition and performance as

4    particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the

5    positive representations made by or about Oclaro materially false and misleading.

6          34.    The Individual Defendants, because of their positions of control and authority as

7    officers and/or directors of the Company, were able to and did control the content of the various SEC

8    filings, press releases and other public statements pertaining to the Company during the Class

9    Period. Each Individual Defendant was provided with copies of the documents alleged herein to be

10   misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

11   their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

12   responsible for the accuracy of the public reports and releases detailed herein and is therefore

13   primarily liable for the representations contained therein.

14         35.    The Company and the Individual Defendants are liable as participants in a fraudulent

15   scheme and course of business that operated as a fraud or deceit on purchasers of Oclaro common

16   stock by disseminating materially false and misleading statements and/or concealing material

17   adverse facts. As described above, the scheme: (i) deceived the investing public regarding Oclaro's

18   business, operations, management and the intrinsic value of Oclaro common stock; and (ii) caused

19   plaintiffs and other members of the Class to purchase Oclaro common stock at artificially inflated

20   prices.

21   Oclaro's and the Individual Defendants' Business and Economic Motivation to Mislead
     Investors During the Class Period

22

23         36.    Defendants were highly motivated to execute Oclaro's $7.5 million strategic alliance

24   with ClariPhy on May 26, 2010 and the acquisition of Mintera on July 21, 2010 before the true facts

     concerning decreasing customer demand and a corresponding decrease in orders were revealed. The

25   Company needed Mintera's sophisticated 40 gigabyte transponder technology to serve growing

26   demand across the industry for that line of products and thus capture the revenue and margins from

27   these sales. Defendants were therefore motivated to make the false and misleading statements

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                      - 12 -

1  alleged herein to maintain the appearance of the Company's strong current and prospective financial

2  condition, and thus secure over $77 million in artificially inflated proceeds from the May 6 Offering

3  so that Oclaro could spend $19.5 million of the cash proceeds to make the strategic investment in

4  ClariPhy and acquire Mintera.  Plaintiffs' motive allegations are probative of defendants' scienter as

5  to both their May 6, 2010 false and misleading statements made in conjunction with Oclaro's

6  Offering documents *as well as* their June 9, 2010 statements wherein defendants touted strong

7  demand but failed to disclose the material decline in customer orders during April 2010.  Critically,

8  plaintiffs allege defendants were specifically motivated to artificially inflate the May 6 Offering

9  proceeds by misrepresenting (*i.e.*, falsely inflating) true customer demand so that Oclaro could

10  afford to execute the admittedly significant May 26, 2010 strategic investment in ClariPhy and July

11  21, 2010 acquisition of Mintera.  These motive allegations, therefore, persist through and are

12  relevant to the June 9, 2010 misstatements and until defendants made a partial corrective disclosure

13  on July 29, 2010.  At that time, and *just eight days* after defendants announced the Mintera

14  acquisition on July 21, defendants finally revealed that, contrary to their May 6 and June 9

15  assurances, demand had decreased in April 2010 (prior to the May 6 Offering), rather than increased.

16      37.    These allegations of defendants' motive to effectuate Oclaro's execution of the May 6

17  Offering at artificially inflated Company share prices caused by their misrepresentations of "strong"

18  and "increasing" customer demand are just as powerful and probative of scienter as allegations of

19  executives' personal, improper insider trading.[11]

20  <center>**SOURCES OF INFORMATION**</center>

21      38.    The allegations herein, made on information and belief, are supported by the firsthand

22  accounts of Oclaro former employees ("FE"), who were employed by the Company during the Class

23  Period:

24      (a)    FE1 is a former Oclaro Executive VP of Sales who worked at the Company

25  between 2007 through 2011.  FE1 reported *directly* to defendant CEO Couder.  FE1 was responsible

27  [11]    *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1056 (9th Cir. 2011).

1   for sales of all of Oclaro's products including non-optical laser diodes, and held the highest-ranking

2   sales position at the Company during the Class Period; and

3              (b)      FE2 is a former Oclaro Senior Manager of Product Marketing in the

4   Company's laser diode business from June 2009 to July 2011. As part of his/her duties and

5   responsibilities, FE2 participated in monthly forecasting meetings covering the entire Oclaro product

6   suite including telecommunications products.

7                           **BACKGROUND TO THE CLASS PERIOD**

8              39.     On February 1, 2010, the Company reported its 2Q10 financial results in a press

9   release, announcing 10% sequential revenue growth:

10              **Oclaro Achieves Positive Cash Flow in Second Quarter Fiscal 2010**
                        **• Revenues Up 10% Sequentially**

11              . . . Oclaro, Inc., a leading provider of optical components and modules for
12      communications, industrial and consumer applications, today announced the
        financial results for its second quarter of fiscal 2010, which ended January 2, 2010.

13              "Generating positive cash flow, on top of ten percent sequential revenue
14      growth, in our second full quarter since the creation of Oclaro is a significant
        accomplishment. . . ."

15      **Highlights For Second Quarter Fiscal 2010:**

16      •   GAAP revenues were $93.6 million for the second quarter of fiscal 2010,
17          compared to $85.1 million in the first quarter of fiscal 2010.

18      •   GAAP gross margin was 27% for the second quarter of fiscal 2010 . . . .

19                              *       *       *

20      •   Adjusted EBITDA was positive $4.3 million for the second quarter of fiscal
21          2010 . . . .

22                              *       *       *

23      •   Cash, cash equivalents, restricted cash and short-term investments increased
            to $56.0 million . . . .

24                              *       *       *

25      **Third Quarter Fiscal 2010 Outlook**

26              "We expect to grow our revenue and are driving to increase our gross
27      margins in what is traditionally a seasonally weaker March quarter," said Alain
        Couder. "Improving our gross margins in the quarter when our industry experiences
        the bulk of its annual pricing re-negotiations would demonstrate our ability to

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                    - 14 -

continually drive costs out of our products and leverage our global skill and infrastructure."

*     *     *

The results of Oclaro, Inc. for the third quarter of fiscal 2010, which ends April 3, 2010, are expected to be:

- Revenues in the range of $97 million to $102 million, including approximately $2.0 million to $3.0 million of Xtellus related revenues

- Non-GAAP gross margin in the range of 26% to 29%.

- Adjusted EBITDA in the range of $4.0 million to $7.5 million.

40. On February 1, 2010, Oclaro hosted a conference call with analysts and investors to discuss the Company's 2Q10 financial results. Couder and Turin primed the market with reports of increasing customer demand trends that they stated were based on end-user need, as opposed to Oclaro's customers building up their inventories, in part because of the short lead times associated with customer demand requirements. In addition, defendants reported the Company was gaining visibility into the remainder of the calendar year:

[Turin:] *We continue to see a strong demand trends* in most of our business areas, in terms of March expectations, and to the extent we are beginning to have some visibility into the rest of the calendar year.

*     *     *

[Couder:] On the non-telecom, specifically in the laser diode, the demand is increasing also.

*     *     *

[Analyst:] [A]s a follow up, what gives you confidence that order trends reflect end user demand versus inventory refresh . . .?

[Turin:] . . . I think the ultra short lead times are consistent with end demand, Paul. I don't think ultra short lead times are consistent with an inventory rebuild, and I think just the demand we are seeing led to supply chain, in the materials out there also suggest that it is real demand.

[Couder:] . . . Clearly, we don't think we are in the bubble situation where customers are putting-in orders to make sure that allocation.

41. On April 14, 2010, the Company issued a press release announcing a reverse stock split, designed solely to create a higher stock price which in turn would attract a broader universe of institutional investors:

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC      - 15 -

Oclaro . . . today announced that its Board of Directors has approved a 1-for-5 reverse split of its common stock . . . .

"*By executing a reverse stock split we believe the higher share price will appeal to a broader universe of institutional investors*," said Alain Couder, President and CEO of Oclaro, Inc. "We also believe a lower share count will better reflect the progress of our anticipated earnings improvements on a per share basis."

\*       \*       \*

"*Demand remains strong across all our businesses and we continue to see improving order trends*."

42.    On April 29, 2010, Oclaro effected the 1-for-5 reverse split of its common stock. After the reverse stock split, there were approximately 42.5 million shares of common stock outstanding. On the same day, the Company issued a press release announcing its 3Q10 financial results, which reported strong figures and a continuation of demand trends: "'*Demand remains strong across all our businesses, and we continue to gain share in key product areas*,' said Alain Couder."

43.    On April 29, 2010, Oclaro hosted a conference call with analysts and investors to discuss the Company's 3Q10 financial results, wherein defendants again assured the investment community that strong demand for its products was continuing.

44.    On April 30, 2010, Morgan Keegan issued an analyst report on Oclaro entitled "Q3: FY10 Results and Forecasts Offset Reverse, Announced Share Offering," which noted that the timing of the Offering was a surprise but that Oclaro appeared to be taking advantage of market conditions:

While the timing is a surprise . . . *we think Oclaro is taking advantage of favorable market conditions and sentiment around its strong results and forecasts to opportunistically raise cash*; while we can't rule it out, we doubt Oclaro has the appetite for a transformative acquisition of another public company (similar to Avanex-Bookham) and *instead seeks strategic, tuck-in acquisitions to fill portfolio gaps* (a small technology company was acquired during the quarter but was deemed "immaterial") or strategic partnerships (in the form of NRE), to provide more flexibility in the "make vs. buy" decision.

45.    On April 30, 2010, the Company filed with the SEC a Form 8-K/A, Amendment No. 2, containing additional financial information related to the April 2009 Avanex merger and certain financial statements which were incorporated by reference into the Bookham Registration Statement

1  in connection with the offering of common stock contemplated by the April 29, 2010 Form

2  424(b)(5), Prospectus Supplement, filed with the SEC.

### FRAUDULENT SCHEME AND FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

46.    <u>False and Misleading Statement</u>:  On May 6, 2010, the Company filed the Prospectus Supplement setting forth the terms of the May 6 Offering, which falsely assured investors the May 6 Offering was being executed at a time customer demand for Oclaro's products was currently particularly strong and had recently increased.  The Prospectus Supplement falsely reported that the "current" and "recent" growth experience was a reversal of a decrease that had occurred 18 to 24 months earlier, while failing to disclose that in fact, very recently the Company, ***in April 2010***, experienced significant and material declines in order trends that would ultimately result in significant book-to-bill declines reported for 4Q10:

> ***We are currently seeing a return of customer demand which had decreased as a result of adverse economic conditions in the preceding 18 to 24 months***.

<div align="center">*       *       *</div>

> ***As customer demand has recently increased in our markets***, and in adjacent markets, lead times for the purchase of certain materials and equipment from suppliers required to meet this demand have increased and in some cases have limited our ability to rapidly respond to increased demand . . . .[12]

47.    On May 12, 2010, Oclaro completed the Offering pursuant to the Prospectus Supplement.  The Company netted proceeds of approximately $77.2 million from the May 6 Offering after deducting underwriting discounts, commissions and estimated Offering expenses.  A press release issued by Oclaro that day directed investors to the May 6, 2010 Prospectus Supplement for more information:

**Oclaro Announces Closing of Public Offering of Common Stock**

> . . . ***Oclaro, Inc., announced today the closing of its previously announced public offering of 6,900,000 shares of its common stock***, including the 6,000,000 shares originally offered and an additional 900,000 shares to be issued pursuant to

---

[12]    In its January 10 Order, the Court held plaintiffs have adequately alleged that defendants acted with scienter when making these May 6, 2010, false and misleading statements, as well as their similar misstatements made at the June 9, 2010 RBC Conference.  January 10 Order at 4-10.

816811_1

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                      - 17 -

the full exercise of the underwriters' over-allotment option. ***The Company received net proceeds of approximately $77.2 million*** . . . . . A portion of the net proceeds may be used to acquire or invest in complementary businesses, products or technologies.

48.     The cash proceeds from the Offering allowed the Company to immediately ***double its cash position*** from $55.7 million at the end of 3Q10 (ended April 3, 2010) to $111 million at 4Q10 (ended July 3, 2010).

