UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS WESTLEY, *et al.*, | No. C-11-2448 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT** |
| OCLARO, INC., *et al.*, | |
| Defendants. | **(Docket No. 130)** |
| _____/ | |

Plaintiffs have filed a class action securities case against Defendants Oclaro, Inc. and two of its officers, Alain Couder (President, CEO, and director) and Jerry Turin (CFO). Currently pending before the Court is Defendants' motion to dismiss the third amended complaint ("TAC"). Defendants' motion seeks dismissal of only those claims based on alleged misrepresentations made in July and August 2010. A prior ruling of the Court deemed Plaintiffs' claims based on alleged misrepresentations in May and June 2010 viable for purposes of Federal Rule of Civil Procedure 12(b)(6). *See* Docket No. 107 (order granting in part and denying in part Plaintiffs' motion for reconsideration).

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.

## I. FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs initiated this securities action in May 2011. *See* Docket No. 1 (complaint). In October 2011, after the Court appointed a lead plaintiff, Plaintiffs filed a first amended complaint ("FAC"). *See* Docket No. 39 (FAC). In March 2012, the Court granted Defendants' motion to

dismiss the FAC on the basis that Plaintiffs had failed to adequately plead falsity. The dismissal was without prejudice, and Plaintiffs were given leave to amend. *See* Docket No. 58 (order).

Plaintiffs thereafter filed a second amended complaint ("SAC"), *see* Docket No. 62 (SAC), which Defendants challenged with another motion to dismiss. In September 2012, the Court granted Defendants' motion. *See* Docket No. 79 (order). As to the alleged misrepresentations made in July and August 2010, the Court concluded that Plaintiffs had adequately alleged falsity – *i.e.*, a reasonable jury could find falsity based on the allegations in the SAC. *See* Docket No. 79 (Order at 13) (but also noting that a reasonable jury could *decline* to find falsity based on the allegations in the SAC; stating, *e.g.*, that "[t]he general nature of the allegedly false statements makes this a less than compelling case" and that "a reasonable jury could find that statements about 85-90% coverage were not misleading because the fact of such coverage at the time was true"). The Court also held that Plaintiffs had adequately alleged loss causation, *see* Docket No. 79 (Order at 32-34), and that it could not make any ruling as a matter of law that the alleged misrepresentations were protected by the safe harbor provision in the Private Securities Litigation Reform Act ("PSLRA") or the bespeaks caution doctrine. *See* Docket No. 79 (Order at 18-20).

Nevertheless, the Court still dismissed the claims based on the alleged misrepresentations in July and August 2010 on the ground that Plaintiffs had failed to adequately allege scienter. Plaintiffs' allegations of scienter were predicated largely on a confidential witness, FE1. The Court ruled that "some of FE1's assertions of knowledge [on] the part of Defendants are wholly conclusory." Docket No. 79 (Order at 28) (emphasis omitted). The Court also held that Plaintiffs had failed to establish a strong inference of scienter because:

> Plaintiffs have essentially assumed that the individual defendants were experienced in the industry by virtue of their position alone. While it is a fair inference that an executive would know of certain facts related to a company, *e.g.*, a major loss to the company . . . , it is not clear that an executive would necessarily know details such as precisely how far out in advance Oclaro knew of customer needs. Second, while Defendants' statements about good customer visibility were misleading – at least a reasonable jury could so find based on the allegations in the SAC – they were not so dramatically misleading or outright false that the only reasonable inference is that Defendants must have possessed the requisite intent in making them. The statements were somewhat general and, if they were misleading, they were not starkly so. Given the generality and fluidity of the statements

2

> regarding visibility, a strong inference of scienter requires more specific allegations than made herein. Finally, it is notable that there does not appear to be any motive for Defendants to make the false or misleading statements about good customer visibility. By this point in time, the May 2010 stock offering had already been completed. Furthermore, as Defendants point out, there is no allegation or evidence of any suspicious insider trading by the individual defendants.

Docket No. 78 (Order at 29).

The Court gave Plaintiffs leave to amend their complaint to address the deficiency regarding scienter, and thus Plaintiffs filed a TAC. For purposes of the pending motion, the relevant allegations in the TAC are as follows.