49.     On May 12, 2010, Morgan Keegan issued an analyst report discussing Oclaro's Offering, and in reiterating comments it made in an April 30, 2010 report, described it as opportunistic for the Company to use its results and strong forecasts to raise cash and potentially secure strategic acquisitions to strengthen its product offerings:

**OCLRD: Padding the Coffers**

- Oclaro today announced closing of its secondary offering of 6.9 mm [million] shares (6.0 mm plus 0.9 mm over-allotment) at $12.00 per share, netting the company $77.2 mm after expenses. We expect proceeds are used to fund working capital and small, ***strategic tuck-in acquisitions to close portfolio gaps***.

                            *          *          *

     ***We think Oclaro took advantage of favorable market conditions and sentiment around its strong results and forecasts to opportunistically raise cash*** . . . .

50.     On May 26, 2010, the Company issued a press release announcing it had entered into a "strategic alliance" with ClariPhy, which included $7.5 million to support the Company's entry into 40 Gigabits per second ("Gb/s") technology:

     . . . Oclaro, Inc., . . . today announced it has made a ***$7.5 million strategic investment*** in ClariPhy Communications, a privately-held fabless semiconductor company. . . . The alliance with ClariPhy is an ***important milestone in Oclaro's strategy to build upon its leadership position in 40 Gigabits*** per second ("Gb/s")

     ***The surge in new broadband services*** . . . ***is driving the rapid transition from 10 Gb/s optical networks to 40 Gb/s*** and beyond.

51.     <u>Reasons Why the Statements in ¶46 Were False and Misleading</u>: As of May 6, 2010, defendants already knew but failed to disclose that as opposed to a current return of demand or a recent increase of customer demand, the Company had experienced a material decline in customer order trends in the days and weeks prior to the May 6 Offering. The April 2010 decline in order

1   trends was, in fact, material, thus requiring disclosure: first, because defendants chose to speak of

2   current demand trends; and second, because SEC rules and regulations, specifically, Regulation S-K

3   Item 303, required such disclosure.  Defendants later admitted during the report of Oclaro's 4Q10

4   financial results that the April 2010 decline, which they knew about but did not disclose, would

5   result in a significant decline in the Company's quarterly "book-to-bill ratio," a metric used by

6   analysts and investors to measure the Company's current and future revenue performance.  *See, e.g.*,

7   ¶7 n.4.

8          [Turin:]  ***Trends point of view**, [we] . . . **saw a little bit of a slowdown in
       early April as people digested the huge order flow in March**.*

9                                    *          *          *

10         [Couder:]  What we can say is that ***April in terms of orders  was a little slow.
11     But May and June were very strong***.

12   Defendants further admitted they actually knew in April 2010 of the declining orders in April as

13   Turin admitted during a July 29, 2010 conference call that he was aware of the Company's bookings

14   status because defendants "get weekly bookings reports," and thus were aware of order flows on a

15   weekly basis.

16         52.     The failure to disclose this known decline in customer demand and orders, which

17   occurred in April 2010, ***before*** the Prospectus Supplement and May 6 Offering, was also in violation

18   of defendants' legal obligation under Item 303 of SEC Regulation S-K which requires an issuer to

19   disclose ***any*** known, material trend or uncertainty reasonably likely to have an impact on the results

20   of its continuing operations.  17 C.F.R. §229.303.  The SEC's related Interpretive Release No. 34-

21   26831, 1989 SEC LEXIS 1011, at *11-*13 (May 18, 1989), requires an issuer to describe any

22   "known trends or uncertainties that the registrant reasonably expects will have a material impact on

23   net sales, revenues, or income from continuing operations."  *Id.*  "The discussion and analysis shall

24   focus specifically on material events and uncertainties known to management that would cause

25   reported financial information not to be necessarily indicative of future operating results."  17 C.F.R.

26   §229.303(a), Instructions, ¶3.

27         53.     <u>False and Misleading Statement</u>:   On June 9, 2010, Turin gave a presentation

28   discussing Oclaro's financial position and growth prospects at the RBC Conference, during which he

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                           - 19 -

1    had an opportunity to address analysts' and investors' questions and concerns, and correct any

2    inaccurate information or misleading statements.  In response to an analyst question concerning

3    customer demand, Turin confirmed that the Company continued to experience strong demand, while

4    failing to disclose that the Company had experienced a significant material decline in orders in April

5    2010:

6        *We see strength across almost all of our business areas, so almost all of our
         product areas are driving the growth*.  We probably have some long-term

7        sustainable growth in a few of those key areas but it's pretty broad based right now,
         and we see most of the customers doing well.

8        54.    <u>False and Misleading Statement</u>: During the June 9, 2010 RBC Conference, an

9

10   analyst specifically questioned Turin about whether the strong and increasing customer demand

11   reflected artificially inflated orders from customers concerned with limited supply as opposed to true

12   demand.  In response, Turin assured the investment community that Oclaro was close to its

13   customers and more specifically, close to what customers were doing from a forecast and volume

14   perspective.  As such, he reported defendants purportedly *knew* Oclaro's customers were *not*

15   building up their inventory, and that the strong customer demand defendants were observing was

16   based on the true level of current end-user demand.  In addition, Turin described the significance of

17   the book-to-bill ratio metric that the Company monitored to assess the strength of customer demand,

18   which he relied on to reject analysts' explicit concerns that customers may have been hoarding

19   products as opposed to ordering based upon actual need or demand:

20       [Analyst:] *Now there's some concern from investors that if it's really tight, people
         will try to hoard products*.  If I need components and optical components, for

21       example.  I might actually double click on the mouse, click it more than once to get
         the components.  *Are you seeing any of that?* . . .

22       [Turin:]  Well, *we're pretty close to our customers and pretty close to what
         they're doing from a forecast and volume point of view*. . . .  *[W]e think we're

23       probably the supplier of choice in most of our high growth, high volume areas.
         And so if there was a double order tendency, it may be towards other potential back*

24       *up suppliers*.

25       *Our order pattern was torrid in March, it's solid in June*.  So if I saw – we
         were over 1.3, maybe 1.35 book to bill in March.  If I saw that repeat in a few

26       quarters, you start seeing that that becomes a pretty hefty overhang and maybe
         double the orders.  *But we see something more rational, more consistent with our*

27       *level of business in June.  So we don't think there's much exposure out there from*
         *that point of view*.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                    - 20 -

1                              *       *       *

2       I'd say that again they're not at the 1.35 book to bill rate that we saw last quarter.
        But that's probably a good thing because if you saw that extend for a couple of
3       quarters, then you might be building up something in the system.  All that said our
        guidance is 1.11 to 1.16.  We could deliver substantially more demand than that.  So
4       that – in a sense that also provides a buffer, so in our total order, ***our total potential if
        there is a little bit of double ordering that's kind of absorbed within that excess that***
5       ***we're not going to get to anyway***.

6       55.    On June 15, 2010 *Gazettabyte* published an interview with defendant Couder during

7   which Couder talked about certain of the Company's products and confirmed his communication

8   with customers in connection with demand for certain of the Company's products.  Specifically,

9   Couder discussed the Company's 40 Gbps products and stated that he had not seen any slowing of

10  demand for 40 Gbps:

11

12      40 and 100Gbps markets

13          Oclaro supplies optical components for 40Gbps differential phase-shift
        keying (DPSK) modulation and offers its own components and module for 40Gbps
14      differential quadrature phase-shift keying (DQPSK) for the metro/ regional market.
        Indeed Oclaro is a DQPSK reference design provider for Huawei, the Chinese
15      system vendor with more than 30 percent market share at 40Gbps.

16          Oclaro is also developing a 100Gbps coherent detection module based on
        polarisation multiplexing quadrature phase-shift keying (PM-QPSK) modulation, the
17      industry defacto standard.  "We think for the very long haul there might be a small
        market for PM-QPSK at 40Gbps but most of the coherent modulation will be at
18      100Gbps," says Couder.  "But at the [40Gbps] module level we are continue to be
        focused on DQPSK."

19          ***Given the recent flurry of 100Gbps coherent announcements, is Oclaro***
20      ***seeing signs of 40Gbps being squeezed and becoming a stop-gap market?***

21          "The only thing I can tell you is that ***I got this morning again an escalation***
        ***from one top customer because we can't supply optical components fast enough for***
22      ***their 40Gbps deployment***," says Couder.  "This is all the noise around coherent –
        100Gbps will be deployed but even at 100Gbps people are looking at shorter distance
23      solution that are cheaper than coherent.  ***I have not seen any slowing down of***
        ***40Gbps***."

24          He expects 40Gbps to mirror the 10Gbps market which is set for healthy sales
        over the coming two to three years.  Prices continue to come down at 10Gbps and the
25      same is happening at 40Gbps.  Ten gigabit modules range from $1,500 to $1,800
        depending on their specification while 40Gbps modules are around $6,000.
26      Meanwhile 100Gbps modules will at least be twice the cost of 40Gbps.  "There are
        many sub-networks deployed with [40Gbps] DPSK and DQPSK and I don't see how

27

28

    THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
    02448-EMC                                                                          - 21 -

operators are going to change everything to 100Gbps on those sub-networks," says Couder.[13]

56.     <u>Reasons Why Statements in ¶¶53-54 are False and Misleading and Defendants' Knowledge of the Falsity</u>: Defendants' statements regarding current customer demand and visibility into the calendar year made on June 9, 2010 were false and misleading when made because defendants already knew, but failed to disclose to investors, that the Company had experienced a significant decrease in customer orders and demand in April 2010, prior to the issuance of the May 6 Prospectus Supplement.  In addition, the statements that the Company was "pretty close" to what customers were doing from a forecast and volume point of view was a false statement of current circumstances designed to quell investors' concerns that customers were hoarding products and reported demand may not be true demand.  In truth, however, defendants knew that such close relationships, to the extent they existed, did not translate into visibility into what customers would do with such orders.  *See* ¶84 *infra*.

<u>Oclaro Purchases Mintera Corporation for $12 Million in Cash with Proceeds from the Offering</u>

57.     On July 21, 2010, the Company announced it had acquired Mintera.  Oclaro paid $12 million to the former security holders and creditors of Mintera in cash proceeds raised in the May 6 Offering – an acquisition defendants could not have made absent the artificially inflated proceeds resulting from the misleading Prospectus Supplement.  The agreement with Mintera also called for Oclaro to pay additional revenue-based consideration whereby former security holders of Mintera were entitled to receive up to $20 million if certain triggering events occurred.  According to a press release issued that day:

> Oclaro, Inc., . . . today announced it has acquired Mintera Corporation, a privately-held leader in high-performance optical transport sub-systems solutions. . . .
>
> "Oclaro's acquisition of Mintera is the latest in a series of strategic moves to increase our addressable market, better serve our customers and outdistance our competition," said Alain Couder, president and CEO, Oclaro.  "Through this acquisition, Oclaro has taken another important step forward in building upon our

---

[13]     In light of the Court's Order regarding leave to amend the Complaint with respect to scienter for the July and August statements, plaintiffs are not currently alleging the actionable falsity of the June 15, 2010 statements to *Gazettabyte*.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                    - 22 -

1    leadership position in 40 Gbps regional and metro networks by broadening our
2    product portfolio and systems expertise to expand into 40 Gbps LH and the 100 Gbps
     Coherent markets."

3    Financial terms of the transaction

4            Revenues of Mintera Corporation were approximately $20M for the twelve
5    months ended June 30, 2010.  Terms of the deal call for a payment of $12M in cash
     upon close, plus a revenue-based earn-out ranging from $0 to $20M payable in cash
6    or stock at Oclaro's option.  Achieving cumulative revenues of $70M over the next
     18 month period would lead to the maximum $20M earn out.

7            58.    On July 21, 2010, Morgan Keegan issued an analyst report discussing Oclaro's

8    acquisition of Mintera that stated the Mintera deal was in fact a strategic play allowing Oclaro to

9    accelerate the development of the products:

10   •    Oclaro announced the acquisition of privately held 40G module supplier Mintera
          for $12 mm in cash . . . plus a $0-$20 mm earn-out (up to $20 mm if Mintera
11        posts $70 mm sales over the next 18-months) . . . .