A.  <u>Defendants</u>

Oclaro is a company that is headquartered in San Jose, California. *See* TAC ¶ 22. It "manufactures and distributes optical network components, modules and subsystems to the global telecommunications market." TAC ¶ 22. "Oclaro depends on a limited number of customers for a significant percentage of its revenues. For example, in the fiscal years ended July 2, 2011, July 3, 2010, and June 27, 2009, its three largest customers accounted for 36%, 29% and 38% of total Company revenues respectively." TAC ¶ 31.

During the relevant period, Mr. Couder was Oclaro's President and CEO, as well as a Board director. He has held these positions since August 2007. *See* TAC ¶ 23. Before working at Oclaro, Mr. Couder was the CEO and President of Bookham (which eventually merged with Avanex and was renamed Oclaro). Mr. Couder has also served as CEO and President of numerous other technology companies since 2002. *See* TAC ¶ 24; *see also* TAC ¶ 25. Mr. Couder claims on his "LinkedIn" page that he has industry expertise in optical components. He also asserts that he is an "'Active Chairman and CEO of Oclaro which he built through M&A.'" TAC ¶ 24.

During the relevant period, Mr. Turin was Oclaro's CFO. He has held this position since July 2008. *See* TAC ¶ 26. Prior to that date, Mr. Turin was Oclaro's VP of Finance and then its Corporate Controller. *See* TAC ¶ 26. Before working at Oclaro, Mr. Turin was CFO for Bookham (which, as noted above, merged with Avanex to become Oclaro). *See* TAC ¶ 27. While at Bookham, Mr. Turin claimed to have had more than 20 years of combined accounting and corporate

finance experience in the technology industry. *See* TAC ¶ 27. In his "LinkedIn" page, Mr. Turin claims responsibility for "[r]oll[ing] out the Oclaro story to the investor community" and "[r]ais[ing] $75M in a 2010 secondary offering, conducted as a "re-branding" of Oclaro.'" TAC ¶ 28.

B.  July 2010 Statements

On July 29, 2010, Oclaro issued a press release announcing its 4Q10 and FY10 financial results. Oclaro also reported accelerated and increasing financial forecasts for 1Q11 and CY10. *See* TAC ¶¶ 1, 10, 60-61.

On July 29, 2010, Oclaro hosted a conference call with analysts and investors to discuss the 4Q10 and FY10 financial results. *See* TAC ¶ 62. During the call, Mr. Turin asserted that Oclaro was continuing to experience "'strong demand'" for its products. TAC ¶ 62; *see also* TAC ¶ 13.

During the call, Mr. Turin also reiterated the accelerated and increasing forecast for 1Q11. *See* TAC ¶ 64.

Finally, during the call, Mr. Turin claimed that Oclaro had already secured "'between 85% and 90%' of orders needed to meet [its] 1Q11 outlook" and that "these strong order figures represented end-user demand rather than customers stocking up on inventory." TAC ¶ 13; (emphasis omitted); *see also* TAC ¶¶ 66-67.

C.  August 2010 Statements

Subsequently, on August 11, 2010, at the Morgan Keegan Technology Conference, Mr. Turin reiterated that customer demand remained strong across all of Oclaro's products and that Oclaro had already secured 90% of orders needed to meet its 1Q11 outlook. Mr. Turin also noted that Oclaro was very close to its customers so that it had good visibility into their needs. *See* TAC ¶ 14; *see also* TAC ¶¶ 29, 82-83. This assurance was given not only to inspire confidence as to *future* orders but also to "quell investor concerns that orders *already* placed and included in [the 90%] 'order coverage' were not double orders or at risk of cancellation." TAC ¶ 14 (emphasis added); *see also* TAC ¶ 29 (noting that claims of good visibility were relevant to not only "the strength of *present* orders, meaning little risk of inventory stockpiling or cancellations, but [also] the Company's outlook from a demand perspective as well") (emphasis in original); TAC ¶ 1 (alleging that Defendants "boast[ed]" that close customer relationships "provided them with knowledge of

4

existing order firmness (*i.e.*, *not* double order or order at risk of cancellation) as well as future customer needs") (emphasis in original).

D.  False Statements

According to Plaintiffs, the above statements in July and August 2010 can be grouped into three different categories:

(1)  Claims of continued strong customer demand;

(2)  Claims that the 85-90% order coverage for 1Q11 did not include double orders, customer inventory hoarding, or orders at risk of cancellation (which was known to Defendants because of the close customer relationships); and

(3)  Claims of accelerated and increasing guidance for 1Q11 and CY10.