12                                    *         *         *

13           Mintera brings 40G modules with DPSK (Differential Phase Shift Keying)
14   modulation that complement Oclaro's initial foray into 40G modules that use
     DQPSK (Differential Quadrature Phase Shift Keying), and can address a broader
15   spectrum of applications. . . .  [T]he business is now more likely to go to Mintera as
     part of a public company vs. a cash-strapped start-up. . . .

16           Strategically we think the deal makes sense and is **another example of the
17   type of strategic investment we expected following the recent secondary [Offering]
     ($77 mm raised; see our May 12, 2010 note, "OCLRD: Padding the Coffers").**
18   **Oclaro recently invested $7.5 mm in 40G/100G DSP/ASIC supplier privately held
     ClariPhy . . . also a Mintera partner, to accelerate development of next-generation
19   40G/100G "coherent" optical components** . . . .

20           59.    In late July 2010, after defendants announced on July 21, 2010 that the Mintera deal

21   closed, *Lightwave Online Magazine*, targeting optical communications professionals worldwide,

22   published a blog article by Stephen Hardy entitled "Oclaro execs explain Mintera deal." The article

23   highlighted a conversation that Hardy had with Executive VP of Sales and Marketing Scott Parker

24   who indicated that as opposed to Couder's June 15, 2010 statement in *Gazettabyte* that he had not

25   "seen any slowing down of 40Gbps," Parker conceded that demand for 40G had been "***soft for a few***

26   ***quarters***," although it had begun to pick up again:

27

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                          - 23 -

Late yesterday afternoon, *I had a chance to talk with two executives from Oclaro – CFO Jerry Turin and Executive VP Sales/Marcom Scott Parker – about the company's acquisition of Mintera* (see "Oclaro acquires Mintera with 40, 100 Gbps in mind").  Here are some highlights:

The acquisition's boost to Oclaro's 100G efforts was at least as important, and perhaps more important, than its effect on the company's 40G portfolio, Turin said.  It probably will have more of an impact when the 100G market reaches the module stage, however.  The execs repeated Oclaro President and CEO Alain Couder's assertion that the initial play in the 100G space is at the component level (see "Oclaro: ClariPhy deal boosts 100G component and module play").

*Parker conceded that the 40G space has been soft for a few quarters, after a certain "major deployer" (that would be AT&T) slowed its rollouts*.  However, he said that demand for 40G has started to pick up again, particularly for DQPSK technology.

Parker foresees DQPSK ruling metro applications and DPSK and coherent 40G duking it out in long-haul applications.  Of the three modulation formats, the market opportunity for 40G coherent technology will be most affected by the advent of 100G coherent.  Both gentlemen foresee a healthy market for 40G in general over the next two years at least (after which 100G is expected to begin rolling out in earnest).  Support for these deployments should make 40G a continuing source of revenue after cost-effective 100G arrives as well.

60.     On July 29, 2010, the Company issued a press release announcing its 4Q10 and FY10 financial results and reported *accelerated and increasing financial forecasts*.[14]  The press release was entitled "Oclaro Announces Record Profitability in Fourth Quarter Fiscal 2010; 44% Fourth Quarter FY 2010 over Fourth Quarter FY 2009  Pro-Forma Revenue Growth," and stated, in part:

"We are proud to have been profitable on a non-GAAP operating income basis for our first year as Oclaro, our adjusted EBITDA has increased each quarter, and our operating margins continue to trend upwards," said Alain Couder, president and CEO of Oclaro.   "Our technology differentiation and product breadth are creating new opportunities for Oclaro; and so we believe our growth will continue through 2010 and that calendar 2011 is shaping up to be a strong growth year."

**Highlights for Fourth Quarter Fiscal 2010**:

• GAAP revenues were $112.7 million for the fourth quarter of fiscal 2010, compared to $101.2 million in the third quarter of fiscal 2010. . . .

---

[14]     After thoroughly examining each purported warning of risk or cautionary language associated with Oclaro's July 29, 2010 press release, in its September 21 Order, the Court held these warnings are *not* meaningful so as to invoke the Safe Harbor provision or bespeaks caution doctrine even as to admittedly forward-looking forecasts, particularly in light of defendants' "more specific professed visibility into customer demand resulting from its close relationships with its customers." *Id*. at 17-19.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                          - 24 -

- GAAP gross margin was 30% for the fourth quarter of fiscal 2010, compared to 28% in the third quarter of fiscal 2010.

  *        *        *

- Adjusted EBITDA was $12.3 million for the fourth quarter of fiscal 2010, compared to $5.8 million in the third quarter of fiscal 2010, an increase of well over 100%.

  *        *        *

- Cash, cash equivalents, restricted cash and short-term investments were $111.6 million as of July 3, 2010.  This includes $77.1 million received in the Company's May follow-on offering of common stock.

- The Company acquired Mintera Corporation in a deal announced and closed July 21, 2010.  Oclaro has a target model for the high speed transmission business of Mintera of gross margins of 40% to 45% and non-GAAP operating margins of 20% to 25%.

61.    <u>False and Misleading Statement</u>:  Oclaro's July 29, 2010 press release highlighted the Company's 1Q11 outlook, announcing revenues were expected to increase to $126 million and gross margins to the range of 31% to 33%:

**<u>First Quarter Fiscal 2011 Outlook</u>**

The results of Oclaro, Inc. for the first quarter of fiscal 2011, which ends October 2, 2010, are expected to be:

- Revenues in the range of $120 million to $126 million.  This includes approximately $3 million to $4 million of revenues from Mintera.

- Non-GAAP gross margin in the range of 31% to 33%.

- Adjusted EBITDA in the range of $12.5 million to $15.5 million.

62.    <u>False and Misleading Statement</u>:  On July 29, 2010, Oclaro hosted a conference call with analysts and investors to discuss the Company's "record" 4Q10 and FY10 financial results.[15]

---

[15]    As with Oclaro's July 29, 2010 press release, in its September 21 Order the Court closely examined all purportedly cautionary language associated with the July 29 conference call, and presuming (but *not* deciding) each statement therein was forward-looking, concluded it was *not* meaningful so as to insulate defendants from liability for these false and misleading statements. *Id.* at 19-20.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                              - 25 -

1    During the call, Turin again repeated the false statements that the Company was continuing to

2    experience strong customer demand, including for the products from Oclaro's APS division:

3           ***We continue to see a strong demand environment for APS and expect to see
             significant ramps of new market opportunities for APS later in fiscal 2011.***

4
5           . . . [O]ur production plans for APS . . . were based on calendar 2009 demand
             environment assumption.  ***Clearly demand is much higher than those assumed
             levels***.

6                                        *          *          *

7
8           Our inventories were up $2.5 million this quarter to $62.6 million from $60
             million last quarter.  We've intentionally increased our material stocks and are
             strategically staging more of this stock to be positioned to execute ***on the strong***

9            ***demand we continue to see out there***. . . .

10          . . . Our CapEx this quarter was approximately $6.2 million, up from $3.7
             million last quarter.  This is a reflection of our continuing investment towards

11           executing ***on more of the strong demand we see out there***.

12          63.    Couder confirmed during the July 29, 2010 call that Mintera – acquired using $12

13   million in cash proceeds from the Offering – was fueling growth at the Company:

14          [A]cquisitions come with new product that are going to further scale our growth.
             And that's why we are so bullish in the growth we can have in the company.  For

15           instance . . . .

16                                       *          *          *

17          The Mintera acquisition has also helped us strengthen our partnership with
             ClariPhy.  Now we are going to be the only company to get immediate access to the

18           40-G chip.

19          64.    <u>False and Misleading Statement</u>:  Turin reiterated the false and misleading increased

20   financial guidance for 1Q11 during the July 29, 2010 call, and assured investors the customer

21   demand needed to meet this guidance existed and that demand continued to exceed supply in the

22   most recent quarter:

23          We have previously defined our non-GAAP operating income target margin
             to be 10% at 35% gross margins.  ***Today we are increasing that target operating***

24           ***model to a range of 12% to 15% non-GAAP operating income at 35% gross***
             ***margins***.

25                                       *          *          *

26          ***Now let me conclude with our guidance for the quarter ended October 3rd,***

27           ***2010.  We expect revenues to be in the range of $120 million to $126 million.  This***
             ***includes revenues from Mintera of approximately $3 million to $4 million.  We***

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                                    - 26 -

*expect non-GAAP gross margins of approximately 31% to 33%.  We expect adjusted EBITDA of approximately $12.5 million to $15.5 million.*

65.    When questioned by an analyst during the July 29, 2010 call about the new 35% gross margin target for December and whether Oclaro had the capacity in place to get to those levels earlier, Turin responded:

> And as far as having the capacity in place, we continue to invest significantly. We almost doubled our CapEx this quarter.  We certain have significant CapEx in the pipeline.  We spent $6.2 million this quarter.  I'd be very surprised if we didn't spend at least a million more than that in the next quarter.  And we've built up some of the inventory stocks as well.  So we're definitely investing toward the increased demand and we believe we'll have the capacity to deliver growing revenues in September and most likely into December too.

66.    During the July 29, 2010 call, Turin sought to quell investor concerns (which had been percolating for months) that strong or increasing demand was really the result of inventory hoarding by Oclaro's customers following direct questions from analysts about Oclaro's orders already secured.  As he had done in the past, Turin again, turning to the Company's quarterly book-to-bill ratio, assured investors that demand by the Company's customers for its products reflected actual end user demand:

> [Turin] It was just above one.  It wasn't as dramatic as the March when it was roughly 1.35, I think.  So that's good because *I remember a lot of the questions during the quarter were about inventory bubbles or double orders.  And I think we've got a real rational order book that's very consistent with the strong growth we see going forward.*
>
> *                    *          *          *
>
> [Turin] *[W]e've not seen any examples of double ordering*.  And like I answered a second ago, to that we think that the order pattern is quite rational, if I had seen a similar book-to-bill as we saw in March, then you might worry about the system getting overheated or inventories building up or double orders.  But where we're at now we don't think there's any of that.

Defendants Admit Knowledge of Decline in Customer Orders Trend in April 2010 yet Reject the Notion of Declining Trends in Demand, Increase 1Q11 Forecast – Stock Price Declines but Remains Artificially Inflated

67.    <u>False and Misleading Statement</u>:  During the July 29, 2010 call, another analyst followed up with a question concerning Oclaro's book-to-bill – which was currently reported at just over 1.0 – and the relationship between reported quarterly book-to-bill ratio and customer demand. Turin replied by stating that virtually all orders for the entire 1Q11 ("between 85 and 90%") were

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC

already secured, but refused to answer questions whether actual or absolute levels of orders had declined.  However, while attempting to simultaneously obfuscate the truth and dampen concerns about double ordering, Turin revealed that the Company's quarterly book-to-bill ratio had declined from 1.35 in the quarter ending March 2010 to just above 1.0 for the quarter ending June 2010, an apparent acknowledgment that orders had declined from the prior quarter.  The "book-to-bill" metric is the ratio of orders booked for future delivery to orders currently being shipped (*i.e.*, billed), and is an important indicator of a company's future revenues.  Moreover, Turin and Couder admitted that the decline in order trends that caused the decline in book to bill ***occurred in April 2010 prior to*** the May 6 Offering, and was known to defendants at the time, due in part to defendants' receipt of weekly bookings reports:

> [Analyst:]  ***My questions are regarding orders and book-to-bill.  You mentioned that book-to-bill being 1.35, approximately in March was right around one in June.  So did the actual level of orders – absolute levels decline quarter-over-quarter?***
>
>           \*       \*       \*
>
> [Turin:]  From an orders point of view, ***I think the best way to look at how we're positioned at this quarter end is the way we typically look at it, which is from an order coverage point of view.  And as of now we're between 85% and 90% covered for the September quarter.  So that gives you a gauge on how we're – you know, feel pretty good and that we're in a pretty strong position from an order point of view***.
>
> ***Trends point of view***, I think we, and from what I gather, a lot of folks in this space and similar spaces maybe ***saw a little bit of a slowdown in early April as people digested the huge order flow in March***.  And then that seemed to stabilize and it's been real nice levels since then, and ***we feel good about our coverage right now***.
>
> [Analyst:]  ***Do you want to comment specifically on the absolute level of orders in June versus March and how we should see that trend going into September?***
>
> [Turin:]  ***No***.  I think the ***coverage with the guidance gives you that number.  And we feel that strong demand continues through the second half of this calendar year***.
>
> [Couder:]  What we can say is that ***April in terms of orders was a little slow.  But May and June were very strong***.  So it was probably during the March quarter, we had 1.3, maybe.  But clearly the business is picking up in May and June and into July as well.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC

68.     Separately, Couder also tried to temper the impact of expectations set by Turin's false representations that Oclaro already had the 85% to 90% order coverage needed to meet 1Q11 guidance.  Couder denied that the bullishness was based on order coverage alone, but instead upon new product offerings that were acquired from ClariPhy and Mintera.  Both acquisitions could not have been accomplished, however, but for the failure to disclose known facts concerning the true state of order trends and customer demand at the time of the Offering.