*See* TAC ¶ 84.

According to Plaintiffs, each of the above claims was predicated on Defendants' professed good visibility into customer needs, but this assertion of good visibility was not substantiated, thus rendering the claims false and misleading as well. That Defendants lacked good visibility into customer demand is supported by allegations that:

• Per a confidential source (FE1), customers were often reluctant to provide detailed information about their own demands so that suppliers such as Oclaro would not dedicate manufacturing capacity to other customers' needs. *See* TAC ¶¶ 84(e), (g).

• Per a confidential source (FE1), at best, Defendants only had good visibility into customer demand for about two weeks forward. Thirty days out was "'a reach,'" and anything beyond that was "'a crap shoot.'" TAC ¶ 84(i).

Plaintiffs also maintain that the above claims were false and misleading because they overstated the strength of the customer demand – *i.e.*, the demand was not "true" demand. *See* Opp'n at 3; *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (noting that defendants did not have an affirmative duty to disclose stop-work orders but, "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of"). In support of this falsity theory, Plaintiffs largely rely on a second confidential source (FE2).

1 • Per the confidential source (FE2), the phrase "order coverage" was used internally to describe a combination of actual purchase orders and "blanket orders." Blanket orders were not actual firm orders but rather represented customer commitments to place actual orders over a certain time span (12 to 18 months). (Blanket orders were submitted for the purpose of securing beneficial pricing from Oclaro.) Thus, blanket orders were susceptible to cancellations and/or push-outs. *See* TAC ¶¶ 84(k)-(l).

## II. DISCUSSION

A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

Because the instant case is a securities fraud complaint, there are additional pleading requirements under the Private Securities Litigation Reform Act ("PSLRA"). Notably, the PSLRA expressly provides that a complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind [*i.e.*, intentionally or with deliberate recklessness]." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

> In determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences. Thus, [t]he strength of an inference cannot be decided in a vacuum and a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. Under the proper analysis, [a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.

United States District Court
For the Northern District of California

1  *VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (emphasis in original;
2  internal quotation marks omitted).
3        In the instant case, Defendants have moved for dismissal on the basis that Plaintiffs have
4  failed to adequately plead scienter.

5  B.    <u>Scienter</u>

6        The Supreme Court has instructed that, in determining whether scienter has been sufficiently
7  pled, a court must review all the allegations holistically. *See VeriFone*, 704 F.3d at 702 (citing
8  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011)). Plaintiffs' allegations in
9  support of scienter boil down to the following:

10 •    According to a confidential source (FE1), it was typically known to those experienced in the
11     industry and it was specifically known to Mr. Turin and Mr. Couder that customers were
12     often reluctant to provide detailed information about their own demands so that suppliers
13     such as Oclaro would not dedicate manufacturing capacity to other customers' needs. *See*
14     TAC ¶ 84(e), (g) & n.24; *see also* Opp'n at 8.

15 •    Mr. Couder and/or Mr. Turin were hand-on managers, *i.e.*, personally involved with
16     customer relationships. Thus, they must have known – or were deliberately reckless to the
17     fact that – there was not good visibility into customers' needs.

18 •    Defendants had a motive to make the false and misleading statements – *i.e.*, one related to
19     the May 2010 secondary offering. *See* Opp'n at 13-14.

20 •    Defendants had a tendency to issue misleading statements, which suggests that Defendants
21     had the requisite scienter. *See* Opp'n at 2-3.

22 •    If "order coverage" included blanket orders which were subject to cancellations and push-
23     outs (as FE2 claimed), that was an important fact that Defendants must have known about.
24     *See* Opp'n at 10 (putting forth a "core operations" theory).

25       For the reasons discussed below, there are significant problems with many of these
26 allegations of scienter. The Court emphasizes that, while it addresses these allegations individually,
27 it is cognizant of the duty to conduct a holistic analysis of Plaintiffs' scienter allegations. The flaws
28 of the various allegations must be exposed as a part of the Court's holistic analysis.

1. **FE1**

As to FE1, there are in essence no new allegations. Plaintiffs have simply added more allegations about the individual defendants' experience, which they argue have bearing on FE1's statements.

As noted above, FE1 stated that it was typically known to those experienced in the industry and it was specifically known to Mr. Turin and Mr. Couder that customers were often reluctant to provide detailed information about their own demands so that suppliers such as Oclaro would not dedicate manufacturing capacity to other customers' needs. *See* TAC ¶ 84(e), (g) & n.24; *see also* Opp'n at 8.