> [Couder:] *[W]hy we are very bullish in growth is not only because the demand is there for the current products*, but that was other thing, we are also introducing several new products in the coming months.  *And we also are going to start to see the scaling of the products that we acquired first through acquisition.*
>
> *         *         *
>
> Yes, it's very simple.  *In fact, we knew about that before*, *and before the acquisition several customer were worried about their financial stability because the VCs were at the end of their fund*.  And therefore they were hesitant.  And but *now that they are part of Oclaro, this is totally removed*.  In fact, *we had several customers – I got 15 e-mail back from customer*, this was great because they like the Mintera technology and they want to work with us.

69.     After the Company's July 29, 2010 conference call and disclosures, and upon defendants' disclosure that Oclaro's quarterly book-to-bill ratio had declined from 1.35 to just above 1.0 due to the slowdown of customer orders in April 2010, Oclaro's stock price closed at $12.33 per share on July 30, 2010, down 7.5% from a close of $13.38 per share on July 29, 2010.  The July 30, 2010 stock price decline was on trading volume of more than 1.5 million shares or 2.45 times the median daily trading volume during the Class Period.[16]

<u>The July 29, 2010 Disclosure of April 2010 Order Decline and Its Impact on the Quarterly Book-to-Bill Ratios, Including Investor Response and Stock Price Decline, Demonstrates the Materiality of the Information Omitted at the Time of the Offering</u>

70.     Defendants' failure to disclose the material known decline in orders during April 2010 in the Prospectus Supplement constitutes a violation of the Company's duty under Regulation S-K Item 303 and was independently a material omission – a fact that investors would have wanted to know before making an investment decision.  The materiality of the omitted information is

---

[16]     In its September 21 Order, the Court held plaintiffs have adequately alleged loss causation with respect to defendants' July 29, 2010 partial corrective disclosure.  *Id*. at 31-34.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                        - 29 -

1  evidenced, in part, by: (i) the impact of the April 2010 order slowdown on the Company's quarterly

2  book-to-bill ratio; (ii) defendants' unwillingness to provide actual order figures; and (iii) the sharp

3  decline in the Company's stock price upon the July 29, 2010 disclosure.[17]

4      71.    During the July 29, 2010 conference call, Turin disclosed that the Company's

5  quarterly book-to-bill ratio had declined from 1.35 for the quarter ending March 2010 to "just above

6  one" for the quarter ending June 2010.  Importantly, the reason for the decrease in Oclaro's quarterly

7  book-to-bill ratio was a slowdown of orders in April 2010, prior to the beginning of the Class Period.

8  According to Turin, the slowdown in April was a "trend" of which Regulation S-K Item 303

9  required disclosure:

10     [Turin:] **Trends point of view**, I think we, and from what I gather, a lot of
       folks in this space and similar spaces maybe saw a little bit of a **slowdown in early
11     April** as people digested the huge order flow in March.

12     72.    The fact that the lower bookings for 2Q10 were due to the slowdown in April, prior to

13  the Class Period, as opposed to May or June, was also confirmed on the call by Couder:

14     [Couder] What we can say is that **April in terms of orders was a little slow.
       But May and June were very strong**.  So it was probably during the March quarter,
15     we had 1.3, maybe.  But clearly the business is picking up in May and June and into
       July as well.

16

17     73.    The April 2010 order slowdown that reduced the Company's quarterly book-to-bill

18  ratio was the only negative information disclosed by the Company in its 4Q10 results or conference

19  call.  The materiality of the decrease in customer orders and demand in April 2010, and the resulting

20  decline in the Company's quarterly book-to-bill ratio disclosed on July 29, 2010, was identified by

21  securities analysts as the cause of the stock price decline.

22     74.    For example, on July 30, 2010, Bloomberg issued a report entitled "Oclar[o] down as

23  much as 11% on 4Q report . . ."  The Bloomberg report specifically tied the stock price decline to

24  investors' "disappoint[ment] in the deceleration in OCLR book-to-bill."

25     July 30 (Bloomberg) – **Oclar[o] down as much as 11% after reporting fiscal
       4Q results** . . . .

26

27  [17]    As previously noted, the Court held in its September 21 Order that plaintiffs have adequately
    alleged the April 2010 slowdown to be material.  *Id*. at 7-10.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                              - 30 -

- OCLR 4Q sales $112.7m vs est $114m; adj EPS 24c vs est 19c, may include 4c FX gain: [Auriga] analyst Chandan Sarkar

- *Some investors may be disappointed in the deceleration in OCLR book-to-bill*

75.    In addition, a July 30, 2010 Auriga analyst report covering Oclaro, entitled "F4Q10 Post Mortem: Profitability Up, Revenues In-line," discussed the Company's July 29, 2010 financial results and specifically pointed to the Company's "bearish" disclosure that disappointed some investors, that in fact the 1.35 book-to-bill reported in 3Q10 had declined to just over 1.0 in 4Q10 and strong demand in March had given way to more steady order flows:

F4Q10 Post Mortem: Profitability Up, Revenues In-line

Oclaro (OCLR, Buy) reported F4Q10 results after the close yesterday.  Revenues at $112.7 were in-line with consensus while non-GAAP EPS of $0.24 compared to consensus of $0.19.  However, $0.04 of the beat was from foreign currency gains. *Given the big run-up in the shares in to the results, we would not be surprised to see some mild pressures on the shares today post the call*.

                              *        *        *

- *Bears Will Point To Deceleration in Book-to-Bill: After a stellar 1.35 B2B in F3Q10, this quarter's B2B was only slightly over 1*.  Management has countered that order coverage in the current quarter already stands at more than 85% so visibility remains strong.  However, it is apparent that some of the "crazy" demand growth the company experienced in March 2010 has now given way to more steady order flows. *Although this deceleration may disappoint certain classes of investors, the steady growth prospects should be seen as a positive by longer-term shareholders.*[18]

---

[18]    On August 3, 2010, Stifel, Nicolaus & Company issued an analyst report covering Oclaro, which explained that the decline in Oclaro's share price resulting from the report was likely due to the sharp decline in book-to-bill ratios that defendants already attributed to the April order decline, which were known but not disclosed:

Oclaro sold off materially (down 7.8% relative to COMP up 0.1% over same period) on Friday, July 30, with certain other optical communications components peers down in sympathy, after Oclaro reported solid June quarter results on July 29, after the close, and provided guidance for sustained and solid growth and margin expansion. *The undue weakness in the stock and sector was likely due to investors interpreting a sharp fall in the book-to-bill for Oclaro from 1.35x to>1.0x as a signal that the optical cycle was ending and the industry would return to a trend of declining profitability as supply exceeds demand after several quarters of the industry being supply constrained.*

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                      - 31 -

76.     Because the April 2010 order decline and decline of Oclaro's quarterly book-to-bill ratio was the only negative news reported during the July 29, 2010 call, it is possible to objectively assess the significance of the April 2010 order slowdown by analyzing Oclaro's stock price reaction to this negative disclosure using an event study.[19]  The event study first determines the historical relationship between a company's stock price and market and industry indices, and then analyzes whether the price decline following the event is larger than the stock's normal historical price volatility.

77.     In the Company's 2010 Form 10-K, Oclaro identified the NASDAQ Composite as its market index and NASDAQ Telecommunications as its industry index.  Consequently, the event study first determines the historical relationship between Oclaro's stock price and the market index (NASDAQ Composite) and the industry index (NASDAQ Telecommunications) for a control period of 120 trading days (and a control period of one year) prior to July 30, 2010.[20]  An event study is a regression analysis measuring the effect of an event like a company's earnings announcement on its stock price and is assessing claims of loss causation and materiality.  *See* Madge S. Thorsen, Richard A. Kaplan & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 99 (2006).  Second, Oclaro's stock price decline on July 30, 2010 (adjusted for market and industry factors) is compared to the stock's normal historical volatility.  In this case, the Oclaro stock price decline on July 30, 2010 was unusually large with less than a 5% probability of occurring randomly, meaning that it was statistically significant and therefore most likely caused by the disclosure of the April 2010 order slowdown.[21]  In other words, an objective event study demonstrates that investors

---

[19]     Plaintiffs have engaged a Certified Financial Analyst to employ an event study to evaluate the July 29, 2010 event, Oclaro's announcement and conference call concerning its 4Q10 financial results.

[20]     In this case, the results are not materially different whether a 120-day period or a one-year period is used.

[21]     **120-day control period**

SUMMARY OUTPUT

| | |
|---|---|
| *Regression Statistics* | |
| Multiple R | 65.73% |

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                                    - 32 -

viewed the information of the April slowdown, and resulting lower quarterly book-to-bill ratio, as material.

**Defendants' Continued False and Misleading Statements Boasting of Strong Customer Demand, Visibility into Customer Ordering Trends, and Increased 1Q11 Financial Forecasts**

78.    Notwithstanding defendants' July 29, 2010 disclosures regarding the April 2010 decline in order trends, some analysts exhibited a favorable reaction to defendants' July 29, 2010 continued misleading statements concerning increasingly strong customer demand, claims of significant visibility into customer needs, and that the Company already had secured 85% to 90% of

| | | | | | |
|---|---|---|---|---|---|
| R Square | 43.20% | | | | |
| Adjusted R Square | 41.74% | | | | |
| Standard Error | 3.22% | | | | |
| Observations | 121 | | | | |
| ANOVA | | | | | |
| | df | SS | MS | F | Significance F |
| Regression | 3 | 0.09206 | 0.0306929 | 65976 | 0.00000 |
| Residual | 117 | 0.12105 | 0.00103 | | |
| Total | 120 | 0.21311 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% |
|---|---|---|---|---|---|---|
| Intercept | 0.0039 | 0.0029 | 1.3258 | 0.1875 | (0.0019) | 0.0097 |
| NASDAQ Composite | 1.4094 | 0.5700 | 2.4725 | 0.0149 | 0.2805 | 2.5384 |
| NASDAQ Telecommunications | 0.4474 | 0.5276 | 0.8480 | 0.3982 | (0.5975) | 1.4924 |
| 7/30/2010 | (0.0830) | 0.0324 | (2.5633) | 0.0116 | (0.1471) | ( 0.0189) |

### 1-year control period

SUMMARY OUTPUT

| Regression Statistics | | | | | |
|---|---|---|---|---|---|
| Multiple R | 54.27% | | | | |
| R Square | 29.45% | | | | |
| Adjusted R Square | 28.60% | | | | |
| Standard Error | 3.66% | | | | |
| Observations | 253 | | | | |
| ANOVA | | | | | |
| | df | SS | MS | F | Significance F |
| Regression | 3 | 0.13895 | 0.04632 | 34.64465 | 0.00000 |
| Residual | 249 | 0.33288 | 0.00134 | | |
| Total | 252 | 0.47182 | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95.0% |
|---|---|---|---|---|---|---|
| Intercept | 0.0061 | 0.0023 | 2.6391 | 0.0088 | 0.0015 | 0.0107 |
| NASDAQ Composite | 1.4526 | 0.4717 | 3.0795 | 0.0023 | 0.5236 | 2.3817 |
| NASDAQ Telecommunications | 0.3374 | 0.4199 | 0.8036 | 0.4224 | (0.4896) | 1.1644 |
| 7/30/2010 | (0.0856) | 0.0367 | (2.3331) | 0.0204 | (0.1578) | (0.0133) |

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                   - 33 -

1   the order coverage needed to meet its increased 1Q11 forecasts.[22] Oclaro's stock price continued to

2   trade at artificially inflated levels over $12.00 per share.