What was typically known to those experienced in the industry does give some, albeit limited, support to Plaintiffs' assertion of scienter.[1] But with respect to FE1's claim that it was specifically known to Mr. Turin and Mr. Couder that customers were often reluctant to disclose details, FE1 does not identify the specific basis of this claim is.[2] This claim remains conclusory.[3]

According to Plaintiffs, "[t]he fact that FE1 stated these industry nuances were known to defendants Couder and Turin is *corroborated* by Turin's own statement that customers were not placing inflated orders to 'hedge their bets.'" TAC ¶ 84(e) (emphasis added). But this contention makes little sense. Plaintiffs seem to be referring to a statement that Mr. Turin made in response to a question from an analyst during the August 2010 Morgan Keegan conference. An analyst asked Mr. Turin what gave him confidence that Oclaro's order strength reflected "'more than double ordering

---

[1] As noted above, the Court acknowledges that Plaintiffs have added to their TAC allegations about Mr. Couder and Mr. Turin's actual experience (*e.g.*, in the technology industry generally and at Oclaro or its predecessor specifically).

[2] The fact that FE1 is a former Oclaro Executive VP of Sales who worked at the company between 2007 and 2011, who was responsible for the sales of all Oclaro's products and held the highest-ranking sales position at the company during the class period, and who reported directly to Mr. Couder, *see* TAC ¶ 38(a), does nothing to establish the basis of FE1's claim that Mr. Turin and Mr. Couder had specific knowledge – at least absent additional facts.

[3] Similarly, to the extent FE1 suggests that Defendants had specific knowledge that they only had good visibility into customer demand for about two weeks forward (and not anything beyond that), *see* TAC ¶ 84(i) (noting that thirty days out was a reach; beyond that, it was a crap shoot), there are no specific allegations to establish the basis of FE1's claim that Defendants had such knowledge.

1 and an inventory refresh.'" TAC ¶ 82. In response, Mr. Turin noted that Oclaro had a book-to-bill
2 ratio of 1.3 back in March 2010: "'The fact that we didn't see 1.3 [*i.e.*, again] in June [2010] tells me
3 that there were not in an irrational order sense where people are just throwing orders at everything in
4 order to double order and hedge their bets.'" TAC ¶ 83. All that this statement reflects is that Mr.
5 Turin was claiming that the customer orders represented true demand, and not, *e.g.*, inventory
6 hoarding, and that this claim was based on book-to-bill ratios in March and June 2010. It says
7 nothing about Mr. Turin's knowledge that customers were reluctant to disclose details about their
8 needs to Oclaro.

9 As a final point, the Court notes that, to the extent Plaintiffs claim that the Court previously
10 "found that . . . plaintiffs had adequately alleged defendants knew close relationships did not
11 translate into knowledge of customer order strength," *see* Opp'n at 8, that is not correct. All that the
12 Court said in its prior order was that, "[w]hile it is a fair inference that an executive would know of
13 certain facts related to a company, *e.g.*, a major loss to the company, it is not clear than an executive
14 would necessarily know details such as precisely how far out in advance Oclaro knew of customer
15 needs." Docket No. 79 (Order at 29).

### 2. Hands-on Managers

17 As Plaintiffs maintain, Ninth Circuit case law indicates that, where an individual defendant is
18 a hands-on manager, that fact weighs in favor of scienter – at least where there are detailed or
19 specific allegations supporting the claim. *See, e.g.*, *VeriFone*, 704 F.3d at 710 (noting that "the
20 complaint alleges in detail that [the individual defendants] were hands-on managers with respect to
21 operational details and financial statements, and that they would have been aware of the
22 complications associated with the Lipman merger"); *In re Daou Sys., Inc. Secs. Litig.*, 411 F.3d
23 1006, 1022 (9th Cir. 2005) (stating that "[g]eneral allegations of defendants' 'hands-on'
24 management style . . . are not sufficient" but adding that "specific admissions from top executives
25 that they are involved in every detail of the company and that they monitored portions of the
26 company's database are factors in favor of inferring scienter in light of improper accounting
27 reports"); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir.
28 2004) (noting that individual defendant admitted, "'I love getting involved in every detail of the

9

1 business,'" and adding that "[it] is reasonable to infer that the Oracle executives' detail-oriented
2 management style led them to become aware of the allegedly improper revenue recognition of such
3 significant magnitude that the company would have missed its quarterly earnings projection but for
4 the adjustments").