3       79.   <u>False and Misleading Statement</u>:  On July 30, 2010, for example, Miller Tabak + Co.,

4   LLC issued an analyst report covering Oclaro entitled "Oclaro: OCLR - $12.89 - Buy Rated, Target

5   $17.50."  The report repeated defendants' false assurance that "Oclaro has hard orders in hand equal

6   to 85% of the full quarter guidance," and reported the following additional details:

> ***Oclaro offered solid guidance for the September quarter***.  The revenue range of
> $121-$126 million including $3-$4 million of Mintera revenues . . . .  Management
> also reiterated it think[s] ***given continued strong demand it could hit 35% GMs in
> the December quarter***.
>
> *      *   *      *   *
>
> ***Oclaro experienced a little bit of softness in orders in April with demand
> accelerating sharply in May and June***.  They noted the strong conditions have
> persisted through July as well.
>
> *      *   *      *   *
>
> ***With roughly 85% of the quarter already in hand in the form of hard orders, the
> question becomes how much book-and-ship business can they handle during the
> quarter***.

    80.   <u>False and Misleading Statement</u>:  On July 30, 2010, BWS Financial also issued a

report discussing the Company's performance and repeating the Company's aggressive outlook, in

particular the accelerated achievement of 35% gross margin by 2Q11 (December 2010):

**OCLR: Demand Pacing ahead of Supply**

- *. . . [T]he Company indicated gross margin of 35 percent would be attained
  by the December quarter instead of the March quarter.*

  *      *   *      *   *

- ***OCLR issued better than expected guidance for fiscal first quarter, which
  leads us to raise our numbers***.

---

[22]   To the extent defendants purport to have warned investors that if any of the Company's major customers decrease, stop, delay or cancel orders, the Company may fall short of its financial operating goals, those warnings were intentionally diluted and rendered meaningless by defendants' repeated assurances that their relationships with customers were such that orders on hand were firm and the potential for cancellation was nearly nil.

81.  <u>False and Misleading Statement</u>:  On August 11, 2010, Turin gave a presentation for analysts and investors discussing Oclaro's financial condition and growth prospects at the Morgan Keegan Technology Conference, during which he had an opportunity to address analysts' and investors' questions and concerns, and correct any inaccurate information or misleading statements. During the presentation, Turin reiterated customer demand for Oclaro products remained strong, stating:

> *As of last week, we are over 90% order covered for this quarter, which is an extraordinary level for our business*.

> *Typically, when we give guidance, we are maybe 60% to 65% range and we feel good*.  The order flow is consistent with the growth we are looking at.

> \*        \*        \*

> *[D]emand is strong across all of our products*.

82.  <u>False and Misleading Statement</u>:  During the August 11, 2010 presentation, an analyst asked Turin the basis for his confidence that orders in hand (purportedly 90% coverage) were not simply the product of double ordering by customers.  Turin specifically differentiated Oclaro from companies with 500 customers, and emphasized that because Oclaro's customer pool was so concentrated and primarily consisted of a few large customers, the Company's relationships with its customers provided a level of visibility that virtually removed the risk of inventory build up and order cancellations:

> [Analyst] [W]hat *gives you confidence that the order strength that you're seeing reflects more than double ordering and an inventory refresh?  Do you have any better visibility there?*

83.  <u>False and Misleading Statement</u>:  In response, Turin reiterated to the investment community that Oclaro had significant and meaningful visibility into customer ordering based largely on the personal contact the Company's executives routinely had with its customers:

> [Turin] *There are a lot of data points.  One is as you started out the Q&A with is 1.3 book-to-bill in March, which is very much an anomaly*.  The fact that we didn't see 1.3 in June *tells me that there were not in an irrational order sense where people are just throwing orders at everything in order to double order and hedge their bets*.

> Also, we're very close to our customers.  The customer base we support are the major telecomm equipment companies and that's a close relationship.  If I had 500 customers of the same size and you couldn't drill down to the different areas

*within the business, you would have less visibility.  But we have a great deal of visibility with these guys.  We've not seen order cancellations.*  When we come to a quarter and there are orders that are unfulfilled, those tend to roll into the next quarter.

*Plus, from an inventory backlog point of view, we don't sell into channels. We don't sell though distribution.  Our customers have done a great job in recent years at pushing most of the inventory risk back on us* through holding strategic stocks or through inventories held at their CM's that are pulled as needed.  There's not a lot of room in their food chains to build up inventory.[23]

84.     <u>Reasons Why Defendants' Statements in ¶¶61-62, 64, 67, 79-83 Were False and Misleading and Defendants' Knowledge of Falsity</u>:  Defendants' statements on July 29 and August 11, 2010 concerning: (1) continued strong customer demand for the Company's products; (2) 90% order coverage for 1Q11 as not including double orders, customer inventory hoarding, or orders at risk of cancellation, known to defendants based on close customer relationships; and (3) the accelerated and increasing guidance for 1Q11 and CY10; were materially false and misleading when made.

(a)     Defendants' statements concerning 85% to 90% order coverage, coupled with their claims that close customer relationships provided them with unique insight into customer needs, were designed to – and did – convince investors that the risk of cancellation of current orders, or inventory stockpiling and double ordering by customers *at present*, was remote.  Turin assured the market on August 11, 2010 that defendants knew this to be the case because "we're very close to our customers" and "we have a great deal of visibility with these guys."

(b)     Furthermore, Turin's earlier assurance on June 9, 2010 that defendants were "pretty close to what they're doing from a forecast and volume point of view" were similarly made to justify both the apparent firmness of existing orders and customer demand *as well as* impending demand needed to meet Oclaro's 1Q11 admittedly bullish forecasts.  Indeed, the purpose and intent of Turin's statement that Oclaro had "90%" order coverage which provided support for the

---

[23]     With regard to defendants' false and misleading statements made at the August 11, 2010 Morgan Keegan Conference, the Court held in its September 21 Order that the only associated purportedly cautionary language pointed to by defendants is contained in a document outside of the pleadings that cannot be considered because it "does not meet the standards of Federal Rule of Evidence 201."  *Id*. at 20.

1    Company's 1Q11 outlook was to convince investors existing orders were firm.   Turin even

2    acknowledged that order coverage of "over 90%" was an "extraordinary level" of coverage, stating

3    that "[t]ypically, when we give guidance, we are maybe 60% to 65%."

4            (c)        Defendants' representations that the Company had visibility into the strength

5    and validity of customer orders – including current "order coverage" – concerned not only visibility

6    into what the *current* order strength represented, but *also future* customer order patterns.   In

7    response to the analyst question on August 11, 2010: "*what gives you confidence that the order*

8    *strength that you are seeing reflects more than double ordering and an inventory refresh? Do you*

9    *have any better visibility there*?" – defendants stated their confidence was based upon several "data

10   points."   According to defendants, the first such data point was Oclaro's decline in quarterly book-

11   to-bill ratio from 1.35 for the quarter ending March 2010, which they described as an anomaly and a

12   deviation from typical order patterns.   Defendants further stated the decline in the Company's

13   quarterly book-to-bill ratio for quarter ending June 2010 (to just above 1.0 from 1.35) indicated these

14   were *not* irrational orders, *i.e.*, customers were not placing inflated orders, including double orders to

15   hedge their bets.   As discussed above, this decline in Oclaro's quarterly book-to-bill ratio was first

16   disclosed on July 29, 2010, and was a complete surprise to investors.   Defendants had *not* previously

17   described the Company's quarterly book-to-bill ratios as irrational or an anomaly.   The other "data

18   point," according to defendants, that gave them visibility and confidence into the strength and

19   firmness of current order coverage was that they were close to their customers – "a very close

20   relationship" even.   *See* ¶83.

21           (d)        Defendants' statements conveyed to the market that Turin and Couder were

22   not only experienced in Oclaro's industry, but experienced with these particular customers and their

23   order and forecasting tendencies, especially "in recent years."   *Id.*   Defendants further assured

24   investors that if customer orders went unfulfilled, they tended to roll into the next quarter (rather

25   than be cancelled), and that because Oclaro did not sell into distribution channels, customers pushed

26   any such "inventory risk" back onto the Company.   *Id.*

27           (e)        The Court's finding in the September 21 Order that it was "not clear that

28   [defendants] would necessarily know details such as precisely how far out in advance Oclaro knew

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                                      - 37 -

1    of customer needs" is directly addressed by detailed allegations herein that defendants knew or

2    deliberately disregarded that *current* order coverage and close customer relationships did not

3    provide *current* visibility or confidence that removed the risk of inventory buildup or order

4    cancellations.  Rather, as reported by FE1 (below), the Company's customers' were often reluctant

5    to provide detailed information about their own demands so that suppliers like Oclaro would not

6    dedicate manufacturing capacity to other customers' needs.  The fact that FE1 stated these industry

7    nuances were known to defendants Couder and Turin is corroborated by Turin's own statement that

8    customers were not placing inflated orders to "hedge their bets."  *See id*.  Nor did defendants

9    disclose, as reported by FE2 below, that orders in place consisted of blanket orders and not actual

10   orders.

11            (f)     FE1 is a former Oclaro Executive VP of Sales who worked at the Company

12   between 2007 and 2011.  FE1 reported directly to Couder.  FE1 was responsible for sales of all

13   Oclaro's products, including non-optical laser diodes, and was the most senior person in the sales

14   department during the Class Period.  FE1 provided facts concerning sales forecasting at Oclaro and

15   the optical components industry generally.  FE1 described the Company as being at the end of a

16   complex food chain of companies whose products are integrated into other companies' products for

17   ultimate end users.  Most of the end users for Oclaro's products, according to FE1, are telecom

18   network carriers.

19            (g)     According to FE1, it is in this regard that as opposed to having an accurate or

20   true picture of customer demand, much of the forecasting process at Oclaro involved "reading the tea

21   leaves" of what customers were likely to do.  Furthermore, according to FE1, Oclaro's customers

22   were often reluctant to provide detailed information about their own needs so that suppliers like

23   Oclaro would not dedicate manufacturing capacity to other customer's needs.  According to FE1,

24   these nuances were known to Turin and Couder, and are also typically known to those experienced

25   in the industry.[24]

26   _____

27   [24]    Plaintiffs do not allege that by virtue of their position alone defendants were presumably

28   experienced in the industry.  Rather, ***plaintiffs have alleged that according to FE1, Couder and***

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                              - 38 -

1    (h)    Based on industry analyst questions to defendants set forth herein, it appears

2    the analysts were aware of these industry trends as well – which likely explains their repeated

3    requests for defendants to explain the basis of their confidence in current customer order coverage as

4    well as Oclaro's financial outlook for 1Q11.

5    (i)    FE1 further reported that defendants' statements that they were very close to

6    customers, from his/her perspective, were accurate to the extent that it was true Turin regularly met

7    with top executives from Oclaro's key customer accounts.  According to FE1, during the Class

8    Period, Oclaro had three customers – Ciena, Huawei and Alcatel – that were the most critical to the

9    Company's financial success, representing 50% of the total market for optical components.  FE1

10    further stated, however, that notwithstanding good relationships with Oclaro's customers, defendants

11    knew the Company only had visibility or a "good grip" into customer demand for about two weeks

12    forward, and that it would be accurate to suggest cancellations of orders scheduled to be delivered

13    less than a couple weeks out would likely not be cancelled.  But according to FE1, beyond a couple

14    weeks, for example, visibility into what customers might do with orders already scheduled for even

15    30 days out was "a reach," and beyond that was "a crap shoot."  Thus, as FE1 reported, defendants'

16    close relationships with customers would not translate into providing Oclaro visibility into the

17    firmness of customers orders or the Company's financial results.

18    (j)    FE2 is a former Oclaro Senior Manager of Product Marketing in the

19    Company's laser diode business from June 2009 to July 2011. As part of his/her duties and

20    responsibilities, FE2 participated in monthly forecasting meetings wherein the entire Oclaro product

21    suite, including Telecom products, were discussed.  According to FE2, these forecasting meetings

22    were typically attended by Executive VP of Slaes, Scott Parker, and at times defendant Couder and

23    Chief Operating Officer James Haynes.  FE2 provided general information concerning the

24

25

26    *Turin were specifically aware that customer visibility in the present demand and corresponding
strength of orders as well as future needs was significantly limited despite* close customer
relationships.  Couder and Turin's extensive industry experience as executives, as detailed herein

27    further supports this claim.  *See* ¶¶8-28.