5 But there are no allegations in the TAC supporting Mr. Turin being a hands-on manager. At
6 best, there are only allegations with respect to Mr. Couder. With respect to the allegations relating
7 to Mr. Couder, they are not particularly strong. For example, Plaintiffs suggest that Mr. Couder was
8 a hands-on manager because, in his LinkedIn page, he asserts that he is an "'Active Chairman and
9 CEO of Oclaro which he built through M&A.'" TAC ¶ 24. But an active executive is hardly the
10 same thing as a hands-on executive who is immersed in the details for forecasting customer demand.

11 Plaintiffs also seem to claim that Mr. Couder was hands-on because he had direct
12 communications with customers. For example, during the July 2010 conference call with analysts
13 and investors, Mr. Couder noted that, after the Mintera acquisition, "'we had several customers – I
14 got 15 e-mail back from customer [sic], this was great because they like the Mintera technology and
15 they want to work with us.'" TAC ¶ 68. That Mr. Couder received communications from customers
16 about a significant acquisition (a one time event) does not necessarily mean that he was hands-on on
17 a regular basis, particularly with respect to forecasting customer sales.

18 Of course, the fact that Mr. Couder got direct communications from customers does suggest
19 that he had at least some personal involvement in customer relationships. And one might infer that
20 the more personally involved he was with customer relationships, then the more likely he should
21 have known that, *e.g.*, customers were not very forthcoming with Oclaro about their needs. But the
22 singular comment about receiving emails on this one occasion does not establish he regularly
23 communicated with customers. On balance, the Court finds that the allegations in ¶ 68 of the TAC
24 do give some weight to Plaintiffs' argument of scienter – at least as to Mr. Couder – but the
25 allegations reveal little or nothing about the *scope and regularity* of Mr. Couder's personal
26 involvement in customer relationships and knowledge of sales forecasting.

27
28

### 3. Motive

In their opposition brief, Plaintiffs note that motive is not required to allege scienter but add that, in this case, there was in fact a motive for the allegedly false and misleading statements made by Defendants. *See* Opp'n at 13-14. According to Plaintiffs, the motive for the allegedly false and misleading statements was related to the May 2010 secondary offering (which was done so that Oclaro could get cash to acquire Mintera and to make a strategic alliance with ClariPhy). *See* Docket No. 79 (Order at 21). But while it makes sense that Defendants made the allegedly false statements in May 2010 prior to the secondary offering (*i.e.*, in order to secure the cash), it is not clear why Defendants had a motive to make the allegedly false statements in July and August 2010 *after* the secondary offering. Indeed, the TAC as pled refers to the May 2010 secondary offering as a motive for the May 2010 statements and even the June 2010 statements, but *not* the July and August 2010 statements. *See* TAC ¶ 36 (stating that the motive allegations "persist . . . until defendants made a partial corrective disclosure on July 29, 2010").

At the hearing, Plaintiffs tried to argue that the improper motive persisted into July and August 2010 but they have failed to provide any real explanation as to why. Plaintiffs suggested that, because Defendants were making the same kind of misrepresentations in July and August 2010 as they had in May 2010 (*i.e.*, that there was strong customer demand), there is a basis for the improper motive to persist, but this makes little sense. If the improper motive in May 2010 was to enable a successful stock offering, it does not make sense for that particular motive to continue once the stock offering was completed. At most, the prior improper motive might give rise to some kind of character-type inference – *i.e.*, that because Defendants had knowingly lied in the past, they were prone to knowingly lie again in the future, but such evidence has little probative value and is likely not admissible to prove such. *See* Fed. R. Evid. 404(b).

### 4. Tendency to Make Misstatements

According to Plaintiffs, scienter may also be inferred because Defendants had a tendency to issue misleading statements. *See* Opp'n at 2. Similar to above, this is akin to a character evidence argument which is of doubtful admissibility. In any event, Plaintiffs point to only one example – *i.e.*, where Mr. Couder stated in an interview published on June 15, 2010, that Defendants had not

11

seen any slowing down of 40Gpbs. According to Plaintiffs, this was not true, as evidenced by a statement from his "direct report Executive Vice President of Sales Scott Parker in late July 2010, when Parker publicly 'conceded that the 40G space has been soft for a few quarters.'" Opp'n at 2-3; *see also* TAC ¶¶ 55, 59.