28

1  forecasting of product sales at Oclaro, as well as specific insight into circumstances surrounding

2  product orders during the summer of 2010.

3          (k)     FE2 explained that in July 2010, there was a lot of "bullishness" at Oclaro

4  about the 1Q11 and CY10 forecast.  According to FE2, the bullishness at the Company in July 2010

5  was due to Oclaro having secured what are called "blanket orders" from customers, but that "the

6  devil was in the details."  According to FE2, ***"blanket orders" were not actual firm orders***, ***but***

7  ***rather***, ***represented customer commitments to place actual orders*** over a certain time span – 12 to

8  18 months.  These blanket orders were submitted by customers for the purpose of securing beneficial

9  pricing terms from Oclaro for its products.  FE2 stated that the phrase "order coverage" was

10  internally used to describe some combination of blanket orders and actual purchase orders.

11  According to FE2, blanket orders typically included "push out" and "pull in" clauses that would

12  affect prices depending on whether or how orders were actually placed.  Actual purchase orders

13  would vary from quarter to quarter based upon any "push outs" or "pull ins" that occurred, and

14  notwithstanding the existence of any blanket orders, FE2 reported sales projections were "all about

15  getting firm orders."

16          (l)     As shown by the facts set forth herein, and the reports of FE1 and FE2,

17  defendants knew or recklessly disregarded that order coverage of 85% to 90% for 1Q11, coupled

18  with close customer relationships, did not provide the visibility and confidence to confirm current

19  orders were firm and thus the Company would meet its 1Q11 financial forecasts.  Defendants further

20  knew orders had declined, rather than increased, from the quarter ending March 2010, and blatantly

21  refused to disclose the actual numerical order level despite analysts' specific requests for that

22  information.  They also failed to disclose "order coverage" included blanket orders, which were ***not***

23  actual purchase orders, and rather were particularly susceptible to cancellation and/or push outs.

24  Defendants instead directed investors to the purported order coverage figures and guidance for 1Q11

25  they had already provided.

26         85.     On September 1, 2010, Oclaro filed with the SEC a Form 10-K for 4Q10 and FY10

27  (ended July 3, 2010).  Oclaro's FY10 Form 10-K was signed by defendants Couder and Turin.  It

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC

1    also reiterated that as of the filing date, September 1, 2010, the Company continued to experience

2    strong customer demand:

3          *We are currently seeing a return of customer demand which had decreased as a
          result of adverse economic conditions in the preceding two years*.

4                                              *       *       *

5

6          *As customer demand has recently increased in our markets, and in adjacent
          markets*, lead times for the purchase of certain materials and equipment from
          suppliers required to meet this demand have increased and in some cases have
7          limited our ability to rapidly respond to *increased demand*.

8          86.    On September 4, 2010, *Silicon Valley Blog* published an article entitled "Oclaro CEO

9    Trumpets Tier One Optical Gear Status," with an excerpt of an interview with Couder.   The

10   interview quoted Couder as stating that Oclaro customers Huawei, Alcatel and Ciena control 50% of

11   the market, and the fact that Oclaro's top three customers make up 35% to 40 % of the Company's

12   revenue was a smart move:

13

14         New players have arrived on the scene to lead the optical rebirth that has
           accompanied the explosion in streaming video and wireless communications.  The
           optical gear sector is shining brightly, and Oclaro is one of the key Silicon Valley
15         companies basking in the glow.

16         The company's revenue has jumped 86 percent during the past 12 months and
           is projected to grow another 32 percent during the next fiscal year.  During the last
17         year, Oclaro stock has effectively tripled and outperformed its leading rivals, Finisar
           (FNSR) and JDSU, and the tech-laden Nasdaq by a wide margin.
18

19         *Following are excerpts from a recent Silicon Valley Blog interview with
           Oclaro CEO Alain Couder*:

20         Q.        Could you give an overview of what Oclaro is doing now and
                     what plans you have for the near future?
21

22         A.        Oclaro was created little more than a year ago when we
                     merged two tier two companies, Avanex and Bookham.  I joined
23                   Bookham three years ago.  We did a turnaround.  After that, it was
                     clear that the industry needed to consolidate in such a way that we
24                   create a tier one player who could really drive the industry.  We've
                     had a successful first year with Oclaro.  We are recognized as a tier
25                   one player.  Together with Finisar, we are the two most profitable
                     companies in the industry right now.
26
                     We are now on a growth path of 30-40 percent per year.  W*e
27                   believe we can scale to become a $1 billion company in two years.*

28                                             *       *       *

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                              - 41 -

Q.          There was a glut of optical equipment before the tech bubble burst in 2000.  What's different today?

A.          There is no new major innovation.  The thing which is different is that in the bubble time, there were all these new carriers coming in and ordering massive amounts of equipment that was not being deployed.  ***Now the carriers are very cautious and they order only when they need it.***

Q.          Can you talk about your revenue from your larger customers?

A.          ***Huawei, Alcatel and Ciena, now Ciena/Nortel, control 50 percent of the market, what's called the DWDM market, which is where we are focused.  Having our three top customers represent 35-40 percent of our revenue when their market share is 50 percent makes a lot of sense.***  We are not over invested in those customers.  We used to be in the past.  We had 30-40 percent of our business in Bookham with Nortel; Avanex had the same number with Alcatel.  That was very risky.

87.     On September 15, 2010, Lightreading.com reported that Oclaro today "announced a new dynamic spectrum wavelength selective switch that provides telecommunications operators an upgrade path to deliver increased bandwidth in the future without having to replace costly networking equipment."   The article further quoted senior Oclaro executive Dr. Krishna Bala ("Bala") as follows:

> "***Consumer demand for higher bandwidth continues to grow at a steady rate and operators worldwide are scrambling to provide the highest speeds at the most affordable price*** points," said Dr. Krishna Bala, EVP WSS Division at Oclaro.  "***We designed our dynamic spectrum 2x1 WSS to meet these needs*** . . . ."

88.     Between September 19 and September 23, 2010, executives from Oclaro attended the European Conference on Optical Communications in Torino, Italy.  Presenters included Oclaro's Director of Product Line Management, Massimo Armiraglio ("Armiraglio"), and Executive VP and Division Manager of WSS, Bala.  Defendants issued Company press releases discussing the presentations made by Oclaro executives during the conference in Italy.  On September 20, 2010, an Oclaro press release described the topics addressed during the conference, which included the following by Armiraglio and Bala, respectively: (i) how Oclaro's recent acquisition of Mintera and strategic partnership with ClariPhy are furthering the Company's competitive lead in the development of 100 Gb/s components and modules; and (ii) how the increased demand for applications such as video and data storage are driving a fundamental shift in optical core networks.

1   89.    Following the press release and presentations, analysts confirmed that during the

2   conference, Oclaro executives continued to boast of its **near-term** business and financial condition.

3   Auriga reported on September 21, 2010:

4       ECOC Review: Bullishness in Optical Sector Abounds

5           The European Conference on Optical Communications (ECOC) is under way
        in Torino, Italy, this week. *We note continuing bullishness from Oclaro (OCLR,*

6       *Buy) and Finisar (FNSR, Hold) at the show*.   We use this note to provide an
        important technology update. *Although we continue to prefer OCLR to FNSR, both*

7       *sets of managements continue to express strength in their near-term business as*
        *well as their longer-term outlook*.

8                                   *        *        *

9
        •   *Investment Conclusion*: *OCLR remains our favorite pick in the optical*

10          *component space.  We reiterate our Buy rating and $20 price target on*
            *OCLR*.

11  90.    Defendants' comments at the Torino, Italy conference in September 2010, which

12  resulted in reports of continued bullishness of the Company, particularly with respect to its near term

13  financial outlook, were designed to maintain the artificially inflated stock price resulting from the

14  actionable false and misleading statements earlier in the Class Period.  In fact, defendants **knew** as

15  early as the second week of September 2010, and **before** the conference in Torino, Italy, the

16  Company was already experiencing significant customer order cancellations.  Defendants ultimately

17  admitted this on October 28, 2010.

18  <u>Oclaro Announces Huge Earnings Miss Due to Sharp Declines in Customer Demand and Order</u>

19  <u>Cancellations</u>

20  91.    Before the market opened on October 28, 2010, the last day of the Class Period, the

21  Company issued a press release announcing its 1Q11 financial results (ended October 2, 2010).

22  Oclaro reported 1Q11 EPS that missed forecasts by 95% and sequential declines in revenue and

23  gross margins:

24          (a)    As opposed to revenues of $126 million, the Company posted only $121

25  million.

26          (b)    As opposed to $0.22 EPS consensus estimates, the Company reported only

27  *$0.01* EPS.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                        - 43 -

1        (c)     Gross margins were 29% as opposed to the analyst consensus of 33%, a

2  sequential decline from 4Q10.

3        (d)     Defendants actually knew of cancellations in the second week of September,

4  before Oclaro executives presented at the September 21-23 conference in Torino, Italy.

5        (e)     Visibility into true customer demand levels (which defendants touted

6  throughout the Class Period) was now limited.

7        (f)     Customer inventories, which defendants assured had not been growing, had in

8  fact become bloated and required correction.

9        92.    The October 28, 2010 press release stated, in part:

10        *"[W]e experienced a slowdown in the rate of revenue growth in late September.*
*Accordingly, our guidance for the December quarter is cautious," said Alain*
11        *Couder*.

12                         *          *          *

13      •   Revenues were $121.3 million for the first quarter of fiscal 2011, compared
14         to $112.7 million in the fourth quarter of fiscal 2010. . . .

15      •   GAAP gross margin was 29% for the first quarter of fiscal 2011, compared
         to 30% in the fourth quarter of fiscal 2010.

16                         *          *          *

17      •   GAAP operating income was $5.0 million for the first quarter of fiscal 2011,
18         compared to $8.6 million in the fourth quarter of fiscal 2010.

19                         *          *          *

20      •   Adjusted EBITDA was $10.9 million for the first quarter of fiscal 2011,
         compared to $12.3 million in the fourth quarter of fiscal 2010.

21      •   GAAP net income for the first quarter of fiscal 2011 was $0.4 million,
22         compared to $10.6 million in the fourth quarter of fiscal 2010.

23                         *          *          *

24   **Second Quarter Fiscal 2011 Outlook**

25        The results of Oclaro, Inc. for the second quarter of fiscal 2011, which ends
   January 1, 2011, are expected to be:

26      •   Revenues in the range of $116 million to $124 million.

27      •   Non-GAAP gross margin in the range of 27% to 31%.

28      •   Adjusted EBITDA in the range of $6 million to $11 million.

93.    On October 28, 2010, Oclaro hosted a conference call with analysts and investors to discuss the Company's 1Q11 financial results.  Couder and Turin participated in the call and attempted to explain the major shortfall and reduced outlook defendants had announced that morning.  During the call, and in stark contrast to defendants' statements made in July, August and September 2010, Couder revealed:

[Couder:]   We have probably seen – you have probably seen several of our customers announcing – announcement getting down for the December quarter.  This is a result of several [carrier] being slow to deploy [their network] or pushing it out, and we are seeing that's what now (inaudible – highly accented language) around the world.  So *we [found this out this]*, not with the announcement, but, in fact, *in mid-September when our customer told us they needed to perform inventory correction*.  *They either push out some of the order to the next quarter or cancel the order altogether*.

. . . We are giving cautious guidance for the December quarter, basically flat from the September quarter.

*          *          *

[Turin:]   *The volatility in push outs we experienced in orders in the last couple weeks of September* also led to a product mix with relatively lower gross margins than we would have expected. . . .

For the December quarter, we do not see our product mix changing for the positive at this time. . . .   We expect relatively flat revenues overall in December. . . .

Also, the Mintera and Xtellus gross margin improvements that *are underway have not been scheduled to come on track in December*.  Accordingly, we've been *cautious in our gross margin guidance for December*. . . .   While we need to be cautious as to the timing *because of our limited short-term visibility*, we do expect to see overall growth and upwards gross margin trajectory returning.