5.  FE2

Since the Court's prior dismissal of the claims based on the July and August statements, Plaintiffs have in the TAC added allegations regarding a new informant, FE2. Plaintiffs contend that scienter may be inferred based on the information provided by FE2.

FE2 is a former Oclaro Senior Manager of Product Marketing in the company's laser diode business from June 2009 to July 2011. As part of his/her duties and responsibilities, FE2 participated in monthly forecasting meetings which covered the entire Oclaro product suite. *See* TAC ¶ 38(b). At times, Mr. Couder attended these meetings. *See* TAC ¶ 84(j). FE2 does not assert Mr. Turin attended these meetings.

According to FE2, Oclaro had "bullishness" in July 2010 because it had secured "blanket orders" from customers – but blanket orders were not actual firm orders but rather represented customer commitments to place actual orders over a certain time span (12 to 18 months). Blanket orders were submitted for the purpose of securing beneficial pricing from Oclaro. They were susceptible to cancellations and/or push-outs. FE2 maintains that "[o]rder coverage" was internally used in Oclaro to describe some combination of blanket orders and actual purchase orders. *See* TAC ¶¶ 84(k)-(l). Thus, according to Plaintiffs, when Mr. Turin referred to order coverage of 85-90% (*i.e.*, to meet 1Q11 projections) in July and August 2010, that was misleading because there was an inadequate disclosure that this included "non-firm" orders that were susceptible to cancellations and/or push-outs.

Defendants criticize Plaintiffs' reliance on FE2 on the ground that the TAC "does not describe FE2 with sufficient particularity to support the probability that he or she possesses knowledge of the information alleged." Mot. at 8. Defendants are correct that, under Ninth Circuit law, a confidential witness must be "described with sufficient particularity to establish [his or her] reliability and personal knowledge" – *i.e.*, "'with sufficient particularity to support the probability

12

that a person in the position occupied by the source would possess the information alleged.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). However, the Court rejects Defendants' contention that there are insufficient allegations to show that FE2 had personal knowledge of what "blanket orders" are, what "order coverage" is, and why Oclaro had a sense of bullishness in July 2010. The fact that FE2 was a Senior Manager of Product Marketing and participated in forecasting meetings is sufficient. Defendants argue that there are no allegations that the meetings involved or included discussions regarding customer orders, *see* Mot. at 8, but given that the meetings were forecasting meetings, that seems to be a fair inference.

Defendants assert that, nevertheless, even if there is no issue regarding *FE2*'s personal knowledge, there is no basis for FE2 to opine on what *Defendants* knew or recklessly disregarded. Defendants note, for example, that the forecasting meetings attended by FE2 were not attended by Mr. Turin at all and were only attended at times by Mr. Couder. *See* Mot. at 8; *see also* TAC ¶ 84(j). The Court agrees that this fact is problematic. While Plaintiffs do allege that "FE2 stated that the phrase 'order coverage' was internally used to describe some combination of blanket orders and actual purchase orders," TAC ¶ 84(k), there is no indication from FE2 that "order coverage" was always or consistently used within the company in a particular way.

Moreover, Plaintiffs' reliance on FE2 is deficient in other aspects. For instance, while FE2 stated that "order coverage" was used to describe some combination of blanket order and actual purchase orders, there is no information as to what that breakdown has been as a historical matter. If blanket orders typically made up, *e.g.*, 75% of the "order coverage," then Mr. Turin's omission of that fact is more indicative of scienter because that fact has great significance. *Cf. Zucco*, 552 F.3d at 1001 (noting that "reporting false information will only be indicative of scienter where the falsity is patently obvious"). On the other hand, if blanket orders made up a small percentage of the "order coverage," then Mr. Turin's omission of the fact is not particularly misleading and consequently there would be a very limited inference of scienter, if any.

Equally (if not more) important, FE2 says nothing about the reliability of blanket orders as a historical matter – *i.e.*, how often do blanket orders not result in firm orders? Do forecasts which rely in part on blanket orders consistently overstate actual orders? If not, then it would not have

13

1 been materially misleading for Mr. Turin to refer to order coverage without disclosing the fact that
2 blanket orders are included therein. This would negate the inference of scienter.