*          *          *

[Oclaro] *ha[s] very limited visibility in revenue growth right now*.

*          *          *

[Couder:]   But on the *more traditional telecom product, we have seen some significant inventory correction*.

94.    Based on defendants' disclosures during the October 28, 2010 call, an analyst asked:

So what gives you confidence then that you're going to be able to produce 30% to 40% growth in the CY 2011 based off of the uncertainty that you just described?  It doesn't seem – *it seems like there's a little bit of a disconnect there*.  What is it specifically that gives you that confidence to make a comment like that?

95.     In response, Couder attempted to convince the market that the future success of Mintera's 40 gigabyte product line – acquired with cash proceeds from the May 6 Offering – would lead to a rebound in Oclaro's overall financial position:

> I think **the comment is based on the acquisitions we have made.  We are seeing excellent traction on 40-G**.  That's the first point.

96.     During the October 28, 2010 call, an analyst asked for additional clarification concerning the customer order cancellations in September 2010: "any **kind of qualitative comments from your customers as to why they're doing kind of an inventory adjustment now** because they should typically be ramping for or getting ready for a strong fourth quarter ramp."  Couder replied, and then followed up, stating:

> **I think it's two things**.  The first thing is that there's some carrier who are slower to deploy the equipment (inaudible – highly accented language) than expected.  And the second one is that there is still a shortage of some high-speed electronic component that leads to some shortages on – for our customer.  And, therefore, they don't need as many optical components.  That's really the two main driver [sic] from what our customer tell us.

> *             *             *

> **First week in September we were very bullish and thinking that we would do a very strong quarter.  And all of a sudden, basically at the end of the second week of September we saw some order cancellation coming**.

97.     Another analyst recognized the inconsistencies between defendants' previous assurances of continued strong customer demand, with 85% to 90% of orders for the quarter **already secured** just weeks earlier, and their Class Period ending disclosures during the October 28, 2010 call.  Couder replied as follows:

> [Analyst:]     Well, so help me understand this inventory correction commentary then.  It sounds like you had – **you had said that you'd expected that you were pretty well covered for the full quarter by the middle of August.  And yet you saw enough falloff to result in you coming in at the bottom of your band of guidance for the fourth quarter – for the September quarter**.  And yet you're saying your book-to-bill was above one.  And you're saying that order rates are normal in the current month.  **It seems like there's a contradiction in that**.

> [Couder:]  No, there's no contradiction.  We were very bullish when we were discussing that, meaning that we thought that we would clearly come at the very high end of the guidance, even at the beginning of September.  And we ha[d] a fairly bullish forecast for the December quarter at that time.  So the inventory correction has basically put us in a situation where at the end of September we came out at the low end of guidance and that we are getting flat for the December quarter, where we will have guided with what we knew at the beginning of September with significant

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                                                - 46 -

1  more revenues, that's what we are getting today.  So that's where the inventory
   correction come[s] in.

2  [Turin:] . . . *In the second half of September it was order cancellations and*
3  *push outs.  So they were orders that were there*.

4  98.  On October 28, 2010, *StreetInsider.com* issued a report on the Company's revenue,

5  earnings and gross margin miss:

6  *Oclaro's (OCLR) Cautious View Pushes Optic Component Stocks Down*

7  Oclaro Inc. said Thursday that its revenue in September saw a slowdown and
   the [sic] it has a cautious outlook for the December quarter, pushing shares of the
8  company down and dragging other optic component companies with it.

9  *                *                *

10 "*We just have very limited visibility in revenue growth rate now*," said Chief
   Financial Officer Jerry Turin on a conference call today.
11
12 *Oclaro reported Q1 EPS of $0.01, compared to the analyst estimate of*
   *$0.22.  Revenue for the quarter was $121.3 million, which compares to the estimate*
   *of $123.32 million*.
13
14 Looking forward, the *company sees Q2 Revenue in the range of $116*
   *million to $124 million, vs. consensus of $128.54 million*.

15 Key Industry Competitor Oplink Reports Above Estimate Results, Says Oclaro Excuses
   Incredible; Analysts Note Inconsistencies and Stock Price Tanks
16
17 99.  Following defendants' disappointing October 28, 2010 disclosures, analysts expected

18 these developments to be representative of an industry-wide trend – *but they were not*.  Rather, the

19 sudden and significant decrease in customer orders *only occurred at Oclaro*.  After Oclaro's October

20 28, 2010 disclosures, but *before* competitor Oplink, Inc. ("Oplink") announced its financial results

21 scheduled to be released that same day, BWS Financial Inc. issued an analyst report downgrading

22 both Oclaro and Oplink.  It stated, in part:

23 OCLR & OPLK: Industry Changes, Downgrading Both

24 *                *                *

25 The earnings results from OCLR confirmed the changes which have resulted over the
   last few weeks as a result of customers canceling and pushing back orders.  The door
26 change in market condition comes at a time when OCLR and its peers have been
   adding capacity in expectation of growing demand.

27 *                *                *

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                    - 47 -

1    As of the time of this note, OPLK has yet to report September quarterly numbers. ***We are anticipating similar negative commentary from OPLK***. OCLR and OPLK serve two distinctly different optical component markets, but share the same customers. If carriers are delaying purchasing plans ***it would have an impact on the entire industry and not just OCLR***.

2

3

4    100.    Later that same day, on October 28, 2010, Oplink did report its 1Q11 revenue and

5    earnings results, ***beating analyst estimates for 1Q11 and forecasting its 2Q11 above estimates***.

6    During a conference call hosted by Oplink to discuss its 1Q11 financial results, an analyst asked

7    Oplink's CEO, Joe Lui ("Lui"), about Oclaro's discussion earlier in the day of inventory buildup and

8    cancellations:

9    [Analyst:]  I watched a number of your customers and ***one of your competitors this morning actually guide down quite significantly talking about some inventory build as well as pushout***.  Can you give us some color. . . .

10

11    [Lui:]  ***We have not seen that order canceling and pushout like you suggest***. . . . I think that the current quarter, meaning the December quarter, is still relatively strong.

12

13    *        *        *

14    I think that we have seen strictly talking about the September quarter, I think that we saw strength across the board, ***meaning just about every customer.  We saw strength***.

15

16    101.    Lui was also asked during Oplink's October 28, 2010 call whether decreases in

17    customer demand in the industry were generally sudden or abrupt:

18    [Analyst:]  ***[T]hose end customer demand changes, is that an abrupt adjustment recently or was this more of a gradual change in terms of order input that you saw through the quarter***?

19

20    [Lui:]  I would say that gradually we sensed that.  ***The softness doesn't come overnight.  So it is a gradual buildup***.

21

22    102.    As a result of defendants' October 28, 2010 disclosures, Oclaro's stock price

23    plummeted.  It declined 37% to close at $8.60 per share on October 28, 2010, from a close of $13.68

24    on October 27, 2010, on tremendous trading volume of more than 14 million shares, an

25

26

27

28

1    approximately 1,400% increase from the previous day.  On October 27, 2010, fewer than one million

2    shares of Oclaro stock were traded.[25]

3         103.    On November 12, 2010, Oclaro hosted an analyst meeting in an attempt to mitigate

4    the damage from defendants' Class Period ending disclosures by telling investors its financial

5    position was not as dire as their October 28, 2010 disclosures suggested.

6         104.    Miller Tabak + Co., LLC issued an analyst report on November 15, 2010 that was

7    even more critical of Oclaro and its executives.  It asked:

8         The question is which company is Oclaro:

9                                    *        *        *

10        [Is it] a rag tag conglomeration of dot.com bust optical businesses *that can't shoot
          straight* and produce stumbling results and inconsistent revenue growth and margins?

11

12        *Judging from the 3Q miss/4Q guidance debacle, the street seems to have voted for
          the latter*.  Even after adjusting the numbers for the lower guidance, OCLR is selling
          at a slight 9-10x CY 2011 estimates.  *The stock is not getting any respect and the
13        management team is getting even less*.

14                          **LOSS CAUSATION/ECONOMIC LOSS**

15        105.    During the Class Period, as detailed herein, defendants devised a scheme to deceive

16    investors and the market about Oclaro's true financial condition by issuing false and misleading

17    statements concerning the Company's true financial condition and performance, including the

18    current and future demand for its products, and in particular its revenue and earnings forecast for

19    1Q11.

20        106.    Defendants' false and misleading statements had the intended effect of and caused

21    Oclaro's stock to trade at artificially inflated prices throughout the Class Period and to reach a Class

22    Period high of $17.45 per share on October 15, 2010.  When the true state of the Company's

23    financial condition concealed by defendants' fraudulent scheme began to reach the market, Oclaro's

24    stock price declined as prior artificial inflation came out of the Company's stock price.  As a result,

25

26    —————————————

27    [25]    In its September 21 Order, the Court held plaintiffs have adequately alleged loss causation
          with respect to defendants' October 28, 2010 corrective disclosures.  *Id*. at 31-34.

28

1    Lead Plaintiff and other members of the class suffered economic losses, *i.e.*, damages under the

2    federal securities laws.[26]

3        107.    On July 29, 2010, defendants made a partial disclosure, revealing for the first time

4    that, as opposed to increasingly strong demand for Oclaro's products as they reported in May and

5    June 2010, the Company had in fact experienced a decline or softness in orders in April 2010 –

6    before the May 6 Offering that generated over $77 million in cash proceeds for the Company.  The

7    April 2010 decline directly resulted in a lower quarterly book-to-bill ratio reported on July 29, 2010.

8    Notwithstanding the Company's repeated representations of strong demand and the accelerated and

9    increasing financial forecasts announced that day, defendants' partial disclosure of the April 2010

10   decline and quarterly book-to-bill impact caused the Company's stock price to decline

11   approximately 7.5%, closing at $12.33 per share on July 30, 2010, down from $13.38 per share the

12   previous day, following a 255% increased trading volume over July 29, 2010.

13       108.    On October 28, 2010, defendants disclosed that, contrary to prior assurances

14   concerning strong visibility into customer ordering practices, overall demand for its products and

15   corresponding 1Q11 and CY10 financial outlook, the Company missed the forecasted financial

16   metrics by a wide margin, its customers had cancelled orders and demand was not expected to return

17   in the foreseeable future.  These disclosures caused Oclaro's stock price to plummet more than $5.00

18   per share (or 37%) to close at $8.60 per share on October 28, 2010, from a close of $13.68 on

19   October 27, 2010, as prior artificial inflation came out of Oclaro's stock price.  This stock price

20   decrease followed massive trading volume of over 14 million shares, an approximately 1,400%

21   increase in trading volume, as compared to October 27, 2010, when the trading volume of Oclaro

22   stock was less than one million shares.

23

24

25

26   [26]    As previously noted herein, the Court held in its September 21 Order that plaintiffs have
27   adequately alleged loss causation with respect to defendants' July 29 and October 28, 2010
     corrective disclosures.  *Id.* at 31-34.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                                      - 50 -

1    109.    The declines in Oclaro's stock price as the market learned more about the true state of

2    the Company's financial condition and operations were directly related to defendants' prior

3    misrepresentations.

4    110.    Like other members of the class of purchasers of Oclaro stock who bought shares at

5    artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss, *i.e.*,

6    damages, when Oclaro's stock prices decreased in response to defendants' July 29, 2010 and

7    October 28, 2010 disclosures.

8    111.    The timing and magnitude of Oclaro's stock price declines on extremely heavy

9    trading volume negates any inference that the loss suffered by lead plaintiff and other class members

10   was caused by changed market conditions, macroeconomic or industry factors or Company-specific

11   facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by

12   lead plaintiff and other members of the class was a direct result of defendants' fraudulent scheme to

13   artificially inflate Oclaro's stock price and the subsequent significant decline in the value of the

14   Company's stock when defendants revealed the Company's true financial condition to the market.

15   **THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE
     AND MISLEADING STATEMENTS**

16

17   112.    The statements alleged herein to be false and misleading are not subject to the

18   protections of the PSLRA Safe Harbor for forward-looking statements because they are either (i) not

19   forward-looking; (ii) subject to exclusion; or (iii) even if purportedly forward-looking, defendants

20   have failed to meet the requirements for invoking the protection, *i.e.*, identifying the statements as

21   forward-looking and demonstrating that the statements were accompanied by meaningful cautionary

22   language.[27]

23   113.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking

24   statement is only protected if it is (i) identified as such; ***and*** (ii) accompanied by ***meaningful***

25   cautionary language. 15 U.S.C. §78u-5(c)(1)(A)(i).