### 6. Holistic Analysis

The Court reiterates that its analysis above is not intended to eschew any holistic analysis. The analysis above establishes that there are some inferences in support of scienter but the inferences are weak and, even when those inferences are taken together collectively, the Court cannot conclude that Plaintiffs have met their burden of pleading facts that give rise to a "strong inference" of scienter, 15 U.S.C. § 78u-4(b)(2)(A). *i.e.*, that Defendants made the allegedly false statements in July and August 2010 either intentionally or with deliberate recklessness.[4] *See VeriFone*, 704 F.3d at 701.

The only issue remaining for the Court is whether to dismiss the claims based on the July/August 2010 statements with or without prejudice. In deciding this issue, the Court takes into account that this action was filed two years ago but has yet to move beyond the pleading stage and that Plaintiffs have been given multiple opportunities to amend their complaint. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987) (noting that "a district court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint'"). Also, it is doubtful whether Plaintiffs could amend to cure the deficiencies identified above. For instance, although Plaintiffs could have developed a theory of "hands-on" management through their confidential witnesses, neither witness has provided sufficient information to support that theory. Similarly, although Plaintiffs easily could have developed its "order coverage" theory through FE1 (and not just FE2), FE1 did not provide such information. Moreover, more specific information could also have been provided by FE2 but was not.

---

[4] Because Plaintiffs have not made out a plausible showing of scienter, the Court need not address Defendants' contention that there is an alternative plausible explanation that points to no liability.

14

1   The Court, therefore, in the exercise of its discretion dismisses the claims based on July and
2   August 2010 statements with prejudice. *See id.*

### C.  Mr. Haynes

Finally, Defendants ask that James Haynes, another officer of Oclaro, be dismissed from this case with prejudice. Mr. Haynes was named in the original complaint filed with the Court but was subsequently dropped in all amended complaints. Nearly two years ago, the parties stipulated to the filing of the first amended complaint, which was the first complaint not to include Mr. Haynes. Docket No. 16 (stipulation and order, filed on July 1, 2011).

Plaintiffs contend that a dismissal with prejudice at this time should be denied because, "[a]lthough Mr. Haynes is not currently named as a defendant in the TAC, he may again be added as a defendant in this matter should it become necessary and appropriate in light of the facts and evidence." Opp'n at 14 n.8. Plaintiffs, however, fail to respond to Defendants' contention that, under Ninth Circuit law, Plaintiffs have abandoned the claim against Mr. Haynes such that a dismissal with prejudice is in fact proper.

The main case on which Defendants rely is *Chubb Custom Insurance Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013). There, the Ninth Circuit noted that noting that the plaintiff had "originally brought a claim for equitable indemnity, which the district court dismissed with *leave to amend*[;] [b]ecause [plaintiff] did not voluntarily renew these claims, however, it has effectively abandoned them." *Id.* at 973 n.14 (emphasis in original). In support of this statement, the court cited an earlier Ninth Circuit case, *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012). In *Lacey*, the Ninth Circuit stated: "For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. *But for any claims voluntarily dismissed*, we will consider those claims to be waived if not repled." *Id.* at 928 (emphasis added). Notably, the *Lacey* court cited approvingly a Fourth Circuit case, *Young v. City of Mt. Ranier*, 238 F.3d 567 (4th Cir. 2001). There, the Fourth Circuit held that the plaintiffs *could* challenge on appeal the dismissal of their claims against a particular defendant in spite of their failure to re-allege claims against him in the amended complaint because the claims against the defendant had been dismissed without leave to amend. However, the Fourth

Circuit went on to note that the plaintiffs had waived or abandoned their claims against *other* officers. As to these officers, the district court had not made any ruling on the merits, and so the claims against these officers remained viable. The plaintiffs' subsequent failure to include claims against these officers in the amended complaint were thus deemed waived or abandoned. *See id.* at 572-73.

Under the Ninth Circuit precedent, then, Defendants' position is correct. Mr. Haynes was dismissed almost two years ago and still has not been added back into this case as part of the TAC. The claims against Mr. Haynes shall be dismissed with prejudice on the basis that Plaintiffs waived or abandoned the claims.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss. All claims based on the July/August 2010 statements are hereby dismissed with prejudice. The Court also dismisses with prejudice any and all claims against Mr. Haynes.

This order disposes of Docket No. 130.

IT IS SO ORDERED.

Dated: May 30, 2013

_____
EDWARD M. CHEN
United States District Judge