26   [27]    As previously noted herein, the Court held in its September 21 Order that ***none*** of
27   defendants' false and misleading statements are subject to the protection of the Safe Harbor
     provision on the bespeaks caution doctrine.  *Id.* at 13-20.

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                        - 51 -

1    114.    Forward-looking statements made orally must be (i) accompanied by a cautionary

2    statement that it is forward-looking, that actual results may differ materially and that additional

3    information concerning risk factors is contained in a readily available written document; (ii) the oral

4    statement must identify the written document, or portion thereof that contains such factor; and (iii)

5    the referenced written documents must contain *meaningful* cautionary language. 15 U.S.C. §78u-

6    5(c)(2)(B).

7    115.    The Safe Harbor excludes from protection all forward-looking statements that are

8    included in financial statements purportedly prepared in compliance with Generally Accepted

9    Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K.  15 U.S.C. §78u-

10    5(b)(2)(A).

11    116.    Statements of historical fact, current condition or a mixture thereof, including

12    statements concerning customer demand and order visibility, are not "forward-looking" and thus not

13    protected by the Safe Harbor.  *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th

14    Cir. 2008); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,

15    320 F.3d 920, 936-37 (9th Cir. 2003); *Institutional Investors Grp. v. Avaya*, 564 F.3d 242, 255 (3d

16    Cir. 2009) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

17    117.    None of the historic or present tense statements made by defendants were

18    assumptions underlying or relating to any plan, projection or statement of future economic

19    performance, as they were not stated to be such assumptions underlying or relating to any projection

20    or statement of future economic performance when made, nor were any of the projections or

21    forecasts made by defendants expressly related to or stated to be dependent on those historic or

22    present tense statements when made.

23    118.    When defendants issued increased and accelerated financial forecasts, however, they

24    did make forward-looking statements.  Defendants are liable for these false and misleading forward-

25    looking statements because at the time each of those statements was made, the particular speaker

26    knew that the particular forward-looking statement was false or misleading, and/or the forward-

27    looking statement was authorized and/or approved by an executive officer of Oclaro who knew that

28    those statements were false or misleading when made, and the statements were not accompanied by

1  meaningful cautionary language or the cautionary language itself was false because order declines

2  had already occurred at the time defendants were issuing the forward-looking statements.  *In re*

3  *Cutera Sec. Litig.*, No. 08-17627, 2010 WL 2595281 (9th Cir. 2010).  To the extent defendants

4  purport to have warned of slowing demand and customer order cancellations, any such warnings

5  were themselves false and therefore ineffective because these specific risk factors had already

6  materialized.  In fact, defendants effectively nullified warnings that customers could delay or cancel

7  orders when faced with growing inventory by assuring investors concerned with that very risk that

8  customers had put "inventory risk back on us."  *See, i.e.*, ¶83.  Thus, defendants' October 28, 2010

9  disclosure that customers cancelled orders because they needed to perform inventory correction was

10  in stark contrast to the assurances made by defendants during the Class Period.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

11

12  119.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-

13  market doctrine in that, among other things:

14  (a)    Defendants made public misrepresentations or failed to disclose material facts

15  during the Class Period;

16  (b)    The omissions and misrepresentations were material;

17  (c)    The Company's stock traded in an efficient market;

18  (d)    The misrepresentations alleged would tend to induce a reasonable investor to

19  misjudge the value of the Company's stock; and

20  (e)    Plaintiffs and other members of the Class purchased Oclaro common stock

21  between the time defendants misrepresented or failed to disclose material facts and the time the true

22  facts were disclosed, without knowledge of the misrepresented or omitted facts.

23  120.    The market for Oclaro common stock was open, well-developed and efficient at all

24  relevant times.  As a result of these materially false and misleading statements and omissions as set

25  forth above, Oclaro common stock traded at artificially inflated prices during the Class Period.

26  Plaintiffs and other members of the Class purchased or otherwise acquired Oclaro common stock

27

28

1  relying upon the integrity of the market price of Oclaro common stock and market information

2  relating to the Company, and have been damaged thereby.

3         (a)    During the Class Period, defendants materially misled the investing public,

4  thereby inflating the price of Oclaro common stock, by publicly issuing false and misleading

5  statements and omitting to disclose material facts necessary to make defendants' statements, as set

6  forth herein, not false and misleading. Said statements and omissions were materially false and

7  misleading in that they failed to disclose material adverse information and misrepresented the truth

8  about the Company, its business and operations, as alleged herein.

9         121.   At all relevant times, the market for Oclaro common stock was efficient for the

10 following reasons, among others:

11        (a)    As a regulated issuer, Oclaro filed periodic public reports with the SEC; and

12        (b)    Oclaro regularly communicated with public investors via established market

13 communication mechanisms, including through regular disseminations of press releases on the major

14 news wire services and through other wide-ranging public disclosures, such as communications with

15 the financial press, securities analysts and other similar reporting services.

16                        **CLASS ACTION ALLEGATIONS**

17        122.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

18 of Civil Procedure on behalf of all persons who purchased or acquired Oclaro common stock during

19 the Class Period (the "Class"). Excluded from the Class are defendants and their family members,

20 directors and officers of Oclaro and their families and affiliates.

21        123.   The members of the Class are so numerous that joinder of all members is

22 impracticable. The disposition of their claims in a class action will provide substantial benefits to

23 the parties and the Court. As of September 6, 2011, Oclaro had more than 50 million shares of stock

24 outstanding, owned by thousands of persons.

25        124.   There is a well-defined community of interest in the questions of law and fact

26 involved in this case. Questions of law and fact common to the members of the Class which

27 predominate over questions which may affect individual Class members include:

28        (a)    Whether the 1934 Act was violated by defendants;

1      (b)     Whether defendants omitted and/or misrepresented material facts;

2      (c)     Whether defendants' statements omitted material facts necessary in order to

3   make the statements made, in light of the circumstances under which they were made, not

4   misleading;

5      (d)     Whether defendants knew or recklessly disregarded that their statements were

6   false and misleading;

7      (e)     Whether the price of Oclaro common stock was artificially inflated; and

8      (f)     The extent of damage sustained by Class members and the appropriate

9   measure of damages.

10      125.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class

11   sustained damages from defendants' wrongful conduct.

12      126.    Plaintiffs will adequately protect the interests of the Class and have retained counsel

13   who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict

14   with those of the Class.

15      127.    A class action is superior to other available methods for the fair and efficient

16   adjudication of this controversy.

17                                      **COUNT I**

18                   **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
                                   **Against All Defendants**
19

20      128.    Plaintiffs incorporate ¶¶1-127 by reference.

21      129.    During the Class Period, defendants disseminated or approved the false statements

22   specified above, which they knew or recklessly disregarded were misleading in that they contained

23   misrepresentations and failed to disclose material facts necessary in order to make the statements

24   made, in light of the circumstances under which they were made, not misleading.

25      130.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

26      (a)     Employed devices, schemes and artifices to defraud;

27

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                    - 55 -

1    (b)    Made untrue statements of material facts or omitted to state material facts

2  necessary in order to make the statements made, in light of the circumstances under which they were

3  made, not misleading; or

4    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or

5  deceit upon plaintiffs and others similarly situated in connection with their purchases of Oclaro

6  common stock during the Class Period.

7    131.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

8  the market, they paid artificially inflated prices for Oclaro common stock.  Plaintiffs and the Class

9  would not have purchased Oclaro common stock at the prices they paid, or at all, if they had been

10 aware that the market prices had been artificially and falsely inflated by defendants' misleading

11 statements.

12    132.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the

13 other members of the Class suffered damages in connection with their purchases of Oclaro common

14 stock during the Class Period.

15                              **COUNT II**

16                    **For Violation of §20(a) of the 1934 Act**
                          **Against All Defendants**
17

18    133.    Plaintiffs incorporate ¶¶1-132 by reference.

19    134.    The Individual Defendants acted as controlling persons of Oclaro within the meaning

20 of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements

21 about Oclaro, the Individual Defendants had the power and ability to control the actions of the

22 Company and its employees.  Oclaro controlled the Individual Defendants and its other officers and

23 employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

24                        **PRAYER FOR RELIEF**

25 WHEREFORE, plaintiffs pray for judgment as follows:

26    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

27    B.    Awarding plaintiffs and the members of the Class damages and interest;

28    C.    Awarding plaintiffs' reasonable costs, including attorneys' fees; and

1          D.        Awarding such equitable/injunctive or other relief as the Court may deem just and

2    proper.

3                                              **JURY DEMAND**

4          Plaintiffs demand a trial by jury.

5    DATED:  March 1, 2013                      ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
6                                              SHAWN A. WILLIAMS
                                               SUNNY S. SARKIS
7

8
                                                        s/ Shawn A. Williams
9                                              _____
                                                      SHAWN A. WILLIAMS

10                                             Post Montgomery Center
                                               One Montgomery Street, Suite 1800
11                                             San Francisco, CA  94104
                                               Telephone:  415/288-4545
12                                             415/288-4534 (fax)

13                                             ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
14                                             JULIE A. KEARNS
                                               655 West Broadway, Suite 1900
15                                             San Diego, CA  92101
                                               Telephone:  619/231-1058
16                                             619/231-7423 (fax)

17                                             Lead Counsel for Plaintiffs

18                                             ROBERT M. CHEVERIE & ASSOCIATES
                                               GREGORY S. CAMPORA
19                                             Commerce Center One
                                               333 E. River Drive, Suite 101
20                                             East Hartford, CT  06108
                                               Telephone:  860/290-9610
21                                             860/290-9611 (fax)

22                                             HOLZER HOLZER & FISTEL, LLC
                                               MICHAEL I. FISTEL, JR.
23                                             200 Ashford Center North, Suite 300
                                               Atlanta, GA  30338
24                                             Telephone:  770/392-0090
                                               770/392-0029 (fax)

25

26

27

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-
02448-EMC                                                                    - 57 -

1

2          DYER & BERENS LLP
           ROBERT J. DYER III
3          JEFFREY A. BERENS
           303 East 17th Avenue, Suite 300
4          Denver, CO  80203
           Telephone:  303/861-1764
5          303/395-0393 (fax)

6          Additional Counsel for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - C11-02448-EMC                                                                      - 58 -

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on March 1, 2013, I authorized the electronic filing of the foregoing with

3  the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5  caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6  CM/ECF participants indicated on the attached Manual Notice List.

7      I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on March 1, 2013.

9

10
           s/ Shawn A. Williams
          SHAWN A. WILLIAMS

11
          ROBBINS GELLER RUDMAN
            & DOWD LLP

12
          Post Montgomery Center

13
          One Montgomery Street, Suite 1800
          San Francisco, CA  94104

14
          Telephone:  415/288-4545
          415/288-4534 (fax)

15
          E-mail:  shawnw@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:11-cv-02448-EMC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Gidon M. Caine**
  gidon.caine@alston.com,joe.tully@alston.com,kathy.kirk@alston.com,chuck.mattson@alston.com

- **Jessica Perry Corley**
  jessica.corley@alston.com

- **Michael I. Fistel , Jr**
  mfistel@holzerlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,davide@johnsonandweaver.com,brettw@johnsonandweaver.com,shawnf@johnsonandw

- **Julie A. Kearns**
  jkearns@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Tina Mehr**
  tina.mehr@alston.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Mark Punzalan**
  markp@punzalanlaw.com,office@punzalanlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **Sunny September Sarkis**
  Ssarkis@rgrdlaw.com

- **Andrew Townsend Sumner**
  andy.sumner@alston.com

- **Joseph G Tully**
  joe.tully@alston.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,erinj@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Robert            J. Dyer                        , III
Dyer & Berens LLP
303 East 17th Avenue, Suite 300
Denver, CO 80203
```